# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION

| | | |
|---|---|---|
| **BLAINE MILAM** | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. _____ |
| | § | |
| **BOBBY LUMPKIN** | § | |
| Texas Department of | § | Capital Case |
| Criminal Justice, | § | |
| Correctional Institutions Division | § | |
| Respondent. | § | |

## PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254

### *Execution date set for January 21, 2021.*

Jeremy Schepers (TX 24084578)
Supervisor, Capital Habeas Unit
Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746
214-767-2286 (fax)
Jeremy_Schepers@fd.org

Jennae R. Swiergula (TX 24104466)
Texas Defender Service
1023 Springdale Road #14E
Austin, TX 78721
512-320-8300
512-477-2153 (fax)
jswiergula@texasdefender.org

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................i

APPENDIX IN SUPPORT ............................................................ii

TABLE OF AUTHORITIES...........................................................iii

PARTIES ...............................................................................iv

JURISDICTION AND VENUE.........................................................iv

I.    Introduction....................................................................1

II.   Procedural history...........................................................1

III.  Mr. Milam is intellectually disabled and exempt from execution
      under the Eighth Amendment..........................................7

    1.   Mr. Milam has deficits in intellectual functioning....................12

    2.   Mr. Milam has deficits in adaptive functioning. ......................15

    3.   Mr. Milam's deficits manifested during the developmental
         period.....................................................................28

    4.   Mr. Milam was exposed to risk factors linked to intellectual
         disability..................................................................30

IV.   This claim is exhausted. .................................................32

V.    Conclusion and Prayer for Relief.....................................32

# APPENDIX IN SUPPORT

Exhibit 1   Report of Edward Gripon

Exhibit 2   Affidavit of Edward Gripon

Exhibit 3   Affidavit of Juanita Bradford

Exhibit 4   Affidavit of Carolyn McIlhenny

Exhibit 5   Affidavit of Kimberly Graham

Exhibit 6   Affidavit of Milton Bennett

Exhibit 7   Affidavit of Jim Wallace

Exhibit 8   Report of Timothy Proctor

Exhibit 9   Report of Paul Andrews

Exhibit 10 Declaration of Jack Fletcher

Exhibit 10A Addendum to Declaration of Jack Fletcher

Exhibit 11 Declaration of Dale Watson

Exhibit 12 Declaration of John Gregory Olley

Exhibit 13 UTMB Health Services Archive Records

Exhibit 14 Longview Regional Medical Center Records

Exhibit 15 Apartment Application and Records

Exhibit 16 TEA Records

# TABLE OF AUTHORITIES

## Cases

*Atkins v. Virginia*, 536 U.S. 304 (2002) ...................................................3

*Ex parte Brooks*, 219 S.W.3d 396 (Tex. Crim. App. 2007) .......................8

*Ex parte Milam*, No. WR-79,322-01, 2013 WL 4856200 (Tex. Crim. App. Sept. 11, 2013) ...................................................................................3

*Ex parte Milam*, No. WR-79,322-02, 2019 WL 190209 (Tex. Crim. App. Jan. 14, 2019)............................................................................... 4, 8

*Ex parte Milam*, 2020 WL 3635921 (Tex. Crim. App. July 1, 2020) ........5

*Hall v. Florida*, 572 U.S. 701 (2014) ......................................................30

*Hall v. State*, 201 So. 3d 628 (Fla. S. Ct. 2016) .....................................29

*Milam v. Davis*, 139 S. Ct. 335 (2018) .....................................................4

*Milam v. Davis*, 733 F. App'x 781 (5th Cir. 2018) ...................................3

*Milam v. Director*, No. 4:13-cv-00545 (E.D. Tex. Oct. 14, 2014) .............3

*Milam v. Director*, No. 4:13-cv-00545, 2017 WL 3537272 (E.D. Tex. Aug. 16, 2017).................................................................................................3

*Milam v. State*, No. AP-76,379, 2012 WL 1868458 (Tex. Crim. App. May 23, 2012).................................................................................................2

*Moore v. Texas*, 137 S. Ct. 1039 (2017) .......................................... *passim*

*Moore v. Texas*, 139 S. Ct. 666 (2019) ......................................................1

*Morris v. Dretke*, 413 F.3d 484 (5th Cir. 2005).....................................32

## Statutes

Tex. Code Crim. Proc. art. 11.071.......................................................5, 7

## Other Authorities

American Association on Intellectual and Developmental Disorders, 11th Edition ("AAIDD-11")........................................................ *passim*

Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-5") ............................................................................... 15, 17, 28

## PARTIES

Petitioner Blaine Milam is an inmate of the Texas Department of Criminal Justice ("TDCJ"). Mr. Milam's TDCJ number is 999558 and he is housed at the Polunsky Unit, in Livingston, Texas.

Respondent Bobby Lumpkin is the Director of TDCJ's Correctional Institutions Division and an agent of the State that has custody of Mr. Milam. The Director has custody pursuant to the judgment and sentence of death entered against Mr. Milam on May 27, 2010, in *State v. Milam,* No. CR09-066.

## JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 2241(a), and 2254(a).[1] Mr. Milam's trial was held in Montgomery County, Texas. Venue is proper in the United States District Court for the Southern District of Texas under 28 U.S.C. § 2241(d) because it is the court for the district within which Mr. Milam was convicted and sentenced.

---

[1] Concurrently with this Petition, Mr. Milam has filed a Memorandum of Law in Support of Authority to Review.

## I.    Introduction.

The State of Texas does not have the power to execute Mr. Milam because he is intellectually disabled. *Moore v. Texas*, 137 S. Ct. 1039 (2017). Applying the criteria reflected in the medical community's consensus, three of the four experts who have been asked to evaluate if Mr. Milam meets all three prongs of intellectual disability—including an expert retained by the State—have concluded that Mr. Milam is intellectually disabled. 53 RR 239; Ex. 10, Declaration of Jack Fletcher ("Fletcher Dec.") at 9; Ex. 2, Affidavit of Edward Gripon ("Gripon Aff.") ¶ 7. Because Mr. Milam meets the "three core elements" of an intellectual disability diagnosis, he is within the class of persons whose execution is prohibited by the Eighth Amendment. *Moore v. Texas*, 139 S. Ct. 666, 672 (2019); *Moore*, 137 S. Ct. at 1041.

## II.    Procedural history.

Mr. Milam was found guilty of capital murder and sentenced to death on May 27, 2010, in the 4th District Court of Rusk County. 56 RR 180. At sentencing, Mr. Milam alleged that he is intellectually disabled and therefore categorically ineligible to receive the death penalty. The State urged the jury to rely on evidence relevant under Texas's then-

standard in its evaluation of the intellectually disability special issue.[2] The jury answered that special issue negatively. 4 CR 987. The jury's determination was not challenged on direct appeal under Texas's then-prevailing Eighth Amendment standard. The Texas Court of Criminal Appeals ("CCA") affirmed the conviction and sentence of death on May 23, 2012. *Milam v. State*, No. AP-76,379, 2012 WL 1868458 (Tex. Crim. App. May 23, 2012) (unpublished).

Mr. Milam filed an Initial Application for Writ of Habeas Corpus in state court raising four claims on April 1, 2013. The Application did not

---

[2] As summarized by the Director in her Response:

> Prosecutor Lisa Tanner closed by arguing Milam was unequivocally not intellectually deficient based upon the four IQ scores- two of which indicated he was in the borderline range and two which clearly showed he was not in that range. [. . .] Regarding adaptive functioning, Tanner referred to the testimony from school teachers, friends, coworkers, and family [. . .] She reminded the jury that Milam passed a driving test, was able to find and keep employment, wrote letters from jail, read books, used computers and the internet, memorized his driver's license number and social security number, fixed cars and other machinery, did school work, played games, cared for Amora, and could carry on a conversation. 56 RR 134-36. He was also able to procure drugs by buying or trading for them and his drug transactions from the police, family, and friends. 56 RR 135. Tanner noted that many of Milam's deficits could be attributed to other factors like lack of education, laziness, and drug abuse. 56 RR 137-38. Finally Tanner cited to the lack of documentation as proof that Milam suffered no deficits prior to the age of eighteen. 56 RR 138.

ECF No. 22 at 105–06.

include a claim that Mr. Milam was categorically ineligible to be executed due to intellectual disability under Texas's Eighth Amendment standard. The CCA denied habeas relief on September 11, 2013. *Ex parte Milam*, No. WR-79,322-01, 2013 WL 4856200 (Tex. Crim. App. Sept. 11, 2013) (per curiam).

Mr. Milam filed a Petition for Writ of Habeas Corpus in the United States District Court for the Eastern District of Texas on October 14, 2014. *Milam v. Director*, No. 4:13-cv-00545 (E.D. Tex. Oct. 14, 2014). The Petition did not allege that, under *Atkins v. Virginia*, the Eighth Amendment prohibited the State from executing Mr. Milam because he is intellectually disabled. On August 16, 2017, the district court denied Mr. Milam's federal habeas petition, *Milam v. Director*, No. 4:13-cv-00545, 2017 WL 3537272, at *51 (E.D. Tex. Aug. 16, 2017), and the Court of Appeals for the Fifth Circuit denied Mr. Milam's Application for a Certificate of Appealability shortly thereafter. *Milam v. Davis*, 733 F. App'x 781 (5th Cir. 2018).

On September 11, 2018, with Mr. Milam's petition for writ of *certiorari* pending in the Supreme Court, the 4th Judicial District Court of Rusk County set an execution date of January 15, 2019. The Supreme

Court denied certiorari from Mr. Milam's federal habeas petition on October 9, 2018. *Milam v. Davis*, 139 S. Ct. 335 (2018).

On January 7, 2019, Mr. Milam filed a subsequent state habeas application alleging, *inter alia*, that he is intellectually disabled according to the medical community's diagnostic criteria and that his execution would therefore violate the Eighth Amendment under *Moore v. Texas*, 137 S. Ct. 1039 (2017). On January 14, 2019, the CCA determined that Mr. Milam's claim should receive adjudication on the merits in light of *Moore*. It stayed Mr. Milam's execution and remanded Mr. Milam's intellectual disability claim to the trial court "[b]ecause of [. . .] recent changes in the law pertaining to the issue of intellectual disability." *Ex parte Milam*, No. WR-79,322-02, 2019 WL 190209 (Tex. Crim. App. Jan. 14, 2019).

On June 3, 2019, the trial court announced in a one sentence "letter pronouncement" that it was "denying" Mr. Milam's application. SHCR Second Supp. 115. On June 12, 2019, Mr. Milam filed a motion to recuse the trial court judge on the basis that he had prejudged the merits of Mr. Milam's intellectual disability claim and denied it before affording Mr. Milam the opportunity to submit evidence and prove his claim via

statutorily mandated procedures. *See* Tex. Code Crim. Proc. art. 11.071 §§ 7–9. The presiding judge of the Tenth Administrative Region denied Mr. Milam's recusal motion on August 12, 2019. *Ex parte Milam*, Order, CR09-066 (4th Dist. Ct. Aug. 12, 2019).

Without taking any further judicial action, the trial court signed verbatim the State's proposed findings of fact and conclusions of law rejecting Mr. Milam's intellectual disability claim on October 16, 2019. SHCR Second Supp. 253–54. The CCA adopted the findings of fact and conclusions of law with slight modifications on July 1, 2020. *Ex parte Milam*, 2020 WL 3635921 (Tex. Crim. App. July 1, 2020). Those findings of fact and conclusions of law ultimately concluded that, despite its earlier authorization, Mr. Milam was not entitled to merits review of his intellectual disability allegation. Instead, the CCA concluded that its authorization of Mr. Milam's intellectual disability claim had "effectively severed the procedural claim—applying *Moore I* and *Hall*—from the substantive *Atkins* claim" and limited their application of *Moore* to a determination of whether "the errors that occurred" in *Moore* arose "in the jury's determination of the intellectual disability special issue during Applicant's trial." *Ex parte Milam*, No. CR-09-066, State's Proposed

5

Findings of Fact and Conclusions of Law, at ¶ 167, 185 (396th Dist. Ct. Oct. 16, 2019). The CCA also adopted a conclusion that its prior order authorizing Mr. Milam's intellectual disability claim under Article 11.071 § 5(a)(1) had "implicitly rejected Applicant's attempt to challenge the substance of his *Atkins* claim pursuant to the actual-innocence of the death penalty provision under Article 11.071 § 5(a)(3)." *Id.* ¶ 221. On July 31, 2020, the 4th District Court of Rusk County set an execution date for Mr. Milam of January 21, 2020.

On September 30, 2020, Mr. Milam filed in the United States Court of Appeals for the Fifth Circuit a Motion for Order Authorizing the District Court to Consider Second or Successive Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2244 ("MFA"). Mr. Milam sought to raise, for the first time in federal court, his claim that the State of Texas cannot execute him because he is intellectually disabled. On October 30, 2020, the Court of Appeals denied authorization on the ground that Mr. Milam could not establish the prior unavailability of an intellectual disability claim, whether under *Moore* or *Atkins*, in accordance with § 2244(b)(2)(A). *In re Milam*, Case No. 20-40663, Order (5th Cir. Oct. 27, 2020) ("Order") at 5–6.

6

### III.  Mr. Milam is intellectually disabled and exempt from execution under the Eighth Amendment.

After *Moore v. Texas*, both clinical and legal definitions of intellectual disability require evidence of: 1) subaverage intellectual functioning; 2) significant limitations in adaptive skills; and 3) manifestation of these symptoms in the developmental period. *Moore*, 137 S. Ct. at 1045 ("generally accepted, uncontroversial intellectual-disability diagnostic definition" identifies "three core elements," which are intellectual functioning deficits, adaptive deficits, and onset of symptoms during developmental period). Three of the four psychological experts who have been asked to evaluate Mr. Milam for all three prongs of intellectual disability—including an expert retained by the State at trial—have determined that he meets these criteria and is intellectually disabled. *See* Ex. 10, Fletcher Dec. at 9; Ex. 2, Gripon Aff. ¶ 7; 53 RR 239. Further, in its October 30 Order denying authorization, the Fifth Circuit noted that Mr. Milam had shown evidence in support of all three elements of an intellectual disability finding. Order at 6. Similarly, in remanding Mr. Milam's intellectual disability claim to the trial court under Tex. Code Crim. Proc. art. 11.071 § 5(a)(1), the CCA found that Mr. Milam had made a prima facie showing that he is intellectually disabled.

*Ex parte Milam*, No. WR-79,322-02, 2019 WL 190209 (Tex. Crim. App. Jan. 14, 2019); *see Ex parte Brooks*, 219 S.W.3d 396, 400 (Tex. Crim. App. 2007) (Texas Code of Criminal Procedure art. 11.071 § 5(a)(1) requires that an applicant must make a prima facie showing that a new legal basis applies to his claim). Although neither is dispositive, it provides substantial support for Mr. Milam carrying his burden here.

First, IQ testing administered to Mr. Milam has resulted in scores within the significantly subaverage range of intelligence on valid IQ testing. Before trial, both Dr. Paul Andrews, a defense expert, and Dr. Timothy Proctor, an expert for the State, administered the WAIS-IV, the most current version of a multifactorial IQ test, to Mr. Milam. Mr. Milam scored 71 and 68 on the tests, respectively.[3]

Additionally, Dr. Gripon, a State psychiatric expert who evaluated Mr. Milam before trial, formed the opinion that Mr. Milam "clearly has

---

[3] Further, the scoring on a third FSIQ test administered to Mr. Milam pretrial was miscalculated. Dr. Andrews administered a Stanford-Binet 5 to Mr. Milam and calculated the score as an 80. However, Dr. Andrews made an error in scoring. The correct score on the Stanford-Binet is a 78. Ex. 11, Declaration of Dale Watson ("Watson Dec.") ¶ 20. When the Flynn Correction is factored into this score, Mr. Milam's FSIQ score on the SB-5 is a 75, also in the range for intellectual disability. *Id.* ¶ 22. However, even if that score were not considered, both WAIS scores are in the range of intellectual disability and Mr. Milam meets prong 1 under *Hall* and *Moore*. *Hall*, 572 U.S. at 723; *Moore*, 137 S. Ct. at 1050.

intellectual limitations" and "does not have normal intellectual potential." Ex. 1, Report of Edward Gripon ("Gripon Report") at 14. Dr. Gripon estimated Mr. Milam's IQ "to be in the range of 65 to 70."[4] *Id.* At a minimum, based on the results of the WAIS-IV tests, this Court is required to consider the evidence of Mr. Milam's adaptive deficits. *See Moore*, 137 S. Ct. at 1048 (requiring that courts not rule out intellectual disability based on intellectual functioning where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual functioning deficits).

Second, Mr. Milam has significant deficits in his adaptive functioning. Adaptive behavior is categorized into the conceptual, social, and practical domains. This criterion is met when at least one these domains is sufficiently impaired. In this case, the only two psychologists to perform formal adaptive deficit assessments by administering rating scales and semi-structured interviews have concluded that Mr. Milam has significant adaptive deficits. Further, information from teachers,

---

[4] Dr. Gripon's report also stated he estimated Mr. Milam's "intellectual level to be in the ranges of an IQ of 65 to 75." Ex. 1, Gripon Report at 14.

friends, employers and family members who knew Mr. Milam as a child and teenager corroborate these findings.

With regard to the conceptual domain, Mr. Milam is impaired in reading, writing, speech, and math and money management. At school and at work, he often needed instructions repeated and required substantial one-on-one assistance. Ex. 3, Bradford Aff at ¶ 6. Mr. Milam also has significant deficits in the receptive language area, as evidenced by his inability to understand and follow a list of grocery items; 51 RR 274; in the expressive language area, including the use of simple words, short sentence structures, and his inability to express himself; in the area of reading and writing, apparent from poor spelling, disorganized sentences and paragraphs, and the fact that Mr. Milam's mother had to fill out his application for employment; 53 RR 207; in the area of handling money, with Mr. Milam not understanding how to use a debit card, how to budget, and a history of purchasing items he already owned; 53 RR 215; and in the area of time management, Mr. Milam did not know how to read an analog watch. 53 RR 217.

In the social domain, Mr. Milam is frequently described as being awkward, shy, and quiet. He had low self-esteem, was bullied, and, once

he reached adolescence, he did not mature at the rate of his peers. Dr. Gripon, who evaluated Mr. Milam for the State prior to trial, wrote "[i]n visiting with Blaine Milam for almost four hours, it becomes glaringly obvious that he is quite simplistic. He has very simplistic ideas, is very naïve, extremely gullible, easily led . . . ." Ex. 1, Gripon Report at 13.

Finally, with regard to the practical domain, he is deficient in his ability to conduct household tasks, such as cooking, laundry, making his bed, other household chores. He never independently sought or accessed medical resources, never had a bank account, and could not use a debit card. Dr. Gripon similarly noted significant difficulties with money concepts. Dr. Fletcher also reports, "[a]t a younger age, his self-care skills were under-developed . . ." and that "[h]e needed considerable support for any form of independent living." Ex. 11, Fletcher Dec. at 8.

Third, these deficits began before the age of 18. Mr. Milam was arrested for the underlying capital offense when he was 18. The overwhelming majority of the evidence of his intellectual disability originates from the developmental period.

### 1. Mr. Milam has deficits in intellectual functioning.

Mr. Milam has scored within the range for intellectual disability on IQ testing administered by both defense and state experts. In November 2009, Mr. Milam was administered the WAIS-IV by Dr. Andrews, a neuropsychologist retained by the defense in anticipation of trial. Mr. Milam, then aged 19, obtained a full-scale IQ score of 71.[5] Ex. 9, Report of Paul Andrews ("Andrews Report") at 4; 53 RR 200. In March 2010, Mr. Milam obtained a full-scale IQ score of 68[6] on the WAIS-IV administered by Dr. Proctor, a neuropsychologist retained by the state to conduct a forensic psychological evaluation. Ex. 8, Report of Timothy Proctor ("Proctor Report") at 15; 53 RR 202. That both WAIS scores are within the 65-75 confidence interval indicates that they are reliable scores. Ex. 11, Fletcher Dec. at 5 ("The most reliable finding and the one that should be weighted most highly in Mr. Milam's evaluation is the close proximity of the two WAIS-IV scores of 70 and 67 and the fact that both are within

---

[5] While this score is already within range for mild intellectual disability, when corrected for the Flynn Effect, the score is reduced to a 70. Ex. 19, Watson Dec. at ¶ 17.

[6] Likewise, this score is already well within range of mild intellectual disability. When corrected for the Flynn Effect, however, the score is reduced to a 67. Ex. 19, Watson Dec. ¶ 34.

the 95% confidence interval of 65-75 established for the WAIS-IV.");[7] *see also* Ex. 12, Declaration of John Gregory Olley ("Olley Dec.") ¶ 11.

In addition to the WAIS-IV, Dr. Andrews administered the Stanford-Binet 5 in December 2009, which he calculated as a full-scale IQ score of 80. Ex. 9, Andrews Report at 4; 53 RR 200. However, Dr. Andrews miscalculated the SB-5, resulting in an error in the verbal IQ and full-scale IQ score; when scored accurately, the SB-5 a full-scale IQ score of 78. Ex. 11, Watson Dec. ¶ 20. Moreover, when calculated factoring in the Flynn Correction, Mr. Milam's FSIQ score on the SB-5 is 75.[8] This score is also within the range of mild intellectual disability. Ex. 11, Watson Dec. ¶ 22.

---

[7] The IQ test scores in Dr. Fletcher's report are adjusted for the Flynn Correction.

[8] Dr. Proctor also administered the Reynolds Intellectual Achievement Scales ("RIAS"). 55 RR 141–42. Despite Dr. Proctor's characterization at trial of the RIAS as an intelligence test, 55 RR 141, the RIAS does not yield a full-scale IQ score. 53 RR 202. Instead, the RIAS is only a screening measure. *Id.* at 203; Ex. 10, Fletcher Aff. at 4 ("The RIAS was not designed to assess the full range of abilities captured by either the WAIS-IV or the Stanford-Binet-5."). Regardless, neither this score, nor the SB-5 score if evaluated without factoring in the Flynn Correction can preclude evaluation of Mr. Milam's adaptive functioning. *See Hall,* 572 U.S. at 707 (court required to evaluate evidence of adaptive functioning where "Hall had received nine IQ evaluations in 40 years, with scores ranging from 60 to 80 . . . but the sentencing court excluded the two scores below 70 for evidentiary reasons, leaving only scores between 71 and 80") (internal citations omitted).

In addition, Dr. Gripon, also an expert retained by the State to assess intellectual disability, estimated Mr. Milam's IQ to be in the range of 65 to 70 after a four-hour interview with him.[9] Ex. 1, Gripon Report at 14. Dr. Gripon concluded that it was "glaringly obvious that [Mr. Milam] is quite simplistic" and "does not have normal intellectual potential." *Id.*

Further, Mr. Milam's deficits in intellectual functioning are confirmed by a history of poor academic achievement. Although Mr. Milam's school records have been destroyed, Texas Education Agency records show that Mr. Milam was referred for special education services for speech therapy in second, third, and fourth grade. Ex. 16, TEA Records at 3. Carolyn McIlhenny, who taught Mr. Milam in the second or third grade, recalled that he "struggled with everything he did academically" and that "[h]is intellectual functioning was the lowest of the class." Ex. 4, Affidavit of Carolyn McIlhenny ("McIlhenny Aff.") ¶ 3. Similarly, Mrs. Juanita Bradford, who taught Mr. Milam in fourth grade, described him as "really slow" and that Mr. Milam had been placed in resource, the then-equivalent of special education. Ex. 3, Affidavit of Juanita Bradford ("Bradford Aff.") ¶ 4.

14

Scoring obtained from IQ testing administered by both defense and state experts—a 71 and a 68 on the WAIS-IV and a 78[10] on the SB-5—places Mr. Milam within the range for intellectual disability. These scores—all of which are valid measures—establish as a matter of law that determining whether Mr. Milam is intellectually disabled must rest on an assessment of his adaptive functioning. *Moore*, 137 S. Ct. at 1050.

### 2. Mr. Milam has deficits in adaptive functioning.

The second prong requires that the applicant show deficits in one of the three domains of adaptive functioning. Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-5") at 33. Mr. Milam's deficits span all three domains. Dr. Jack Fletcher assessed Mr. Milam's adaptive functioning. To do so, Dr. Fletcher reviewed records pertaining to the issue of Mr. Milam's overall functioning, including affidavits and testimony from former teachers, employers, friends, and his Sunday school teacher, as well as reports by Drs. Paul Andrews, Timothy Proctor, Mark Cunningham, Edward Gripon, and Dale Watson, and other social

---

[9] Dr. Gripon also estimated Mr. Milam's IQ to be in the range of 65 to 75. Ex. 1, Gripon Report at 14.

[10] Adjusted with the Flynn Effect, this score is a 75.

history records. Dr. Fletcher also administered the Vineland Scales of Adaptive Behavior-2[11] to Shirley Milam and Teresa Milam Shea. Ex. 10, Fletcher Dec. at 5.

Dr. Fletcher asked Shirley Milam to focus on the period when Mr. Milam was between the ages of 17 and 18 in his administration of the instrument to her. The result yielded "scores of 62 in the Communication domain, 66 in the Daily Living Skills domain, 74 in the Socialization domain, and an adaptive behavior composite of 65 (first percentile)." *Id.* at 7. Dr. Fletcher requested that Ms. Shea focus on the period when Mr. Milam was between 9 and 10 years old. The resulting scores were "67 for Communication, 68 for Daily Living Skills, and [. . .] 75 for Socialization, with an adaptive behavior composite of 69 (first percentile)." Ex. 10A, Addendum to Declaration of Jack Fletcher ("Fletcher Addendum"). Dr. Fletcher noted that the scores obtained separately from Mrs. Milam and Ms. Shea are consistent with each other. Further he noted, priority should be given to the composite scores—65 and 69 respectively—because

---

[11] The Vineland delivered as a semi-structured interview in order to minimize response bias. Ex. 10, Fletcher Dec. at 7.

they are the most reliable. Ex. 10, Fletcher Dec. at 7; Ex. 10A Fletcher Addendum.

At trial, Dr. Cunningham also conducted a formal assessment of Mr. Milam's adaptive functioning and concluded that he exhibited "substantial" deficits across all domains. 53 RR 262. Dr. Fletcher noted the consistency of the results he obtained with those obtained by Dr. Cunningham from the only other formal assessment of Mr. Milam's adaptive functioning. Ex. 10, Fletcher Dec. at 6. Based on his review of historical social records; witness statements from teachers, childhood friends, former coworkers, and family members; and his administration of the Vineland, Dr. Fletcher formed the opinion that Mr. Milam had significant limitations in adaptive functioning during the developmental period. *Id.* at 7.

### i. *Conceptual skills*

The conceptual domain includes language, reading and writing, arithmetic, as well as planning and time. DSM-5 at 37; American Association on Intellectual and Developmental Disorders, 11th Edition ("AAIDD-11") at 45. Both Dr. Cunningham and Dr. Fletcher concluded Mr. Milam possessed significant deficits in this domain. *See* Ex. 10,

17

Fletcher Dec. at 10. Mr. Milam struggled with receptive language—the ability to understand what was being said—and expressive language—the vocabulary that he used and being able to pronounce and articulate words. 51 RR 206–07.

At school, Mr. Milam struggled to understand instructions. Even after exercises were modified to his academic limitations, he still did not understand. Ex. 3, Bradford Aff. ¶ 6 ("Blaine often seemed confused by instructions and required a lot of one on one attention."); Ex. 4, McIlhenny Aff. ¶ 3 ("Blaine struggled with everything he did academically and required significant one-on-one attention. I had to modify instructions and adapt exercises to his academic limitations. Blaine often did not understand what was going on in class."). Teachers described him as "slow." 51 RR 14, 33; Ex. 3, Bradford Aff. ¶ 4 ("Blaine was a really slow student."). Carol McIlhenny states that "[h]is intellectual functioning was the lowest of the class." Ex. 4, McIlhenny Aff. ¶ 3; *see also* Ex. 10, Fletcher Dec. at 6.

He similarly needed instructions repeated at work. He often needed to be shown how to do something, rather than instructed verbally. Even

then, demonstrations sometimes had to be repeated. According to Milton

Bennett,

> When Blaine was a young teenager, I hired him to help me with small projects around the land, like raking leaves, hauling trash, and small building repairs. We worked side by side and I always supervised what Blaine was doing. When I showed Blaine how to something, he would not remember how to do it the next time, and I had to show him again. For example, I had to show Blaine how to read a tape measurer and make a small mark with a pencil on a board to be cut. However, I would have to show him how to read the tape measure again the next time I asked him to do it

Ex. 6, Affidavit of Milton Bennett ("Bennett Aff.") ¶ 5.

Jim Wallace supervised Mr. Milam at Nichols Marine, where he

was hired to wash and vacuum boats, check them for marks and

scratches, and sweep and empty the shop. According to Mr. Wallace,

"Blaine could not complete a task as instructed. If he washed the outside

of a boat, he would not vacuum the inside. I would have to check every

boat Blaine washed and had to tell him to go back and do something

again." Ex. 7, Affidavit of James Wallace ("Wallace Aff.") ¶ 5.

Additionally, "he could not complete a task independently and required

a lot of supervision." *Id.* ¶ 6*; see also* Ex. 10, Fletcher Dec at 8.

Gary Jenkins supervised Mr. Milam at Big 5 Tire. He testified that

when Mr. Milam first started, Mr. Jenkins had to show him what to do,

not just tell him, even though Mr. Milam had been working on cars for years. 54 RR 285–86.

Mr. Milam also had difficulty with reading and writing. Dr. Gripon found that "[h]is primary adaptive deficit is writing." Ex. 1, Gripon Report at 15. Mr. Milam's vocabulary development was limited; he used simple words and short sentence structures; and it was difficult to understand what he was attempting to express. 53 RR 213. Mr. Milam struggled with reading, got mixed up about sequences and characters, and his spelling was poor. *Id.* at 214. Dr. Gripon concluded, "Blaine Milam has serious limitations in his ability to read and write. I/We asked him to write a sentence and he did print a short sentence. It was not grammatically correct and some of the words that should have ended in "ing" did not." Ex. 1, Gripon Report at 3 (referring to interview conducted along with Dr. Timothy Proctor). Dr. Cunningham and Dr. Proctor both tested his spelling and obtained a score of a 77, which is in the deficient range. 53 RR 214. Dr. Fletcher reports, "Ms. Shea, who worked with him closely on schoolwork, said his writing was hard to read and it was difficult for him to write in sentences." His mother had to fill out employment applications for him. 53 RR 207; Ex. 10, Fletcher Dec. at 8.

In school, Mr. Milam struggled with reading comprehension, could not spell, and his hand shook when he tried to write. Ex. 3, Bradford Aff. ¶ 6. In the fourth grade, he was referred to resource, the then-equivalent for special education, to benefit from individualized academic support in reading and math. *Id.* Mr. Milam's poor reading skills were also apparent in Sunday school, where he struggled to read along. "[H]e did not read as well as the other children in the class." Ex. 6, Bennett Aff. ¶ 3; *see also* 53 RR 214 (Mr. Milam had difficulty reading out loud, would stumble over larger words, would sometimes get mixed up about sequences and characters in trying to recall what he had read).

Mr. Milam also spoke with a stutter, Ex. 3, Bradford Aff. ¶ 7, and was referred to special education services for a speech impairment in second, third, and fourth grade. Ex. 16, TEA Records at 3. Mr. Milam continued to struggle to pronounce certain sounds, referring to his older sister Sherry as "Werry." 51 RR 184. He was in a group of kids who Sherry Brown, a teacher at Tatum Primary School, pulled out of class because they needed extra help on alphabet and sounds. 54 RR 313.

Dr. Gripon observed "significant difficulty with mathematics as it applies to handling money, etc." Ex. 1, Gripon Report at 15. Similarly,

lay witnesses described that Mr. Milam could not calculate his pay after a day's work and could not count change. Ex. 3, Bennett Aff. ¶ 6 ("At the end of the day, when I told Blaine how many hours he had worked and his pay per hour, he could not figure out how much I owed him."); 51 RR 276; 53 RR 74, 223–25, 233. Mr. Milam had to be shown how to read a tape measure and would have to be reminded how to do so every time he was required to use one. Ex. 6, Bennett Aff. ¶ 5. He could not read the time correctly on Dr. Cunningham's analog watch. 53 RR 217.

Mr. Milam also struggled with shopping. He did not look to see if the size of the clothing he was purchasing was the right size for him. His family members often had to exchange his clothing purchases for him. 51 RR 274. When he was sent to the grocery store with a list of items, he did not purchase everything on the list. *Id.*

### ii.   *Social skills*

The social domain includes interpersonal skills, self-esteem, gullibility, naïveté, and social problem solving. AAIDD-11 at 45. Dr. Gripon observed that Mr. Milam "has very simplistic ideas, is very naïve, extremely gullible, easily led . . . ." Ex. 1, Gripon Report at 13. Mr. Milam's teachers observed that he had few friends and did not make eye

contact. Ex. 3, Bradford Aff. ¶ 3 (Mr. Milam "only had one friend"); Ex. 4, McIlhenny Aff. ¶ 4 ("He did not make eye contact. . . . He was often alone in class."); 51 RR 19 (Mr. Milam had "one or two friends" in school). Mr. Milam was remembered as a particularly quiet, shy and self-conscious child. Ex. 3, Bradford Aff. ¶ 3 ("He was shy . . . . If I called on him, he would stay silent and not give an answer."); Ex. 4, McIlhenny Aff. ¶ 4 ("Blaine was a very shy child."); Ex. 6, Bennett Aff. ¶ 3 ("Blaine was very self-conscious about reading aloud in Sunday School.").

In the classroom, Mr. Milam was "bashful" and "shy," "didn't want to meet your eye too much," and "h[u]ng his head." 51 RR 28. The rest of Mr. Milam's family was social, but he was "awkward and shy." Ex. 5, Affidavit of Kimberly Graham ("Graham Aff.") ¶ 3. As a teenager, Mr. Milam was "desperate" to have a girlfriend but "had a hard time with girls." *Id.* Both Carolyn McIlhenny and Milton Bennett thought he had low self-esteem. 51 RR 30; Ex. 6, Bennett Aff. ¶ 4. He only ever had one close friend as a child. Ex. 10, Fletcher Dec. at 8. Mr. Milam struggled to maintain friendships as his emotional immaturity became more pronounced and he became "socially isolated." 51 RR 212; Ex. 10, Fletcher Dec. at 8 ("Ms. Shea and Ms. [Milam] indicated that he was socially

23

isolated and that he didn't have age appropriate social skills. Ms. McIlhenny and Ms. Bradford both report that socially, he was shy and isolated. His employer Jim Wallace indicated that Mr. Milam did not have many friends.").

Mr. Milam was bullied at school. His friend Chris Lay testified that other kids pulled up his shirt, trying to see his scars from a surgery. Mr. Milam became upset and cried. 53 RR 1–12. He was also teased because of his speech impediment. 53 RR 21; *see also* Ex. 10, Fletcher Dec. at 6 ("Socially, his childhood friends Chris Lay and Kimberly Graham described him as shy and socially awkward. Both indicated that other children often teased him.").

Even as a young teenager, Mr. Milam watched Scooby Doo and played with cars for hours with his niece Neva, who is ten years younger. 51 RR 233. Coworkers described him as "like a child." Ex. 8, Proctor Report at 8. At the age of 16, Mr. Milam seemed to be closer to the age of 10 emotionally. 52 RR 101. His family members described his throwing temper tantrums in his mid-to-late teens, as if he were a much younger child. 53 RR 220. Jim Wallace said, "Blaine appeared to be a follower and wanted to do what [his older brother] Danny did." Ex. 7, Wallace Aff. ¶ 8.

Friends recalled that after he started dating Jesseca Carson,[12] Mr. Milam "did whatever she said." Ex. 5, Graham Aff. ¶ 5; Ex. 10, Fletcher Dec. at 8 ("He had a particularly difficult time with girls and withdrew from most friendships after he met Ms. Carson.").

### iii.   Practical skills

The practical domain captures activities of daily living, occupation skills, use of money, safety, health care, travel/transportation, and schedules/routines. AAIDD-11 at 45. Mr. Milam has never lived independently and required the significant support of family and peers in all activities of daily living. Dr. Fletcher reports, "[a]t a younger age, [Mr. Milam's] self-care skills were under-developed and he needed many reminders to do simple tasks like brush his teeth." Ex. 10, Fletcher Dec. at 8.

Dr. Cunningham found that Mr. Milam exhibited deficits in the practical domain, namely that Mr. Milam did not make his bed, did not perform household chores, and did not prepare any meals beyond using a microwave. 53 RR 224. Mr. Milam never had his own bank account and never managed his own finances. *Id.* at 224–25. He was unable to work

---

[12] Jesseca Carson was Mr. Milam's co-defendant for his capital murder conviction.

unsupervised and struggled to complete any task that was outside of an assigned routine. *Id.* at 225.

Similarly, Dr. Gripon concluded that Mr. Milam possessed deficits in the practical domain, specifically that Mr. Milam could not manage his bank accounts independently, could not memorize the pin number to his debit card, and was unable to learn how to use his debit card to purchase. Ex. 1, Gripon Report at 9 ("As an example, in an area where he would purchase gas, [Mr. Milam] would actually give the people, whom he knew, his PIN number and they would actually operate the machine for him."). Eventually, Mr. Milam's debit and credit cards were taken from him. *Id.* Dr. Fletcher concludes, "[h]e needed considerable support for any form of independent living." Ex. 10, Fletcher Dec. at 8.

And indeed, Mr. Milam never did live independently and did not live outside of the family home, except for a period of thirteen weeks, from August 1, 2008, to November 11, 2008. 50 RR 8. He did not live there alone, but with Ms. Carson. Mr. Milam and Ms. Carson obtained the apartment after a then-coworker vouched for them to management. 50 RR 33. Records show that Mr. Milam was issued a "Notice to Vacate" and "Advance Notice of Intent to Exercise Lockout Rights" for failing to pay

rent and utilities in a timely manner in two of the three months during which he was a tenant. Ex. 15, Apartment Application and Records at 2–4. Mr. Milam had signed a lease until February 28, 2009, but moved out on November 11, 2008. *Id.* at 8. At the time of moving out, Mr. Milam owed $1,480.74 in unpaid rent and unpaid utilities, damaged property and cleaning fees, and unreturned keys. *Id.* at 8, 10.

Mr. Milam's employment involved repetitive, low-skilled tasks. As a young teenager, Mr. Milam was employed by his Sunday School teacher on an *ad hoc* basis to rake leaves, haul trash, and assist with small building repairs. Ex. 6, Bennett Aff. ¶ 5. Later on, a coworker of Mr. Milam's mother helped him obtain employment washing boats and sweeping trash. Ex. 7, Wallace Aff. ¶ 4. His supervisor recognized that Mr. Milam was unable to learn his duties and could not complete any task as instructed. *Id.*; Ex. 8, Proctor Report at 8. Mr. Milam remained employed there for about one month. Ex. 8, Proctor Report at 8.

Mr. Milam's mother filled out his application for employment at M&M Lube, 53 RR 207, where Mr. Milam was eventually employed as a lube tech. Ex. 8, Proctor Report at 6. His duties were limited to changing oil and fuel filters. His employer reported that he was unable to train Mr.

27

Milam to handle money. *Id.* at 7. Finally, Mr. Milam was employed as a "tire buster" at Big 5 Tire to change oil and air filters, and change and fix flat tires. He did not perform any mechanical or body work. 50 RR 20. Despite reporting good work performance, both Mr. Milam's manager and direct supervisor reported incidents involving tardiness and missed work days resulting in Mr. Milam's termination after only four months of employment. Ex. 8, Proctor Report at 8; 50 RR 48. While Mr. Milam was able to learn "tasks that are repetitious and routine," he was "not able to progress beyond this point to more complex mechanical work." Ex. 10, Fletcher Dec. at 6.

Mr. Milam's medical records further reveal a number of work-related accidents requiring medical attention and treatment, including a head injury sustained after being struck with pipe tongs, Ex. 14, Longview Regional Medical Center at 1, and being knocked out by an open car door. Ex. 13, UTMB Health Services Archive at 7.

### 3. Mr. Milam's deficits manifested during the developmental period.

The third prong requires the applicant to show that his deficits in intellectual and adaptive functioning manifested during the developmental period, that is, prior to age 18. DSM-5 at 37. First, Mr.

28

Milam's IQ test scores date from when he was between the ages of 19 and 20. There is no evidence to suggest that an IQ test performed before the age of 18 would have produced meaningfully different results. Further, the developmental onset criterion does not require a childhood qualifying IQ score, nor a childhood diagnosis of intellectual disability. AAIDD-11 at 27; *see also Hall v. State*, 201 So. 3d 628, 633, 637 (Fla. S. Ct. 2016) (finding Hall intellectually disabled after remand from United States Supreme Court and reflecting that earliest IQ test administered on Hall was at age 23).

Second, Mr. Milam was 18 at the time of his arrest in the present case. Consequently, all, or almost all, of the evidence of adaptive deficits necessarily dates from the developmental period. Indeed, much of it comes from teachers, employers, and friends who knew him from early childhood through his mid-to-late teens. Similarly, Dr. Fletcher's evaluation of Mr. Milam's adaptive deficits focused on the ages of 8–9 and 17–18. Ex. 10, Fletcher Dec. at 5. Dr. Fletcher concludes, "[t]he difficulties described by Ms. Shea and Ms. Milam, and corroborated by others, clearly occurred early in his development and persisted." *Id.* at 7.

### 4. Mr. Milam was exposed to risk factors linked to intellectual disability.

Exposure to risk factors is not a diagnostic criterion, but their presence corroborates evidence reflecting that a person may be intellectually disabled. *Hall v. Florida*, 572 U.S. 701, 706 (2014) ("Hall's upbringing appeared to make his deficits in adaptive functioning all the more severe."). Risk factors known to be linked to the development of intellectual disability include maternal illness, family poverty and chronic illness in the family, social deprivation, lack of formal education, and inadequate family support. AAIDD-11 at 59. Mr. Milam was exposed to numerous risk factors associated with intellectual disability.

First, Mr. Milam's mother Shirley was twice hospitalized while she was pregnant with him. The first time, she was diagnosed with pneumonia, which resulted in a high fever. 51 RR 175. This resulted in a four-day hospitalization. She later contracted a blood infection, was again hospitalized for two to three days, and was treated with antibiotics. 51 RR 176. Dr. Cunningham testified that there is "some possibility that the pregnancy complications contributed to" Mr. Milam's intellectual disability. 53 RR 273.

Second, teachers recalled limited involvement from Mr. Milam's parents in his educational development. Ex. 3, Bradford Aff. ¶ 8 ("Shirley Milam was quiet and rarely came to school."). Mr. Milam was eventually removed from school in the fourth grade by his parents and was not homeschooled for any significant period of time. 51 RR 239–40. His access to any support services was therefore limited and, after fourth grade, entirely eliminated.

Third, following Mr. Milam's departure from school in the fourth grade, his father suffered a debilitating heart attack and stroke which left him unable to work. 51 RR 241. Mr. Milam was left alone at home to help care for his sick father, preventing any further formal education and severely limiting opportunities for socialization. *Id.* at 258–59. Mr. Milam spent his days watching Westerns with his father and rarely went outside. 52 RR 94; 51 RR 264. As a teenager, Mr. Milam spent most of his time with Neva, playing with cars and watching Scooby Doo, or alone in his room. 52 RR 92. Dr. Cunningham noted that withdrawing from school "very significantly [] took him out of those social interactions that are an important part of developing as a person." 53 RR 301; *see also* Ex. 12, Olley Dec. ¶ 27 (lack of formal education is a risk factor for intellectual

disability). Mr. Milam was prevented from benefiting from adequate educational support, and any family support became quasi-nonexistent when he was left home alone with his ill father beginning at age 12. These risk factors corroborate that the deficits and limitations evident in Mr. Milam's intellectual functioning and adaptive behavior indicate an intellectual disability.

## IV. This claim is exhausted.

Mr. Milam raised an intellectual disability claim in light of *Moore* in a Subsequent Application for Writ of Habeas Corpus in state court. SHCR 10. The claim before this Court is therefore exhausted. *Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005) ("The exhaustion requirement is satisfied when the substance of the federal claim has been fairly presented to the highest state court[.]") (internal quotations and citations omitted).

## V. Conclusion and Prayer for Relief

For these reasons, Mr. Milam respectfully requests that this Court find that the State of Texas cannot execute him because he is intellectually disabled.

*/s/ Jennae Swiergula*
Jennae R. Swiergula
Texas Defender Service
1023 Springdale Road #14E
Austin, TX 78721
512-320-8300
jswiergula@texasdefender.org

*/s/ Jeremy Schepers*
Jeremy Schepers (TX 24084578)
Supervisor, Capital Habeas Unit
Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746
214-767-2286 (fax)
Jeremy_Schepers@fd.org

33

## VERIFICATION BY ATTORNEY

I, the undersigned, am the attorney appointed pursuant to 18 U.S.C. § 3599 to represent Petitioner Blaine Milam in these proceedings. I have met with Mr. Milam, consulted with co-counsel at the Federal Public Defender's Office, Northern District of Texas, and directed experts and investigators regarding the circumstances of Mr. Milam's conviction and sentence of death. It is in that capacity that I verify this Petition. I declare under penalty of perjury that the foregoing allegations in this Petition are true and correct to the best of my knowledge and that this Petition for Writ of Habeas Corpus is being filed using this Court's CM/ECF system on December 15, 2020.

Subscribed by me December 15, 2020,
Austin, Texas.

/s/ Jennae Swiergula
Jennae Swiergula

34

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2020, I served a copy of the foregoing pleading on, Tomee Heining, counsel for the Respondent, via email at tomee.heining@oag.texas.gov.

*/s/ Jeremy Schepers*

Jeremy Schepers