Exhibit 1

Court Coordinator
Annette Griffin

Official Court Reporter
Terri Boling

Telephone
903-657-0358

Fax
903-655-1250



# J. CLAY GOSSETT

JUDGE
FOURTH JUDICIAL DISTRICT
RUSK COUNTY COURTHOUSE, SUITE 303
115 NORTH MAIN
HENDERSON, TEXAS 75652

# FAX COVER SHEET

**DATE:** 5-7-10

**TO:** Judge Gossett

**FAX #:** 936·538-3767 3572

**FROM:** Annette Griffin, Court Coordinator

**RE:** CR09-066 Milam

**TOTAL PAGES (INCLUDING COVER SHEET)** 15

**COMMENTS:**

**NOTE: If any of these fax copies are illegible, or you do not receive the same number of copies as stated above, please contact us immediately at (903) 657-0358. Thank you.**

## Edward B. Gripon, M.D. P.A.

3560 DELAWARE STREET, SUITE 502
BEAUMONT, TX 77706

—

(409) 899-4472

April 21, 2010

4TH District Court
c/o The Honorable J. Clay Gossett -
Judge Presiding
Rusk County Courthouse
115 N. Henderson Street
Henderson, Texas 77652

RE: THE STATE OF TEXAS vs BLAINE K. MILAM
CAUSE NO: cr09-066

Dear Judge Gossett:

I am writing at this time in regard to the psychiatric evaluation of the above named 20 year old single Caucasian male who I had occasion to see at the Conroe County Correctional Facility on March 26, 2010.

I began the evaluation of Blaine Milam by explaining that there was no right to privilege and that confidentiality could not be maintained as a part of the examination process. I further explained that he had the right to avoid answering any specific question that he wished to omit. I further explained that the information that I would potentially glean from the examination process would serve as the basis of a report that would be filed with the 4th District Court of Rusk County, and that a copy would be potentially available not only to his own attorney of record, but also to the Prosecutor. He stated that he understood these stipulations and that he was willing to talk with me.

NATURE OF THE EXAMINATION: The examination consisted of a standard psychiatric interview with the formulation of a mental status examination. Any available collateral information, if any, was also reviewed.

FACTORS CONSIDERED IN THE EXAMINATION: The examiner considered, in addition to other issues determined relevant, the following:

1. The capacity of the Defendant during criminal proceedings to:

**PAGE II**
**BLAINE KEITH MILAM**
**April 21, 2010**

      (a). rationally understand the charges against the Defendant and the potential consequences of the pending criminal proceedings
      (b). Disclose to counsel pertinent facts, events and states of mind;
      © Engage in a reasonable choice of legal strategies and options;
      (d). Understand the adversarial nature of criminal proceedings;
      (e). Exhibit appropriate courtroom behavior; and
      (f). Testify, if desired/necessary

2. Whether the Defendant had a diagnosable mental illness or is a person with mental retardation
3. The impact of any mental illness or any mental retardation, if existent, on the Defendant's capacity to engage with counsel in a reasonable and rational manner
4. If the Defendant is taking psychoactive or other medication:

      A. Whether the medication is necessary to maintain the Defendant's competency, and
      B. The effect, if any, of the medication on the Defendant's appearance, demeanor, or ability to participate in the court proceedings.

This interview was conducted in the accompaniment of Tim Proctor, Ph.D.

This interview was videotaped and began at approximately 11:00 a.m. on Friday, March 26, 2010 and ended at approximately 3:00 p.m.

Tim Proctor, Ph.D. had spent some additional time with Blaine Milam prior to my time with him. This interview time was utilized to perform psychological testing, specifically IQ testing, earlier on the same morning.

I obtained some generic and historical information that allowed me to determine the extent to which Blaine Milam could give an understandable, rational, and coherent history.

I did find Blaine Milam to be a fair historian although he did have some difficulty with dates, specific details and certain facts associated with his history. However, he appeared to understand my questions and he did appear to make a legitimate and appropriate attempt to answer those questions.

Blaine Milam was born on or about 12/12/1989 in Longview, Texas.

**PAGE III**
**BLAINE KEITH MILAM**
**April 21, 2010**

He was reared in the area of Tatum, Texas, which is reportedly near Henderson, Texas, some 45 miles or so from Tyler, Texas.

EDUCATIONAL HISTORY: Blaine Milam did not have substantial formal education.

He reported that he attended formal school in Tatum thru the 6th grade. He stated, at that time, he began home schooling for a period of approximately one year. He stated that he was taught in the home school setting for about 6 months by his mother and another six months by an adult cousin.

After the attempt at one year of home schooling, Blaine Milam's formal education ended.

I asked him about the reason for the home schooling and he stated that his father had become angry with the school authorities because of corporal punishment, i.e., spanking/paddling.

He reports that he can read better than he feels he can write. He does report that he can only print and that he can only write his name in cursive. He reported significant difficulty even attempting to write anything else in cursive.

Blaine Milam reported that he wanted to obtain more formal schooling and had actually hoped that some day he would be able to go to college.

He stated that he never repeated a grade, as far as he could remember, but he thinks that he was told that he went to summer school on one occasion, possibly after the 5th grade.

He reported that he did not cause significant trouble in school and that his multiple absences from school were for medical reasons.

Blaine Milam has serious limitations in his ability to read and write. I/We asked him to write a sentence and he did print a short sentence. It was not grammatically correct and some of the words that should have ended in "ing" did not. However, he was able to sign his name but the rest of the short sentence was printed.

He states that he rarely reads for pleasure and that his last book that he even attempted

**PAGE IV**
**BLAINE KEITH MILAM**
**April 21, 2010**

to read was something about Johnny Cash in regard to "men in black". However, he did state that he had seen the movie so he knew something about the content of the book and therefore could follow its general message.

JUVENILE HISTORY: As a juvenile, he states that he has no juvenile record and he was never referred to Juvenile Probation.

WORK HISTORY: Blaine Milam states that at about age 13, he began working with his father on natural gas compressor maintenance. He did that, he states, for about 3 years, from age 13 to 16.

Blaine Milam reported that he began working in a lube shop at age 16. This shop was apparently named M & M Express Lube. He worked there for about 2 ½ years until the middle of 2008. He stated that he was a relatively good employee, in his opinion, until he started to use drugs, specifically methamphetamine. He stated that after starting to use methamphetamine, he would arrive to work late, and frequently not show up at all. However, he stated that when he was sober/abstinent from drugs, he was told that he was a "good employee".

In working at the lube shop, he stated that he had problems handling money. He reported that he had difficulty writing charge tickets. He could recognize many of the customers because they were from that area and he could frequently recognize their vehicle. He reported that he could tell his employers what work he had done, but if he had to write it down, he had difficulty completing the tickets and apparently they had an equal amount of difficulty reading his tickets.

In any event, he performed the following duties in the lube shop:

1. Changing oil
2. Changing filters
3. Changing vacuum hoses
4. Belt tension work
5. Changing spark plug
6. Replacing spark plug wires
7. Working on fuel filters, water pumps, etc

Basically, he did general auto mechanic work in the lube shop as well as oil changes.

**PAGE V**
**BLAINE KEITH MILAM**
**April 21, 2010**

He left the lube shop because he stated that Jessica told him he was not earning enough money. He reporting having learned mechanic work from his father and stated that if he was able to see something done, he could generally repeat the work/job.

From July of 2008 until September 2008, he worked at Big 5 Tire in Longview, Texas. Again, he did oil, lube, and tire changing work. He referred to that as tire "busting". He did relate, in his opinion, that tires were difficult and dangerous. In that job, he made $700 every two weeks, i.e., $1400 per month.

He then tried to get a job at Trinity Asphalt in Longview, Texas. He was going to work there in the tool area helping in the tool shack. However, this job was going to be from 4:00 p.m. until 4:00 a.m. He was told that he would make approximately $12.50 an hour, but he stated that he did not remain on that job for even day because "Jessica did not want me to work those hours".

From a financial standpoint, he stated that began working in lube shops at about $6.25 per hour and worked his way up to approximately $9-$9.50 per hour.

After attempting to get a job at Trinity Asphalt, he returned to Big 5 Tire and worked there for approximately one week.

FAMILY HISTORY: His father died September 10, 2008. He was 48 years of age and he died of complications of multiple cardiovascular problems.

He then went over with us, a strongly positive family history of heart attack/cardiovascular disease, involving uncles and essentially almost all the male members of the family.

His mother is 50 years of age. She lives in Lake Cherokee and manages a Family Dollar store in Longview. He has a half-brother who is 35 years of age and a half-sister who is 32. They are both children by his mother. He has one full brother, Danny, who is 28 years of age and currently in State Jail secondary to violating probation, although Blaine did not know why he was on probation in the first place. He stated that Danny was the individual who introduced him to drugs. He has one sister, Sherry, who is approximately 24 years of age. Blaine Milam reported that he is the youngest child in the family. He was able to tell us that his parents married in either 1977 or 1978.

**PAGE VI
BLAINE KEITH MILAM
April 21, 2010**

He does report that he was close to his father and that he was significantly bothered by his father's death and had significant emotional difficulty following the death of his father.

Blaine Milam stated that his father became ill in 2000, had a stroke and significant complications of a by-pass operation. He was apparently, for a period of time, in a coma. He was then in what Blaine Milam referred to as a "vegetative state". Blaine states that it took his father some 2-3 years to "get better".

He did report in the interview process, that his father had a problem with alcohol secondary to consuming whiskey and/or brandy.

Blaine Milam reported that he returned to utilizing drugs, specifically methamphetamine, after the death of his father because he was experiencing depression and he used the drugs to "cope".

SEXUAL ABUSE HISTORY: This young man does state that he was sexually abused by a male cousin who was some four years older than he. Blaine states that he was 9 or 10 years of age when this occurred and it occurred when he went to visit the cousin in Louisiana. He reported that the male cousin gave him gifts and introduced him to pornography. He acknowledges that he became "addicted" to pornography.

He reported that the nature of the sexual acts between he and the cousin included both oral and anal sex. He reported a frequency of the oral sex occurring many times and the anal penetration occurring approximately three or so times.

SEXUAL HISTORY: Blaine Milam stated that his first sexual experience with a female occurred when he was approximately 13 years of age. He stated that the female was approximately 12.

Blaine Milam reported that the sexual activity occurred for a few months and involved kissing and touching/fondling each other.

Blaine Milam reported his only other sexual experience prior to his relationship with Jessica as having been with a girl some 10 years older than he. He reported that he was 15 when this occurred and the girl was a friend of his brother (Danny) and that she was approximately 25 years of age at the time. He reported they had intercourse on at least one occasion.

**PAGE VII**
**BLAINE KEITH MILAM**
**April 21, 2010**

EXPLANATION OF HOW HE MET JESSICA: He states that he met Jessica on-line utilizing My Space.

He was able to explain to me, in a basic/fundamental way, how My Space communication might work.

He states that he met Jessica on-line in 2007 and they later met in person. Shortly thereafter, they began living together.

He discussed computers which he reported he can use to some extent. He was familiar with instant messenger.

He reported that after meeting Jessica on-line, he was able to determine that she actually lived in the Longview area, he telephoned her and ultimately scheduled going out to dinner. He described this process in some detail. Therefore, he was able to give fair detail in regard to his initial experience with Jessica.

He stated that at first, their relationship was great. He felt that he loved her, however, he states that she later began making fun of him and particularly tended to make fun of him from a sexual standpoint. She would taunt him about being physically small in regard to the size of his genitalia.

He described that their relationship, over time, gradually became significantly more distant and troubled. He reports that the relationship was very conflicted at the time of the instant offense.

DRIVER'S LICENSE: We talked with him, at that point in time, about driving. He stated that he did obtain a license in 2007, having passed the written exam on his first attempt. Also, he passed the driving exam on the first attempt.

He reported that he began driving at age 10 after having been initially taught to drive by his father.

In regard to the written driving exam, he reported missing only two questions. However, he did state that he spent a lot of time studying for the exam and that he had gotten some help to prepare for the exam.

Blaine Milam reports never having taken driver's education.

**PAGE VIII**
**BLAINE KEITH MILAM**
**April 21, 2010**

OTHER AREAS OF FUNCTION: Blaine Milam does state that at age 18, he obtained a voter registration card and actually voted in a local as well as national election.

In regard to a checking account, Blaine Milam reported that he once had a checking and savings account which was opened after he met Jessica.

He reported that although he had a credit card at one time, he also had an ATM card, but he could not keep up with the balance on these accounts and he frequently got into trouble trying to use them. He states that they were later "taken away".

He also described in some detail, the fact that he could not remember his own PIN number and that he had significant difficulty utilizing this type of card. As an example, in an area where he would purchase gas, he would actually give the people, whom he knew, his PIN number and they would actually operate the machine for him. He reports that he could not do this type of activity independently because of the need to remember and utilize various multiple step procedures and utilize memorized numbers.

MARITAL HISTORY: Blaine Milam has never been formally married and has no children.

HISTORY OF VIOLENCE: He denies a history of significant violence prior to this alleged offense. In addition, he states that he has been compliant in the two jails in which he has been incarcerated and that he has not been "in trouble in regard to any type of violent behavior while in jail".

LEGAL HISTORY: Blaine Milam reports that he has been incarcerated since 12/2/2008. He states that he has been continuously in jail, initially in Rusk County and later housed in Conroe.

Blaine Milam reported that he had experienced a prior legal problem when he was younger. He stated that while "high" on methamphetamine, he had placed some pornography in a minor female's clothing drawer. This girl was, at that time, approximately 11 years of age and he was, at that time, 17. He did state that he did lie to the police by telling them "someone else made me do it". He was able to discuss the fact that he was attempting to avoid getting into trouble.

PAGE IX
BLAINE KEITH MILAM
April 21, 2010

Blaine Milam reported that he had spent considerable time utilizing a computer pursuing pornography. In addition, he states that he has been "addicted" to pornographic videos and magazines.

He states that at the time of his arrest, he had been using amphetamines for a consistent three day period of time.

MEDICAL HISTORY: Blaine Milam reports kidney surgery when he was about 7 years of age in Longview, Texas. He also describes some problem with his scrotum at one point in time. He was unable to describe that in a way that I could clearly understand what he was talking about, but it appeared as though he may have been talking about some type of torsion of the testicle, but again, I do not have his medical history and have not reviewed the medical records, therefore, he was only able to state that he had some type of scrotal abnormality.

MENTAL HEALTH HISTORY: Blaine Milam reports that in November of 2008, he cut his left wrist. He states that he was depressed over the death of his father and was in a process of grieving. He stated that his father had died on or about 9/10/2008.

At that time, he states that Jessica was not supportive of his grief and was threatening to leave him.

He reports their problems had been associated with a number of issues. Specifically, he stated that she was very controlling and would frequently refer to him as a "cry baby". He reported having loved her and her child but stated that Jessica was "pushing me away". He reported that he became depressed, that he was sent for evaluation, and was ultimately evaluated at an outpatient mental health facility for one day only. He stated that prior to that, there had been a mental health warrant issued because he had threatened suicide. He was taken to jail but released after an overnight stay. He was apparently told that he would be placed in some type of group therapy but he states that he never went to that treatment.

In further regard to the relationship with Jessica, he states that he was upset over his belief that Jessica was cheating on him. He specifically discussed another young man by the name of Ryan whom he thought Jessica was romantically involved with. He stated that on one occasion or more, he had come in and seen Jessica and Ryan sitting on a couch and that he felt there was something "going on between them".

**PAGE X**
**BLAINE KEITH MILAM**
**April 21, 2010**

In regard to the mental health evaluation, he states that he was given a prescription for Zoloft but it was never filled.

CURRENT MEDICATION: He states that he is not on psychoactive medication in the Conroe Jail. Therefore, he is not on any current medication, from a mental health standpoint.

In the Rusk County Jail, he states that he was given Benadryl for allergies and was given medication for persistent headaches. He refers to his headaches as "migraines".

DRUG AND ALCOHOL HISTORY: Blaine Milam reports a significant drug history. He began using marijuana at approximately age 12. He reported his problems with drugs became much more significant when he began using crack cocaine at age 15. He reported only a brief interlude with crack cocaine and later stopped its use.

Blaine Milam later described his utilization of methamphetamine which he began at age 16. He reported initially using it on weekends but later began using this four or more times per week.

He states that he realizes the use of methamphetamine has been a substantial problem in his life. He states that by the time he was 17 years of age, he was injecting methamphetamine. He had begun utilizing meth by smoking it in a pipe but later began injecting it in his left forearm.

He stated that he was utilizing meth until March of 2008 when he stopped for a period of time. He reports having stopped until after his father died. He resumed using methamphetamine in September of 2008. He was able to give a specific date for the resumption of methamphetamine use. He stated that it was associated with a tattoo that he had placed on his right upper arm. The tattoo apparently is related to the loss of his father and says something to the effect of "rest in peace, daddy", has a cowboy hat on it and is associated with a remembrance of his father.

On his left arm, he has another tattoo which he had placed on his arm on or about 9/27/2008. He describes this as "Jessica with a heart". It has some pink coloring and apparently a blue rose.

He does report having obtained both of those tattoos while "high on meth".

**PAGE XI**
**BLAINE KEITH MILAM**
**April 21, 2010**

He gives, as a reason for using methamphetamine, utilizing the drug predominately when he was either "upset me or sad".

Again, he reported that his brother had introduced him to the use of methamphetamine. He states that when using methamphetamine he would feel "on top of the world". He also stated that he would feel "ten feet tall" and would have increased sexual activity/interest.

He reports having used ecstasy on one occasion.

Blaine Milam reports that he has never been involved in sales nor manufacture of methamphetamine, although he did report that he had obtained a recipe for manufacturing methamphetamine but he was afraid that he would "blow myself up".

In regard to the commercial aspect of obtaining methamphetamine, he states that he would usually purchase it for $50 at each time of purchase. On occasion, he would obtain Sudafed PE for the drug dealer. The drug dealer would, in turn, give him $50 per box.

Blaine Milam reports utilizing methamphetamine for as long as eight days. He reports staying up continuously and not sleeping. He reported "when I stopped using methamphetamine, I would be depressed, lonely, and hurt all over".

He also discussed the use of ICE/crystal meth.

In regard to alcohol utilization, Blaine Milam states that he would occasionally drink whiskey or cinnamon snapps. This occurred between the ages of 12 and 14. He reports little to no use of alcohol as an adult.

CERTAIN SPECIFIC BELIEFS: Blaine Milam reports that he does believe in "spirits" and that he has experimented, along with Jessica, with a Ouija Board. When he was using the Ouija Board, he was also utilizing methamphetamine and reports that he was "high".

He reports some type of paranormal experience. He went into detail of a time that he viewed some type of "spirit" when he was 9 years old, describing seeing someone out behind the house whom he believed may be his deceased paternal grandmother.

In regard to the Ouija Board, he states that after significant discussion with Jessica, they purchased this Ouija Board at the mall. He and Jessica would hold on to the board and he does believe then and now, that he was able to communicate with his deceased father as well as one of her dead parents.

RELIGIOUS TRAINING: Blaine Milam states that he was reared in the Baptist Church, attended church when he was younger but left when he became older. He re-engaged briefly with the church but stated that basically drugs got in his way of attendance. He did not participate in church significantly as a young adult.

BASIC IMPRESSION OF BLAINE MILAM: In visiting with Blaine Milam for almost four hours, it becomes glaringly obvious that he is quite simplistic. He has very simplistic ideas, is very naive, extremely gullible, easily led, and has difficulty with authority figures. In addition, he has difficulty with people that he views as smarter than he.

Blaine Milam actually referred to himself as gullible. I would agree with that assessment.

Blaine Milam has clearly developed and accepted the role/persona of a person who has diminished mental capacity, i.e., low intelligence. He refers to himself as slow and states that most people he comes in contact with are, in his opinion, clearly smarter than he.

MENTAL STATUS EXAMINATION: Blaine Milam's mental status examination on March 26, 2010 reveals him to be oriented to place and person. He knew the date and year but was not specific as to the day of the week. His ability to report recent events was limited and consistent with his intellectual level.

His mood was essentially normal. His affect was generally appropriate, however, at times, he would smile somewhat inappropriately and on occasion, appeared to be almost mildly euphoric.

He presented himself as an individual who is not intellectually sophisticated and he gave the presentation of an individual who is aware that he has certain specific limitations.

Blaine Milam has no evidence of thought disorder. Specifically, he denied and I found

**PAGE XIII**
**BLAINE KEITH MILAM**
**April 21, 2010**

no evidence of hallucinations, illusions or delusions. He does not allege either visual nor auditory hallucinations. His judgement is poor. His insight is limited to fair.

His intelligence, based upon the interview alone, was estimated by this examiner to be in the range of higher mildly mentally retarded or borderline range.

I would estimate, based upon on the interview process alone, Blaine Milam's IQ to be in the range of 65-70.

DIAGNOSIS: From a diagnostic standpoint, Blaine Keith Milam represents the following diagnoses:

Axis I:      Drug Abuse - predominately methamphetamine - currently in institutional remission
Axis II:     Mental Retardation vs Borderline Intellectual Potential
Axis III:    No Diagnosis
Axis IV:     5 - currently charged with capital murder and awaiting trial
Axis V:      65 - based upon his current ability to function in an incarcerated setting

CONCLUSION: It is very difficult to determine the true intellectual potential of Blaine Keith Milam.

He clearly has intellectual limitations, and unfortunately also has minimal formal educational training.

In light of those two circumstances, it is very hard to discern whether he represents a higher functioning mildly mentally retarded individual or a lower functioning individual with borderline intellectual potential.

There is NO "white line" determination for mental retardation.

As a psychiatrist, I utilize DSM-IV-TR criteria. These criteria are somewhat "soft" as they are stated. Blaine Milam is certainly not intellectually gifted. He does not have normal intellectual potential.

I would estimate his intellectual level to be in the range of an IQ of 65 to 75.

I am not, based upon reasonable psychiatric probability, able to state with certainty,

**PAGE XIV**
**BLAINE KEITH MILAM**
**April 21, 2010**

whether this man's IQ is definitely in the higher range of mild MR or in the lower range of borderline intellectual functioning. My inability to do this is because of the basic nature of the diagnostic criteria, i.e., specifically, DSM-IV-TR recognizes that an IQ score has a range of plus or minus approximately five. In addition, DSM-IV-TR states that a mentally retarded person has an IQ of APPROXIMATELY 70 or below, as one of the criteria.

Unfortunately, as I stated previously, this man's intellectual potential associated with his lack of formal education creates a deficit that is in a range that could conceivably be between upper mildly mentally retarded and lower borderline intellectual functioning.

He does have some deficits in adaptive functioning. His primary adaptive deficit is in writing. However, he also has some significant difficulty with mathematics as it applies to handling money, etc.

DISCUSSION: I would be happy to answer any specific question that might arise in regard to this man's evaluation. If after you review this information, I can be of further assistance in this matter, please do not hesitate to contact me thru my office address listed above.

Sincerely,

Edward B. Gripon, M.D., P.A.

EBG:paa
DICTATED:NOT READ
SUBJECT to TRANSCRIPTION ERROR

**BASIC IMPRESSION OF BLAINE MILAM:** In visiting with Blaine Milam for almost four hours, it becomes glaringly obvious that he is quite simplistic. He has very simplistic ideas, is very naive, extremely gullible, easily led, and has difficulty with authority figures. In addition, he has difficulty with people that he views as smarter than he.

Blaine Milam actually referred to himself as gullible. I would agree with that assessment.

Blaine Milam has clearly developed and accepted the role/persona of a person who has diminished mental capacity, i.e., low intelligence. He refers to himself as slow and states that most people he comes in contact with are, in his opinion, clearly smarter than he.

Exhibit 2

COUNTY OF JEFFERSON    §
                       §    Affidavit of Edward B. Gripon, M.D.
STATE OF TEXAS         §

Appeared before the undersigned authority duly designated to administer oaths, Edward B. Gripon, states on oath;

1.    My name Edward B. Gripon. I am a resident of Jefferson County, Texas. I am over 18 years of age and am otherwise competent to give this affidavit. No promises or agreements have been made in exchange for my statement, and I do not expect any in the future.

2.    I am board certified in general psychiatry and have added qualifications in forensic psychiatry. I have practiced psychiatry for more than 30 years. I have worked on many cases evaluating competency to stand trial, intellectual disabilities, insanity and future dangerousness, both on behalf of the State and the defense, including more than 50 death penalty cases.

3.    I was retained by the State in regards to Blaine Milam. I found that Blaine Milam fit within the range of a significant subaverage general intellectual functioning, in the 65-75 range. Mr. Milam also had related limitations in adaptive functioning and the onset was before the age of 18, as testified too at trial and throughout the punishment hearing.

4.    I remained at the punishment hearing to evaluate the testimony of Dr. Cunningham, the defense expert. It was my opinion after Dr. Cunningham's testimony that the jury had not given Dr. Cunningham's testimony much credibility and thus informed the State Prosecutor, Mr. Jimmerson, that it would be better if I did not testify because my testimony would not have been favorable to the State. The defense never asked me to testify.

5.    Dr. Proctor testified for the State and Mr. Milam was given the death penalty. The testimony of Dr. Proctor was centered on the first prong of Texas' test for mental retardation, or intellectual disability, with regards to tests by Dr. Andrews and Dr. Proctor which showed that Mr. Milam had scored an 80 on the Standford-Binet and a Reynolds Intellectual Assessment Scale (RAIS). Mr. Milam had also scored a 68 and 71 on a WAIS-IV (Wechsler Scale) instrument administered by Dr. Proctor and Dr. Andrews. It is my understanding of Texas law at the time of Mr. Milam's trial that he could have been found not intellectually disabled if he failed to meet the first prong of the three part test.

6.     The Supreme Court's recent decision in *Hall v. Florida* bolsters Mr. Milam's claim of intellectual disability. Mr. Milam's trial focused on his failure to establish the first prong and Dr. Proctor and the State Prosecutor's spent little time discussing the second and third issues.

7.     It is my opinion that Mr. Milam is intellectually disabled within the requirements of the DSM-5 and the holding of *Hall v. Florida.*

Submitted this _____ day of October, 2014.


_____
Edward B. Gripon, M.D., P.A.

Signed before me on October _____, 2014.



Notary for the State of Texas


DEBORAH KAY DELONEY
Notary Public, State Of Texas
My Commission Expires
06-08-2016

Exhibit 3

**STATE OF TEXAS**

**COUNTY OF RUSK**

### AFFIDAVIT OF JUANITA BRADFORD

BEFORE ME, the undersigned authority, on this day personally appeared Juanita Bradford, who upon being duly sworn by me, testified as follows:

1. My name is Juanita Bradford and I am a resident of Rusk County, Texas. I am over the age of eighteen and competent to make this affidavit.

2. I was Blaine Milam's 4th grade teacher at Tatum Elementary School.

3. Blaine was a kind, gentle child. He was shy and only had one friend. He was very quiet and would not speak to me if other children were in the classroom. If I called on him, he would stay silent and not give an answer.

4. Blaine was a really slow student. He was in resource, which was the equivalent of special education. Blaine was pulled out of the classroom every morning for three hours for help with math and reading. I am not sure who referred him for resource. I did not refer him.

5. Special education services were coordinated by Region 7 Education Service Center in Kilgore, Texas. Special education referrals were made if a teacher noticed that a child wasn't progressing at the rate they should and needed extra assistance. A teacher would fill out the paperwork to request that a diagnostician administer an examination and conduct an evaluation. Depending on how the student did on the examination and evaluation, a recommendation for services might be made. A team would then meet once or twice a year to determine if the student continued to need the special education services

6. Blaine often seemed confused by instructions and required a lot of one on one attention. I had Blaine for science and social studies. He needed a lot of individual instruction for those subjects. He struggled with reading comprehension and writing. Blaine could not spell and his hand shook when he tried to write.

7. Blaine had a stutter.

8. Shirley Milam was quiet and rarely came to the school. Danny Milam was a slow student and received resource services. Blaine's sister Sherry was more sociable.

9. Blaine was pulled out of 4th grade by his parents.



_Juanita Bradford_
Signature

12 - 10 - 18
Date

SIGNED and SWORN before me this _____10_____ day of December, 2018.

_____
Notary Public, State of Texas

NAOMI FENWICK
Notary Public, State of Texas
Comm. Expires 04-04-2022
Notary ID 131516965

Exhibit 4

**STATE OF TEXAS**

**COUNTY OF RUSK**

### AFFIDAVIT OF CAROLYN MCILHENNY

BEFORE ME, the undersigned authority, on this day personally appeared Carolyn McIlhenny, who upon being duly sworn by me, testified as follows:

1. My name is Carolyn McIlhenny and I am a resident of Rusk County, Texas. I am over the age of eighteen and competent to make this affidavit.

2. I taught 2nd and 3rd grade at Tatum Primary School. Blaine Milam was a student of mine.

3. Blaine struggled with everything he did academically and required significant one-on-one attention. I had to modify instructions and adapt exercises to his academic limitations. Blaine often did not understand what was going on in class. His intellectual functioning was the lowest of the class.

4. Blaine was a very shy child. He did not make eye contact, and I would have to tell him to look at me when I spoke to him. He was often alone in class.

5. Blaine was often sick. He was on crutches for part of the year and had a drain for urine. He wet his pants a few times throughout the year.

6. Attendance could be a factor in access to special education services. At the time, I attributed his struggles to his poor attendance, but I believe he had cognitive limitations. I think he would have still had academic difficulties if his attendance was better.

7. At the time that Blaine was in school, there were no state mandated criteria for determining whether a student should be passed or held back. I never held a student back without their parents' support.

8. Either a teacher or a parent could request that a student be tested for intellectual and developmental disabilities. However, a student could not be tested without the student's parents' consent.


_Carolyn McElhenny_
Signature

_11-29-18_
Date

SIGNED and SWORN before me this ___29th___ day of November, 2018.



Notary Public, State of Texas

CAITLIN PURCELL
Notary Public, State of Texas
Comm. Expires 05-10-2022
Notary ID 131562101

Exhibit 5

**STATE OF TEXAS**

**COUNTY OF GREGG**

Graham KG

**AFFIDAVIT OF KIMBERLY ~~DOPSON~~**

BEFORE ME, the undersigned authority, on this day personally appeared Kimberly ~~Dopson,~~ who upon being duly sworn by me, testified as follows:

Graham KG

1.  My name is Kimberly Dopson and I am a resident of Gregg County, Texas. I am over the age of eighteen and competent to make this affidavit.

2.  I knew Blaine from childhood. We lived in the same trailer park when we were around seven years old and stayed friends as teenagers.

3.  Blaine's family was social, but Blaine was awkward and shy. When we hung out with our friend group, Blaine was never in charge of making plans.

4.  Blaine had a hard time with girls. Blaine told me that he really wanted a girlfriend, but he did not have any real success. He was overly sweet, almost too sweet, and awkward. I had tried to set Blaine up with friends who had a history of dating awkward guys.

5.  I do not know how she and Blaine met. After learning about her, I remember looking Jesseca up on the internet and wondering why a pretty cheerleader girl like her would be with somebody awkward and shy like Blaine. I thought Jesseca was weird, and was trying to transform Blaine into what she wanted him to be. Blaine was so desperate for a girlfriend and for her to love him that he did whatever she said. He did everything for her and wanted to impress her. I recall that Blaine's relationship with his dad became more strained because of Jesseca. He did not understand why Blaine was getting tattoos and piercings and talking back to him.

6.  Blaine was different after he started dating Jesseca. He stopped socializing with me. I remember inviting Blaine and Jesseca to go to a lake with me and my boyfriend. I spoke to Jesseca on the phone, and she told me they would not go because Blaine had told Jesseca that he and I had dated in the past, which was not true. After hanging up, I tried calling Blaine, but he did not answer my calls.

7.  After Blaine's dad died, I planned to go to the funeral and I called Blaine for directions. He would not give me directions and did not tell me that the funeral had been canceled due to weather. I think he did not want me to come because of Jesseca. Sometime after Blaine was arrested, he called me to apologize for ignoring

me and not being a good friend while he was with Jesseca. Blaine is the kind of person who could take the fall for something Jesseca did.

_____                    11-29-18
Signature                                           Date

SIGNED and SWORN before me this ____29____ day of November, 2018.

_____
Notary Public, State of Texas

NAOMI FENWICK
Notary Public, State of Texas
Comm. Expires 04-04-2022
Notary ID 131516965

Exhibit 6

**STATE OF TEXAS**

**COUNTY OF RUSK**

### AFFIDAVIT OF MILTON BENNETT

BEFORE ME, the undersigned authority, on this day personally appeared Milton Bennett, who upon being duly sworn by me, testified as follows:

1. My name is Milton Bennett and I am a resident of Rusk County, Texas. I am over the age of eighteen and competent to make this affidavit.

2. I met Blaine through the Lakeview Baptist Church in Henderson, Texas, where I led a youth group for Sunday School. Blaine attended Lakeview Church and Sunday School for five years.

3. Blaine was very self-conscious about reading aloud in Sunday School. I would always ask him beforehand if it was ok for me to call on him to read aloud. He struggled with reading and he did not read as well as the other children in the class.

4. Blaine was one of the most polite and nicest kids I've ever met. He got along well with the other children in Sunday School and was always very kind. He also seemed to have low self-esteem.

5. When Blaine was a young teenager, I hired him to help me with small projects around the land, like raking leaves, hauling trash, and small building repairs. We worked side by side and I always supervised what Blaine was doing. When I showed Blaine how to do something, he would not remember how to do it the next time, and I had to show him again. For example, I had to show Blaine how

to read a tape measurer and how to make a small mark with a pencil on a board to be cut. However, I would have to show him how to read the tape measure again the next time I asked him to do it.

6. At the end of the day, when I told Blaine how many hours he had worked and his pay per hour, he could not figure out how much I owed him.

7. Blaine stayed over at our house a few times. One night, he went to use the restroom and the doorknob fell off the door. Blaine did not know what to do and how to get out. My son, who is around Blaine's age, found him and had to help him out.

8. I cannot say anything bad about Blaine's character. I was really surprised when I learned about the crime because it did not make sense with the Blaine I knew.

_Milton Bennett_
Signature

_12 - 11 - 18_
Date

SIGNED and SWORN before me this __11__ day of December, 2018.

_N_____A._
Notary Public, State of Texas

NAOMI FENWICK
Notary Public, State of Texas
Comm. Expires 04-04-2022
Notary ID 131518965

2

Exhibit 7

**STATE OF TEXAS**

**COUNTY OF GREGG**

## AFFIDAVIT OF JAMES "JIM' WALLACE

BEFORE ME, the undersigned authority, on this day personally appeared James Wallace, who upon being duly sworn by me, testified as follows:

1. My name is James Wallace and I am a resident of Gregg County, Texas. I am over the age of eighteen and competent to make this affidavit.

2. I was Blaine Milam's coworker and supervisor at Nichols Marine.

3. I met Blaine through my ex-girlfriend who worked with Blaine's mother, Shirley Milam, at the Dollar Store. She asked to me to help Blaine get a job at Nichols Marine.

4. I helped Blaine get a job at Nichols Marine. He was hired to wash boats before they were sold to customers. Blaine's duties were to wash the outside of boats, vacuum inside the boats, check the boat for any scratches or marks, and to sweep and empty trash around the shop.

5. Blaine could not complete a task as instructed. If he washed the outside of a boat, he would not vacuum the inside. I would have to check every boat Blaine washed and had to tell him to go back and do something again.

6. I regretted hiring Blaine because he could not complete a task independently and required a lot of supervision. He seemed to want to learn but trying to explain his duties to him was very frustrating. When I tried to explain what his duties were, it went in one ear and out the other. Blaine just was not smart.

7. Blaine never drove himself to work. I do not think he was capable of it. Blaine's mother drove Blaine to the Family Dollar every day. I picked Blaine up from the Family Dollar and drove him the rest of the way to Nichols Marine.

8. Blaine was very limited conversationally. That also made me think he was not very intelligent. He only ever spoke about his brother, Danny Milam. Blaine had no personality. He wanted to be looked up to but no one liked Blaine as a friend. Instead, Blaine seemed to be a follower and wanted to do what Danny did.

9. Blaine was only employed by Nichols Marine for about six months.

_____
Signature

_____11-29-18_____
Date

SIGNED and SWORN before me this __29__ day of November, 2018.

_____
Notary Public, State of Texas

NAOMI FENWICK
Notary Public, State of Texas
Comm. Expires 04-04-2022
Notary ID 131516905

Exhibit 8

# PRICE, PROCTOR & ASSOCIATES, LLP

*A LIMITED LIABILITY PARTNERSHIP OF BOARD CERTIFIED FORENSIC PSYCHOLOGISTS*

11882 Greenville Ave., Suite 107; Dallas, Texas 75243
Telephone: 972-644-8686•Facsimile: 972-644-8688

**J. Randall Price, Ph.D., ABPP, FACPN**
*Board Certified in Forensic Psychology*
*Board Certified in Neuropsychology*

**Timothy J. Proctor, Ph.D., ABPP**
*Board Certified in Forensic Psychology*
*Fellowship Trained in Forensic Psychology*

## Report of Findings, Conclusions & Opinions

### Identifying Information:

| | |
|---|---|
| **Defendant:** | Blaine Keith Milam |
| **Date of Evaluation:** | 3/26/10 |
| **Date of Report:** | 5/4/10 |
| **Date of Birth:** | 12/12/89 |
| **Age:** | 20 |
| **Case:** | The State of Texas v. Blaine Keith Milam |
| **Cause No.:** | CR09-066 |
| **Offense:** | Capital Murder |
| **Offense Date:** | 12/2/08 |
| **Judge:** | The Honorable J. Clay Gossett |
| **Court:** | 4th Judicial District, Rusk County, Texas |

### Referral Information:

The attorneys for the State requested this forensic psychological evaluation of the defendant, Mr. Blaine Keith Milam. In compliance with instructions of the Court, I reduced my findings, conclusions and opinions to this report, which was delivered to Judge Gossett for in-camera inspection. This report was not provided to the prosecution or the defense.

It was requested that this forensic psychological evaluation include a consideration of diagnostic issues including a determination of whether or not the defendant meets the diagnostic criteria for mental retardation[1]. Several very similar definitions of mental retardation exist. The following are the most common:

---

[1] Mental retardation and the more recently put forth diagnostic term, intellectual disability, are synonymous. While some groups now view intellectual disability as preferable, mental retardation is used throughout this report because it is the term used in state and federal law.

Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage general intellectual functioning existing concurrently with related limitations in two or more of the following applicable adaptive skills areas: communication, self-care, home living, social skills, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18. [American Association on Mental Retardation (AAMR), 1992]

Intellectual disability is characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before the age of 18. [American Association on Intellectual and Developmental Disabilities (AAIDD; formally known as AMMR), 2010]

The essential feature of mental retardation is significantly subaverage general intellectual functioning that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. The onset must occur before age 18 years. [Diagnostic and Statistical Manual of the American Psychiatric Association, Fourth Edition, Text-Revision, 2000 (DSM-IV-TR)]

Person with mental retardation means a person determined by a physician or psychologist licensed in this state or certified by the department to have subaverage general intellectual functioning with deficits in adaptive behavior. [§ 591.003 (16) of the Texas Health & Safety Code]

## Evaluation Procedures:

The forensic psychological evaluation of the defendant included clinical interview, psychological testing, telephone collateral interviews and a review of records and other relevant materials. Below is a brief discussion of each of these facets of the evaluation.

The clinical interview was conducted with psychiatrist Edward Gripon, M.D. This portion of the evaluation was video recorded, and per the instructions provided to Dr. Gripon and me, the defendant was not questioned regarding the alleged offense.

This evaluator conducted the psychological testing of the defendant. The psychological testing was conducted both prior to, as well as after, the clinical interview. The tests administered were:

- Dot Counting Test
- Rey 15-Item Test
- Test of Memory Malingering (TOMM)
- Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV)
- Reynolds Intellectual Assessment Scales (RIAS)
- Wide Range of Achievement Test – Fourth Edition (WRAT-4)

In addition to reviewing audio or typed notes of numerous interviews conducted by investigators for the State, this evaluator personally conducted several collateral interviews. Attempts to contact the defendant's sister, Ms. Sherry Digby, were unsuccessful. The initial phone number used was apparently outdated, but even use of an updated one had not resulted in a successful

telephone contact at the time that this report was written. I was also unsuccessful in reaching Ms. Tamara Templeton and Mr. John Templeton, the defendant's former employers at M & M Express Lube, but I was able to listen to the audio of Ms. Templeton's interview with an investigator for the State. The individuals with whom I successfully conducted collateral interviews are listed below. Prior to each one, the person interviewed was informed of the nature and purpose of the collateral interview and the manner in which the information would be used:

- Mr. Brian Perkins (defendant's former supervisor at Big 5 Tire; 4/28/10)
- Mr. Gary Jenkins (defendant's former supervisor at Big 5 Tire; 4/28/10)
- Mr. Jim Wallace (defendant's former supervisor at Nichols Marine; 4/28/10)
- Ms. Dana McDonald (defendant's former supervisor at Nichols Marine; 4/28/10)
- Ms. Shirley Milam (defendant's mother; 5/2/10 & 5/3/10)
- Ms. Teresa Shea (defendant's half-sister; 5/3/10)

Finally, voluminous records and related materials were reviewed as part of the current evaluation. Included in the records reviewed were psychological test data of Paul Andrews, Ph.D., ABPP, who evaluated the defendant at the request of defense counsel on 11/20/09 and 12/10/09. A summary list of the records and related materials reviewed in this case is found at the conclusion of this report in Appendix A.

## Notification of Purpose:

The defendant was evaluated in the Montgomery County over the course of approximately nine hours. Psychological testing was conducted in a room inside the custody area of the jail, while the clinical interview was conducted in a room located near the jail waiting area because it allowed for video recording. Conditions were adequate for the clinical interview and the second psychological testing session; however, conditions for the first psychological testing session were less than desirable due to significant background noise at times and the occurrence of various individuals frequently walking by the window in the room that looked out into the hallway. While the window was also present during the second testing session, it was much less of an issue because very few individuals were walking around and talking in that area by that point in the day. The tests given during the first psychological testing session, which therefore may have been influenced, at least somewhat, by the background noise and window, were the Rey 15 Item Test and the WAIS-IV.

Prior to beginning the psychological evaluation process, the defendant met privately with one of his attorneys. In addition, his attorney was present at the jail, or at least easily contacted if necessary, throughout the evaluation process in the event that the defendant had any questions or issues. On one occasion, the defendant expressed the desire to ask his attorney a question and he was allowed to do so.

At the beginning of the evaluation, this evaluator went through his consent form with the defendant in a line by line fashion. After reading each line, the defendant was asked to explain what it meant to him and was provided the opportunity to ask questions. It is noteworthy that he was able to read nearly all of the words on the form and typically did a good job of explaining what each statement meant. In a few instances, he indicated that he did not know the meaning of a word and therefore asked for an explanation. The information contained within the consent form included the nature and purpose of the evaluation, that the typical doctor-patient relationship did not exist and that no treatment services would be provided. He was also

educated regarding the lack of confidentiality present, and in particular, that the results of the evaluation would ultimately be available to the attorneys for the State and of the possibility that a report and/or testimony by this evaluator could occur during his trial. He was also informed that it was his choice as to whether or not he participated. The defendant, after being provided the opportunity to ask questions, indicated that he understood the above and expressed, both verbally and in writing, his consent to be evaluated. This information was reiterated to him prior to the clinical interview with Dr. Gripon and he again indicated his understanding and consent to participate.

## Brief Summary of Background Information:

The following is a summary of background information regarding the defendant. Information contained in this section was obtained through clinical interview with the defendant, collateral interviews and a review of available records. Unless otherwise indicated, the information was provided by the defendant.

Early Childhood/Family History: The defendant was born in Longview, Texas and raised in Tatum, Texas. Married parents raised him. He has two full biological siblings; an older brother, Mr. Danny Milam, and an older sister, Ms. Sherry Digby. In addition, he has two half siblings from a prior relationship on the part of his mother; an older brother he has never met and an older sister, Ms. Teresa Shea, who was in the home until she turned age 21.

When asked about his developmental history, the defendant reported that he has been told that he "almost killed" his mother in the time leading up to his birth and at his actual birth. The defendant's mother indicated that the defendant got perception from his father, who stated this because the defendant's mother went to the hospital twice during her pregnancy. She said that the first time she was hospitalized for a week with pneumonia and had a fever. She said the second time she was hospitalized for two to three days for an "infection in the blood" and that she again had a fever. The defendant was not aware of his developmental milestone history; however, his mother provided information regarding this with his half-sister, Ms. Teresa Shea, appearing to provide assistance. The information provided by the defendant's mother suggested attainment of developmental milestones within normal limits. Specifically, she indicated that he learned to crawl at approximately seven or eight months of age but "mainly scooted on his belly more than anything." It was also at approximately this age that he began the early stages of talking by saying words such as "Mom" and "Dad." She reported that the defendant learned to walk "on his own" and that this occurred at approximately 11 months of age. When asked how the defendant's achievement of developmental milestones compared with that of his siblings, his mother responded that his siblings reached the above described milestones even before the defendant did.

The defendant did not describe abuse perpetrated by his parents, but maintained that he was sexually abused by a male cousin who was three or four years older than him. The abuse reportedly began when he was age 9 or ten years old and occurred over the course of two summers when he would visit his cousin in Louisiana. The defendant indicated that it was his cousin who introduced him to pornography and that this was his first exposure to sex. He said, "I fell in love with the porn" and indicated that his cousin used this as a way to get the defendant to perform sexual acts on him. Specifically, he said that his cousin would withhold pornography from the defendant unless the defendant performed oral sex on him. The defendet reported that the abuse occurred between 20 and 40 times. He said that there were times where his cousin

attempted to penetrate his anus and that on approximately three occasions he did so. The defendant reported feeling ashamed regarding this abuse. He said that after it occurred he became increasingly fascinated with pornography and that this increased further after puberty.

The defendant's mother is a manager at Family Dollar and he remains in contact with her. The defendant's father reportedly had long-standing health problems and died in 9/08 due to the last of several heart attacks he reportedly experienced over the course of the later years of his life. In addition to heart issues, the defendant's mother reported that the defendant's father suffered a stroke at some point that resulted in deterioration of his mental abilities. The defendant reported a close relationship with his father and indicated that his death was difficult for him. When questioned regarding his family history, the defendant reported a criminal history on the part of his brother, Danny, who is currently incarcerated. He reported a history of substance abuse on the part of his father, who reportedly drank frequently until his heart problems developed. He also reported a drug problem on the part of his brother, who he said is the one responsible for introducing him to alcohol and methamphetamine use.

Educational History: Unfortunately, little in the way of school records is available because the defendant left school at an early age and his records have since been destroyed. The records that are available indicate that he attended school in the Tatum Independent School District from 1996 to 2000. He apparently began receiving special education services in 1997 for the primary disability of "speech impairment" and continued to receive these services until 2000, when he apparently left school. No disabilities other than "speech impairment" are listed. Consistent with the above is a 2/16/10 letter from Rusk County Special Education Shared Services Arrangement that indicated the defendant's last "Full and Individual Evaluation report" was dated 2/8/00 and that it indicated "speech impairment."

The defendant apparently had no memory of special education services, including speech therapy, until it was mentioned to him recently. He denied that he was ever held back a grade, but indicated that he once avoided being held back by attending summer school. He denied a history of being diagnosed with mental retardation by a professional, but indicated that his siblings may have said something like this to him; apparently as a form of teasing. The defendant's mother recalled that he was in speech therapy. She also indicated a recollection that he was tested for "special classes," but could not recall if he was actually placed in such classes. She denied any recollection of him having been labeled as learning disabled or mentally retarded. It is her memory that his schoolwork "started going downhill" after he developed kidney problems at approximately age seven. She said that connected with this illness, he experienced fevers and was "put to sleep back to back." Although she was never told by a healthcare professional that these experiences affected her son's mental abilities, she believes that they did and that it caused him to "gain weight." The defendant's mother indicated that she viewed the defendant as being "slower" than her other children.

It is not exactly clear when the defendant left school, but it was certainly very early; especially by today's standards. The defendant's mother reported that it was during the 4th grade, while the defendant thought it was during the 5th grade. By all accounts the defendant was pulled out of school by his father because his father was upset after he was "paddled" by the principal. After leaving school, the defendant may have received some amount of home schooling, but if he did, it appears that this was very limited. Indeed, there are several individuals who are alleged to have provided home schooling to the defendant, but it appears that these individuals either deny that they provided such services or report that they only provided informal instruction while also

urging the defendant's mother to initiate a formal home school program. The defendant's mother told this evaluator that after he was taken out of school, over the course of a year or so, he was enrolled in a home school program through a Christian academy in Dallas, Texas. She said that she served as his teacher; however, no record of this seems to be available. In total, the defendant has a very limited educational history that appears to be no greater than the 5th grade level. He reported that he now looks back with regret on his educational history and wishes he had stayed in school.

The defendant denied that he was a significant discipline problem while in school. He said that the paddling he received that led to his father removing him from school stemmed from an event where a peer attempted to take his lunch money, and in response, he placed the boy in a "headlock." He denied that he skipped school, but acknowledged missing days secondary to the aforementioned kidney problems that he developed at approximately age seven. The defendant endorsed having friends while in school and named three individuals in particular. He recalled that one of the three friends was "popular" and that he considered himself to be "less popular" than that friend.

In terms of the defendant's self assessment of his academic abilities, he reported that his reading abilities are better than his writing abilities. He indicates that he writes letters and reads those sent to him by others. This is consistent with information found in the records reviewed in this case. He said that he only prints and does not write in cursive. He described some trouble reading cursive writing and indicated that his mother writes in this manner. He said that when he reads books, he tends to choose ones where he has seen the movie before or is already familiar with information regarding the subject at hand. He provided examples of reading books about country music singers Johnny Cash and Alan Jackson. He described math as his weakest subject and said that this has always been the case.

Work History: By all accounts, the defendant has a fairly significant work history. His father was a natural gas compression mechanic and he indicated that at approximately age 13, he began doing work for his father. He said that his father "always got aggravated" with him because his father would have to show him something "100 times" or let him "put [his] hands" on it so that he could learn it. The defendant's father apparently taught him to perform mechanical work. The defendant's stepsister indicated that this was something that the defendant's father stressed with all the children, although the defendant's sister resisted it. Based on all available information, it appears that it was common for the defendant to work on mechanical devices while growing up and that he developed a knack for this type of work. The defendant reported that in particular he liked working on vehicles and that he enjoyed this type of mechanical work better than working on compressors.

At age 16, the defendant was hired as a lube tech at a newly built oil change station called M & M Express Lube. Records indicate he held this job from 1/6/06 to 3/17/07, which is somewhat in contrast to the dates the defendant provided during the clinical interview. The defendant apparently worked this job on a full-time basis, as he recalled working all day Monday through Friday and then half the day on Saturdays. Information found in the records and related materials reviewed suggests that the defendant was a good employee when he was present, but that some issues with unreliability, including not showing up on time, were present. Consistent with this, the defendant reported during the clinical interview that he was a good employee until he "got on drugs." He described instances of showing up late or missing work completely, but indicated that despite this, his employers would not fire him. The defendant

initially reported that he "did everything" at the lube shop, but then added that despite attempts to train him to handle money, he was unable to handle this task. He said that he would create tickets, but that at times others had trouble reading these and so if possible, he would get out of this task. One of his major work duties was changing oil and fuel filters. In addition, on older model vehicles, he was reportedly able to perform tasks such as changing sparkplugs, bells, spark wires and fuel pumps. He suggested that he was good at his job and that some customers only wanted him working on their cars. Information found in the supporting materials reviewed indicates this job included him engaging in tasks such as reading part books and the information found on filters. He apparently impressed at least one of his employers as being "very mechanical." Records indicate that he resigned without notice on 3/17/07, a day he was supposed to work, due to issues with another employee that had been hired and due to his desire to pursue a career in the oil field. In contrast, the defendant reported that he left the job because his girlfriend at the time, Ms. Jesseca Carson, wanted him to because he was not making enough money. He said that his employers had talked him out of quitting on other occasions in the past and that while he wanted to put in two weeks notice, he ultimately just "walked out one day."

The defendant reported that until age 18, he had to get rides to work because he was ineligible for the driver's test due to the combination of his age and lack of education. He reported that once he was allowed to take his driving test, however, he passed both the written and driving exam on the first occasion. He said that he read the written exam by himself, without assistance, and that one of his bosses helped him study for the exam so that he was prepared. He said that he only missed two items on his written test, and that on his driving test, he was told that he did a good job because he displayed the ability to parallel park. He said that in contrast to the success he had with passing is driving exam, he said that his sister, Ms. Sherry Digby, had to take it six times before she was able to pass. He said that after passing his driving exam, he drove to himself to work. His mother reported that in addition to driving to work, he ran errands such as going to the store.

The defendant's work history also apparently includes employment at Big 5 Tire, Trinity Asphalt Company, Nichols Marine and, briefly, at an unspecified oil change shop for one week. It appears that of these jobs, he was employed for the longest period of time a Big 5 Tire. While the length of time he held this job in not clear, he reported that his time there ended in 9/08. Like his job at M & M Express Lube, this was a full-time job. In particular, his hours were reportedly 7:00 AM to 6:00 PM Monday through Friday and 7:00 AM to 12:00 PM on Saturday. Two of the defendant's supervisors at Big 5 Tire were interviewed by this evaluator and each expressed very positive impressions of him as an employee. The defendant apparently worked as a "tire buster," where his duties included changing tires, fixing flat tires, checking front ends, looking over shocks and struts and performing oil changes. The defendant was reportedly able to catch on to the tasks required of him, and his employers thought enough of him to consider him for a sales position. At the time that he left the job, he was reportedly being trained on the computer system so that he could work as a salesman. One of the defendant's supervisors at this job, Mr. Brian Perkins, commented that the defendant was an "excellent" worker and that he even allowed the defendant to work on the "high end" cars because he trusted his ability. He also stated that the defendant did his job "exceptionally well" and performed "oil changes like it wasn't nothing." He said that the only issue he ever had with the defendant was with respect to his temper and that on a limited number of occasions, he was "a little edgy" with customers as well as with him. The supervisor indicated that reading and writing were required with respect to the work orders that the defendant had to complete and for the computer work on which he was

being trained. He said that he trusted the defendant to "watch the front" of the shop, and that when this occurred, he never found the cash register to be short by any meaningful amount.

Another of the defendant's former supervisors at Big 5 Tire, Mr. Gary Jenkins, provided a similar account as that provided by Mr. Perkins. He reported that the defendant was able to catch on to tasks as well as other individuals he has had as employees. He described the defendant as a valuable employee and indicated that the quality of his work was so good that they made an exception and "let him slide" when they had some issues with him being late or missing a day of work. In addition, they hired him back after he had left the job for a week, which was apparently a very unusual practice for them. With respect to the instance when he left Big 5 Tire for a week, he reported that as was the case with M & M Express Lube, his girlfriend told him to quit this job because she was not happy with salary. He said he then worked briefly at Trinity Asphalt in the "tool shack" on the night shift. He said that his girlfriend did not like the hours of this job, so he quit it and returned briefly to Big 5 Tire. He said that he then left Big 5 Tire because he got "back on the drugs."

The defendant also worked at Nichols Marine for approximately one month. When he held this job is not precisely clear, but his supervisor, Mr. Jim Wallace, estimated that it was three or four months prior to the alleged offense. Although the defendant's job was to clean boats, he reportedly asked on a frequent basis to be allowed to perform mechanical work. Mr. Wallace described the defendant as "a little bit on the slow bit." When asked what he meant by this, Mr. Wallace explained that the defendant did not understand certain things and that these things had to be explained to him. He said that the defendant seemed to be someone who learned better when the task was demonstrated to him as opposed to when told how to do it. He also remarked that the defendant was not very educated due to his lack of schooling. He also reported that the defendant was strange and "acted more like a child." He described unusual behavior on the part of the defendant that included him talking to himself. Mr. Wallace said that the defendant did "about average" with respect to cleaning boats. He said cleaning the used boats was the toughest and that the defendant was "not great" with that, but that he did better once he was told where to clean and what chemicals to use. In addition to speaking to Mr. Wallace, this evaluator also spoke to Dana McDonald from Nichols Marine. She indicated that she did not have a lot of interaction with the defendant, but that when she did, she observed him to be sociable and polite. She denied that she viewed him as someone with any type of mental issue, including lack of intelligence. She said that she mainly observed that he tended to do what was asked of him.

Medical History: In terms of the defendant's prior medical history, as noted above, he apparently had kidney problems at age seven and this required surgery. At age 14 or 15, he reportedly had some issue related to his testicles being "twisted" in his scrotum. He reported that he has a history of migraine headaches for which he was apparently hospitalized at one point. He maintained that after undergoing a CAT scan related to his migraines, a doctor asked if he had ever been dropped on his head. In terms of current medical problems, he reported continued struggles with migraine headaches as well as instances of an urgent need to urinate that he attributes to his past kidney problems. While in the Rusk County Jail, he was reportedly taking some type of medication for migraine headaches as well as Benadryl due to allergy and sleep issues. He reported no treatment with medications since been transferred to the Montgomery County Jail.

Psychiatric History: The defendant reported a fairly limited history of psychiatric treatment. He reported that he attempted to kill himself by cutting his left wrist in 11/08; however, available records indicate this incident occurred in on 10/31/08. He showed this evaluator a faint scar on his wrist that he indicated was the result of this attempt. He said that he was depressed at the time and that his father had recently passed away. He also reported that his girlfriend would get mad at him and threatened to leave if he did not stop crying about his father. He said that the police were called, but that instead of being taken to a hospital, he was taken to the Rusk County Jail, where he was screened, but not arrested. Records from this screening, which was conducted by Mark R. Stover, M.A., QMHP, note depression and possible drug issues. It is also of note that his level of intelligence at the time of this evaluation was estimated as average. The next day, he was reassessed, this time by Russell Montgomery, LPC. At the time of this reassessment, he denied suicidal ideation. Although not noted in the record, the defendant reported that was he referred to group therapy but never presented for this treatment. He said that he was told that he should bring his girlfriend with him to treatment, but she would not go. He said that he believes he was prescribed the antidepressant Zoloft, but never took this medication because he "chose meth over that."

Substance Use: The defendant described an extensive substance abuse history. He said that he began alcohol use at age 12 and that it got to the point that he drank a pint of either whiskey or schnapps per day. He said his brother introduced him to this substance. He said that his alcohol use decreased when he started using methamphetamine. In terms of his illicit drug use history, he said that he tried marijuana at age 12, but only used this substance a "couple" more times after this initial instance. At age 15, he reportedly used crack cocaine for one week before then switching to methamphetamine. He said his brother introduced him to methamphetamine and that he tried the substance because he trusted his brother. He said that he now resents his brother for introducing him to alcohol and methamphetamine. He said that by age 16, he was using methamphetamine every weekend. He said that he gave half of his paycheck to his father and spent the other half on alcohol and methamphetamine. He began methamphetamine use by smoking it with a pipe, but then escalated to "shooting it up." He described the process he used to shoot up. He denied that he manufactured this substance. He said that after injecting methamphetamine, he is unable to recall the events that follow. Over time, he reportedly began using methamphetamine during the week as well, and by age 17, he was using this substance approximately four times per week. He said that he used methamphetamine regularly until he met his girlfriend, Ms. Jesseca Carson, in 3/08. She knew that he had a history of drug use and reportedly said that if he ever got back into drugs, she would leave him. As noted above, his father died in 9/20/08. He reportedly drank alcohol after his father's funeral and then returned to methamphetamine use. The first night that he returned to methamphetamine use, he got a tattoo on his right arm that reads "RIP Daddy." On 9/27/08, he got a tattoo on his left arm that has his then-girlfriend's name written over a heart. He maintained that he would not have gotten these tattoos were he not "high." He said that it was actually his girlfriend's idea for them to get each other's names tattooed, but that after he got his, she decided that she did not want to follow through with her end of the bargain. In addition to the drugs noted above, he reported that he used the substance ecstasy on one occasion. Available records also note the use of a narcotic pain reliever, but whether this was prescribed and the frequency of the use are unclear. It does not appear that he has ever had substance abuse treatment.

Relationship History: The defendant reported that he had his first serious girlfriend when he was age 13 and she was age 12. From a sexual standpoint, this relationship reportedly involved kissing and "fondling." He said he first had sexual intercourse at age 15. His partner was a

female friend of his brother who he believes was age 25. He said that this was a one-time occurrence. The defendant reported that he met the aforementioned Ms. Jesseca Carson via the Internet. He reported the ability to use a computer and the Internet, although he said his typing is "hunt and peck." As noted above, he described a strong interest in pornography. He said that he viewed pornographic images on the Internet anytime he had the opportunity to do so. He denied that he frequented pay sites, but instead maintained that he viewed only free images. He said that he now wishes that he had never been introduced to pornography. He met Ms. Carson through MySpace and began to exchange messages with her. In addition to communicating through MySpace, they reportedly communicated through instant messaging and spoke via the telephone. He said that he had a lot of contact with her at first followed by no contact for a while. Approximately five months after they first made contact via the Internet, they met in person when they went out to eat together. He said this developed into a romantic relationship. They lived together in an apartment for a period of time and reportedly planned to marry. He said that the use of an Ouija board led to them leaving the apartment because they came to believe that it was haunted. He reported that he did not have a bank account until his relationship with Ms. Carson and that she managed his money. Ms. Carson's daughter is the alleged victim in the current case.

Criminal History: The defendant was interviewed regarding his criminal history with the exception of the alleged offense, which, as was noted above, was not discussed per the instruction provided this evaluator. The defendant was previously convicted of a non-contact sex offense against a child. It appears that this offense took place on or about 3/6/07, when the defendant was age 17. When questioned by law enforcement regarding this offense, the defendant provided an elaborate account regarding an individual named Robert forcing him, with a pistol, to commit the offense. During the current evaluation, however, the defendant acknowledged that he "made up a lie" and that no one forced him to engage in this behavior. The offense occurred at the home of Ms. Sarah Hodges, who was the defendant's neighbor. He said that two sisters lived in the home, an older sister that was his age as well as a younger sister. While he maintained that he had a "crush" on the older sister, the offense occurred against the younger sister, who he said was age 11 at the time. In terms of what the offense involved, he reportedly put pornographic pictures in the child's drawer that included writings on them by him such as "try this" and "call Blaine." The defendant reported that he is ashamed of this offense and wishes he could apologize to the victim. He said he was "high on meth" at the time and that he is a different person when he is high. It appears that the defendant accepted a plea bargain for this offense on 5/28/08. From the records, it seems that he received a deferred sentence of five years in prison and apparently 180 days of jail time followed by community supervision including participation in a sex offender treatment program. In terms of the jail time, he reported during the clinical interview that he was in a jail work release program, where he was allowed to work during the day and then returned to jail at night. There are also notations in the records that were reviewed that suggest this was the case.

In addition to the offense described above and the alleged offense, the defendant was arrested for Assault – Family Violence on 1/21/08 following an altercation with his brother. Available records indicate that the defendant hit his brother while driving. The disagreement between them reportedly stemmed for the defendant attempting to light a cigarette and his brother telling him not to do so with a child present a car. Available records indicate that the defendant's mother also was hit by the defendant during this altercation. The following quote from the defendant's mother regarding the defendant's temper is noted in the law enforcement records, "The mother said she wanted to get Blaine help for his uncontrollable anger due to the fact that

Blaine was easy to upset and when upset he became violent. She said the violence was getting worse." In contrast, when questioned about this by this evaluator, the defendant's mother denied that the defendant has a problem with his anger and stated that law enforcement misunderstood what she said. She also downplayed this fight between her sons and indicated that she believes law enforcement should have stayed out of it. When questioned about this offense during the clinical interview, the defendant reported that after being taken to jail, he posted a $50 bond. He said that the account of this offense documented in the available records is "all wrong" and that he actually did not do anything to his brother. The defendant admitted, however, that like his father, who reportedly had a "short fuse," he can have issues with anger. He maintained that this only occurs when he is "on meth." In terms of his current disposition while free of drugs and alcohol in an incarcerated setting, he reported that he is a "pretty reasonable fellow now."

Institutional Adjustment: The defendant denied difficulties with others during his incarceration stemming from the alleged offense. Throughout the course of the day this evaluator spent with the defendant, he was noted to interact with various members of the correctional staff. During the early course of the evaluation, he was very concerned about having the opportunity to turn in his commissary slip. He maintained that he has difficulty completing his commissary slip correctly, and that when he does so himself, correctional staff "throw it away." As a result, he said he pays another inmate with candy to complete the form for him. He said that his difficulty with completing the form is with adding up the total correctly. As noted above, he reports significant difficulties with math.

## Behavioral Observations & Mental Status Examination:

The defendant presented in jail-issued clothing and appeared his stated age. His grooming and hygiene were fair to good. He typically made good eye contact. His speech, gait and psychomotor behaviors were grossly within normal limits. He was a pleasant and overtly cooperative throughout the evaluation process. The rapport between the evaluator and the defendant seemed to improve following the clinical interview, and this may have contributed to the improved test performance that was observed. Indeed, although measures of test taking effort (see below) were within acceptable limits, the possibility that the defendant's performance during the first testing session was less than optimal was considered based on all available information. Another possible issue during the first testing session may have been the amount of background noise and distraction present that was not an issue during the later testing.

From an emotional standpoint, the defendant's affect was euthymic. He laughed at times and made use of humor. He reported that his sleep varies because he is at times bothered by nightmares. With respect to his appetite, he indicated that he has gained 85 pounds, and that he tends to gain weight when he is depressed. With respect to suicidal ideation, he reported that although he has wished that a truck would hit him, he does not have a plan to harm himself.

Throughout the evaluation, the defendant's thought processes were goal directed and logical. He denied hallucinations and no signs of such were observed. He was in touch with reality and did not appear to be delusional in his thinking, although he did report strong beliefs regarding magic and the influences of things such as spirits. He reported that he has been told about these things by others and that he is prone to believe what he is told. He stated, "I'm a real gullible person. Did I say that right?" He also stated, "If someone tells me something I'm going to believe it." With respect to specific experiences, he described an incident when he was

approximately age nine where he believes he saw a man with long hair, who was bloody and coming toward him. He also reported various beliefs regarding the power of Ouija boards.

Cognitively, the defendant impressed as an individual with below average intelligence. He seemed to have a good understanding of the circumstances surrounding the current evaluation. He was aware of the likely date of his upcoming trial. He displayed an interest in social interaction and attempted to make conversation with others. His fund of information seemed basically consistent with his apparent level of intellectual functioning. His attention, concentration and memory abilities appeared grossly intact.

## Prior Psychological Test Results:

A previous psychological evaluation of the defendant by Paul Andrews, Ph.D., ABPP was conducted on 11/20/09 and 12/10/09. The test data from this evaluation were provided to this evaluator and the following is a summary of the results. On 11/20/09, the defendant was administered for the first time by Dr. Andrews the Green Word Memory Test (WMT), a measure of test-taking effort. He was also administered the Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV), an individually administered comprehensive intelligence test. With respect to the results of the WMT when administered on 11/20/09, it should first be noted that the subtests most frequently utilized as primary effort measures are Immediate Recognition (IR), Delayed Recognition (DR) and Consistency (CS) and that the WMT manual indicates that "a clear fail is one in which any one of these scores is at or below 82.5% correct." In this regard, the 11/20/09 administration of the WMT, based on the information provided by Dr. Andrews, appears to meet criteria as a suboptimal effort profile, as two of the three primary effort measures fell below this threshold (IR=75, CS=80). It should be noted that the manual states that "If any of the primary effort scores are 82.5% or below, there is a very high probability that other test scores from the same person significantly underestimate the person's actual abilities, owing to poor effort." It is also noted that "there are very few 'false positives,' with the exception of people with dementia." Concerning the other three measures of note on the WMT, the defendant obtained a Multiple Choice (MC) score of 65%, Paired Associates (PA) of 60% and a Free Recall (FR) score of 35%. The manual states that "Scores of less than 70% correct on MC or less than 60% on PA would be very suspicious, except in someone with dementia or profound amnesia."

On the WAIS-IV as administered by Dr. Andrews, the defendant's Full Scale IQ was 71 [3rd %ile; CI (95%) 68-76], which falls in the Borderline range. His performance on the General Abilities Index (GAI), a measure of overall intellectual functioning with less influence from working memory and processing speed, also fell within the Borderline range [77; 6th %ile; CI (95%) 73-83]. His Verbal Comprehension Index (VCI) score was 74 [4th %ile; CI (95) 69-81], which falls in the Borderline range. His Perceptual Reasoning Index (PRI) score was 84 [14th %ile; CI (95) 79-91], which falls in the Low Average range. His Working Memory Index (WMI) score was 74 [4th %ile; CI (95) 69-82], which falls in the Borderline range. His Processing Speed Index (PSI) score was 68 [2nd %ile; CI (95) 63-80], which falls in the Extremely Low range. Notably, his PRI score was significantly higher than both his VCI and PSI. When using the VCI and PRI subtest mean scaled scores as a source of comparison, the Block Design and Matrix Reasoning subtests were identified as relative weaknesses, whereas the Visual Puzzles subtest was identified as a relative strength.

On 12/10/09, Dr. Andrews administered to the defendant an extended battery of tests that appears to have included a re-administration of the WMT as well as the Test of Memory

Malingering (TOMM), Stanford Binet Intelligence Scales – 5th Edition (SB5) and the Sentence Comprehension and Math Computation subtests of the Wide Range of Achievement Test – Fourth Edition (WRAT-4). In addition, several neuropsychological tests were administered, some of which the results were difficult to decipher from the information provided. These included the Cognistat, Trail Making Test (Part A and B), Wisconsin Card Sorting Test (WCST), Rey-Osterrieth Complex Figure Test, Controlled Oral Word Association, Rey Auditory Verbal Learning Test and Symbol Digit Modalities Test.

Turning to the results of this battery of tests, the outcome of the 12/10/2009 administration of the WMT by Dr. Andrews also appears to fall within the suboptimal effort range when looking at the primary effort measures described above (IR=65, DR=80, CS=80), all of which fell below 82.5%, as well as the previously described memory measures (MC=60, PA=60, FR=45).

Like the WMT, the TOMM is also a measure of test-taking effort. In contrast to the WMT results, the defendant apparently performed well on the TOMM, as he obtained a 47 on Trial 1, a 50 on Trial 2 and a 49 on the Retention Trial. These results suggest adequate effort on this measure.

The SB5 is another individually administered comprehensive intelligence test. This assessment provides three different IQ estimates as well as five Factor Index Scores. The defendant's Full Scale IQ on the SB5 was 80 [9th %ile; CI (95) 76-84], which falls in the Low Average range. His Verbal IQ was 90 [25th %ile; CI (95) 84-96], which falls in the Average range, while his Nonverbal IQ was 72 [3rd %ile; CI (95) 67-79], which falls in the Borderline Delayed range. It is striking that on this test his verbal abilities were measured as being significantly better than his nonverbal ones. With regard to factor index scores, he obtained a 71 [3rd %ile; CI (95) 66-82] on Fluid Reasoning, which falls in the Borderline Delayed range. He obtained a 97 on Knowledge [42nd %ile; CI (95) 89-105], which falls in the Average range and was identified as a relative strength for him. On Quantitative Reasoning, he obtained a score of 78 [7th %ile; CI (95) 72-88], which falls in the Borderline Delayed Range. His Visual Spatial score of 88 [21st %ile; CI (95) 81-97] falls in the Low Average range. Working Memory was estimated at 80 [9th %ile; CI (95) 74-90], which falls in the Low Average range.

As was noted above, information was only available for two subtests of the WRAT-4 as administered by Dr. Andrews. The WRAT-4 is a measure of achievement. On the Sentence Comprehension subtest, he achieved a score of 80 [9th %ile; CI (95) 73-88; 6.2 Grade level], while on the Math Computation subtest, he achieved a score of 60 [0.4 %ile; CI (95) 52-73; 2.7 Grade level].

In terms of the neuropsychological instruments that were administered, one was apparently the Cognistat. Although not totally clear from the information provided, it seems that on this measure the defendant performed in the average range in the areas of Orientation, Attention, Comprehension, Repetition, Naming, Memory, Similarities and Judgment, while in the area labeled as Calculate, his performance fell in the range of mild impairment.

On the Trail Making Test Part A, which is typically considered a measure of processing speed, the defendant's performance as scored by Dr. Andrews fell in the Mildly Impaired range [t=39; 14th %ile]. On the Trail Making Test Part B, which is typically considered a measure of processing speed and mental set shifting, his performance as scored by Dr. Andrews fell in the Mildly to Moderately Impaired range [t=32; 4th %ile].

The WCST is a card sorting task that measures executive functioning and mental set shifting. Results indicate that he was able to complete all six categories of task (>16th %ile). He exhibited one loss of set, which is a failure to maintain the current sorting principle (>16th %ile). He made 25 perseverative responses during the test [t=39; 13th %ile], which falls in the mildly impaired range.

The other psychological tests administered by Dr. Andrews were more difficult to decipher based on the information provided, but the following appears to representative of the findings based on the notations of Dr. Andrews on the test protocols. On the Rey-Osterrieth Complex Figure Test, it appears that the defendant performed in the severely impaired range on Copy (Scaled Score = 1), in the borderline range on Immediate Recall (Scaled Score = 6) and in the borderline range on Delayed Recall (Scaled Score = 5). On the Controlled Oral Word Association, Dr. Andrews noted that the defendant performed in either the normal or mildly impaired range, depending on which norms are used. On the Rey Auditory Verbal Learning Test, Dr. Andrews apparently found the defendant to be in the severely impaired range on Learning (T = 14), the below average range on Recall (T = 43) and the above average range on Recognition. Finally, based on the information provided by Dr. Andrews, it appears that on Symbol Digit Modalities Test, the defendant performed in the severely impaired range when this test was administered in written format and in the mildly to moderately impaired range when it was administered orally.

## Current Psychological Test Results:

Assessment of Effort (Rey 15-Item Test, TOMM and Dot Counting): The defendant's test-taking effort was assessed at three different intervals (i.e., near the beginning, middle and end of the psychological testing). The Rey 15-Item Test was given toward the beginning of the first testing session. On this test, his score was 11 out of 15, which suggested acceptable test-taking effort on this task. The TOMM was given toward the early portion of the second testing session, which followed the clinical interview. On this test, the defendant obtained a score of 49 out of 50 on Trials 1 and 2, which is suggestive of adequate effort on this task. Finally, the Dot Counting Test was given toward the end of the second testing session. He earned an E-Score of 18 on this test. Whether or not this result suggests adequate effort depends on the comparison group used, but when all available information is considered, it appears to suggest adequate effort on this test. Taken in combination, the results of these tests indicate that the defendant put forth acceptable effort on these measures. It must be noted; however, that the defendant expressed prior experience with some of the measures, which raises the possibility of practice effects that could have possibly increased scores slightly. It could also be noted that despite his scores on these measures, as was noted above, some concerns regarding less than optimal test performance during the first testing session (i.e., the WAIS-IV test results) appears warranted when all available information is considered.

WAIS-IV – The defendant's intellectual abilities were measured with the WAIS-IV, the test that was previously administered to him by Dr. Andrews. His composite scores on this measure were as follows:

| Index | Index Score | 95% Confidence Interval | %ile Rank | Qualitative Description |
|---|---|---|---|---|
| Verbal Comprehension (VCI) | 72 | 67-79 | 3rd | Borderline |
| Perceptual Reasoning (PRI) | 77 | 72-84 | 6th | Borderline |
| Working Memory (WMI) | 71 | 66-80 | 3rd | Borderline |
| Processing Speed (PSI) | 71 | 66-82 | 3rd | Borderline |
| General Ability (GAI) | 72 | 68-78 | 3rd | Borderline |
| Full Scale IQ (FSIQ) | 68 | 65-73 | 2nd | Extremely Low |

With respect to this administration of the WAIS-IV, a few comments are warranted. The Similarities subtest for the Verbal Comprehension Index was not used because it was discontinued prematurely during administration. This premature discontinuation occurred because although it appeared that his response to item #9 on this subtest was poor and warranted a score of "0," further inspection after the test was completed revealed a score of "1" was appropriate. It is of note based on the defendant's performance on the Similarities subtest when it was previously administered to him by Dr. Andrews, it does not appear that he would have answered any further items correctly had they been administered to him. Nonetheless, to account for Similarities not being used, the VCI was prorated and the FSIQ and GAI were derived using the prorated VCI.

It is the opinion of this evaluator that the scores listed above, which are based on prorating, are the most appropriate manner in which to present the defendant's performance on this administration of the WAIS-IV. These scores are quite similar to the defendant's prior administration of this test by Dr. Andrews, although it is somewhat surprising that these scores are somewhat lower, given that this administration took place second. Of course by these WAIS-IV results and those obtained by Dr. Andrews must be considered in light of the previously noted test results and observations regarding test-taking effort.

It may be of interest to the reader that had the scoring of the defendant's WAIS-IV included the prematurely discontinued Similarities score (Raw Score =11; Scaled Score = 3), rather not using that subtest in favor of the prorating method, it would have changed the overall results only slightly. The VCI would have differed by 4 points. Specifically, the VCI would have been 68 [2nd %ile; CI (95%) 64-75], instead of the prorated result, which was 72 [3rd %ile; CI (95%) 67-79]. The GAI would have differed by 2 points. Specifically, the GAI would have been 70 [2nd %ile; CI (95%) 66-76], instead of the prorated result, which was 72 [3rd %ile; CI (95%) 68-78]. The FSIQ would have only differed by only 1 point. Specifically, it would have been 67 [1st %ile; CI (95%) 64-72], instead of the prorated result, which was 68 [2nd %ile; CI (95%) 65-73].

RIAS - The RIAS is also an individually administered test of intelligence. The defendant's overall summary scores on the RIAS were as follows:

| Index | Standard Score | 95% Confidence Interval | %ile Rank | Qualitative Description |
|---|---|---|---|---|
| Verbal Intelligence Index (VIX) | 78 | 73-86 | 7th | Moderately Below Average (i.e., Borderline) |
| Nonverbal Intelligence Index (NIX) | 87 | 81-94 | 19th | Below Average (i.e., Low Average) |
| Composite Intelligence Index (CIX) | 80 | 75-86 | 9th | Below Average (i.e., Low Average) |

It is of note that there was a 9-point difference between Mr. Milam's VIX and his NIX. This indicates that his nonverbal abilities exceeded his verbal abilities on this measure. While this same trend was also present on the prior WAIS-IV administrations, it is of note that the opposite trend was noted on the SB5.

WRAT-4 - The defendant's academic abilities were assessed with the WRAT-4 and his scores are as follows:

| Subject | Standard Score | 95% Confidence Interval | %ile Rank | Grade Equivalent |
|---|---|---|---|---|
| Word Reading | 82 | 74-91 | 12th | 6.9 |
| Sentence Comprehension | 86 | 79-94 | 18th | 8.2 |
| Spelling | 77 | 69-87 | 6th | 5.1 |
| Math Computation | 55 | 47-69 | 0.1 | 1.9 |
| Reading Composite | 82 | 76-88 | 12th | N/A |

The defendant's scores on the WRAT-4, especially on verbal and written subtests, are generally within the range of what could be expected, if not higher than expected, given his performance on intelligence testing. His math computation score of 55 indicates that this is an academic area where his skills fall well below expectations.

**Diagnoses:**

The following diagnoses are based on the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition-Fourth Edition-Text Revision (DSM-IV-TR) published by the American Psychiatric Association (2000):

| AXIS I: Clinical Disorders/Other Conditions of Clinical Attention | |
|---|---|
| Diagnostic Code | Disorder or Condition |
| 304.40 | Amphetamine Dependence, Sustained Full Remission, In a Controlled Environment |
| 305.00 | Alcohol Abuse |
| 315.1 | Mathematics Disorder |
| | Rule-Out Pedophilia, Sexually attracted to Females, Nonexclusive Type |
| | |
| AXIS II: Personality Disorders/Mental Retardation | |
| Diagnostic Code | Disorder or Condition |
| V62.89 | Borderline Intellectual Functioning |
| | Rule-Out Personality Disorder Not Otherwise Specified with Antisocial Traits |
| | |

## Conclusions & Opinions:

The defendant, Mr. Blaine Keith Milam, is charged with Capital Murder. On 3/26/10, he underwent a forensic psychological evaluation and it was requested that this evaluation include a consideration of diagnostic issues including a determination of whether or not he meets the diagnostic criteria for mental retardation. While this evaluator is unable to anticipate all potential questions that might be asked of me at trial, especially given that I am currently unaware of the opinions of the experts that might potentially be called at the request of defense counsel, the following paragraphs summarize my conclusions and opinions in this case based on the information currently available to me.

It is my opinion that the defendant does not meet criteria for mental retardation. The diagnoses provided above are based on the DSM-IV-TR; however, regardless of the definition of mental retardation used, three elements are typically considered: 1) significantly subaverage intellectual functioning; 2) significant deficits in adaptive functioning; and 3) onset prior to age 18. It is my opinion that none of these three elements is present on the part of the defendant. My reasons for this opinion are summarized in the paragraphs that follow.

With respect to the first of these elements, it is my opinion that the defendant does not present with significantly subaverage intellectual functioning. While one of the four available Full Scale IQ scores falls below 70 and another is at 71, there are also two scores of 80. When all four of these scores are taken into consideration, the results do not appear consistent with someone with significantly subaverage intellectual functioning, but rather, they suggest borderline intellectual functioning. It is of note that it is this evaluator's opinion that the defendant does not meet the criteria for significantly subaverage intellectual functioning even prior to consideration of the possibility that some, or even all of these scores, might represent an underestimate of his true level of functioning. As was described above, several possible indicators of suboptimal

performance are present. Indeed, based on the test data reviewed, it appears that while the defendant did well on several measures of test taking effort, he twice obtained suboptimal effort profiles on the WMT as administered by Dr. Andrews. Also of concern is some of the variability that was noticed across the intelligence tests that were administered. For example, the discrepancy between his verbal and nonverbal abilities on the SB5 as compared to the other measures is difficult explain. That he performed better on the SB5 than the WAIS-IV is surprising, as more typically the opposite pattern is observed. Further, as was described above, there appear to be reasons, when all available information is considered, to question whether the WAIS-IV administration by this evaluator represents a true measure of the defendant's abilities. Although the difference is rather small, that the WAIS-IV Full Scale IQ score obtained by this evaluator was lower than the one obtained by Dr. Andrews is surprising given that the current score was obtained second. This finding appears even more surprising when it is considered that the WMT results obtained from Dr. Andrews appear to suggest that suboptimal effort may have been an issue during his administration. As described previously, other issues that may have contributed to an underestimate of the defendant's true abilities during the current WAIS-IV administration include the presence of background noise and distraction during the administration and the observation that the rapport between the evaluator and the defendant appeared to improve during the clinical interview, and that in conjunction with this, his performance on psychological testing seemed to improve. Finally, it is of note that in addition to the above issues, at least some consideration of the possible impact of the defendant's extreme lack of education on his intellectual testing performance should be considered. While intelligence tests attempt to minimize the impact of education, some tasks, such as those involving vocabulary, by their nature have at least some educational component to them. That the defendant's intelligence test scores would be higher if he had benefited from a more adequate education certainly remains a possibility. In total, it is the opinion of this evaluator that the defendant's level of intellectual functioning is most consistent with the borderline range and not of that of a person with mental retardation.

Moving to the next element, while it is certainly the case of the defendant, as all people do, has strengths and weaknesses, he does not present with clearly identifiable areas of adaptive functioning in the significantly impaired range. With respect to the adaptive functioning area of functional academic skills, it is of note that despite a very limited educational background, his academic abilities, with the exception of mathematics, appear to be at a level higher than one would expect for a person with mental retardation. Indeed, his performance on a sentence comprehension test administered by this evaluator was at a grade level that is typically considered beyond that which those with mild mental retardation reach. As is the case with the area of functional academic abilities, it does not appear that the other relevant areas of adaptive functioning fall in the significantly impaired range with this defendant and therefore this element of the definition of mental retardation is also not met in my opinion.

With respect to the third element, which is onset prior to the age of 18, it must first said that in addition to significantly subaverage intellectual functioning and significantly subaverage adaptive functioning not being present at the current time, it is also the case that there is not evidence that these elements were present prior to the age of 18. Indeed, there appears to be no indication in the records and other materials available for review that the defendant has ever received a diagnosis of mental retardation. While the educational records available are clearly sparse, they do not indicate a diagnosis of mental retardation. Indeed, these records indicate that the defendant's last "Full and Individual Evaluation report" was dated 2/8/00 and only indicated "speech impairment," with no other diagnoses. It is certainly the case that some of the

individuals who have had contact with the defendant have described him with terms such as "slow," however, it does not appear that he was ever diagnosed or considered to have mental retardation prior to the age of 18.

Although Mr. Milam does not meet criteria for mental retardation, he does present with borderline intellectual functioning; mathematics disorder, amphetamine dependence, in full sustained remission, in a controlled environment; and alcohol abuse. With respect to the borderline intellectual functioning diagnosis, it must be said that while the defendant does not meet criteria for mental retardation, he does present with below average intellectual functioning. When interacting with the defendant, his presentation suggests below average intellectual functioning and this also appears to be suggested by the test results. Based on this, a diagnosis of borderline intellectual functioning is warranted. In addition to borderline intellectual functioning, the defendant meets criteria for a mathematics disorder. While his other areas of academic functioning are mostly consistent with his level of intellectual functioning, his mathematic abilities are below what would be expected. The other two diagnoses; namely amphetamine dependence, in full sustained remission, in a controlled environment and alcohol abuse, deal with the defendant's substance dependence/abuse problem. In addition to these four diagnoses, two "rule-out" considerations are listed above. This means that although these conditions are not diagnosed, they require further consideration prior to being ruled out. The first rule-out consideration is pedophilia, sexually attracted to females, nonexclusive type. Without even addressing the alleged offense, it appears that this diagnosis warrants consideration based on his prior sexual offense. The second rule-out consideration is a personality disorder not otherwise specified with antisocial traits. While it does not appear that the defendant met criteria for a conduct disorder prior to the age of 15, which would be required for diagnoses of antisocial personality disorder, evidence of at least some antisocial personality traits are present.

The above findings, conclusions and opinions are based on the information currently available to me. If additional information becomes available in the future or if any factual errors were made on my part, please let me know. Please note that this evaluator reserves the right to make adjustments or changes to the above diagnoses and opinions if new information becomes available that warrants such changes.

Respectfully Submitted,


Timothy J. Proctor, Ph.D., ABPP
Board Certified in Forensic Psychology

Exhibit 9

# Paul Andrews, Ph.D.

Clinical and Forensic Psychologist
Diplomate, American Board of Professional Psychology
Assessment and Treatment

P. O. Box 6691                                   (903) 581-2085 (Office)
Tyler, Texas 75711                               (903) 595-1645 (Fax)

## NEUROPSYCHOLOGICAL SCREENING REPORT

Examinee:  Blaine Milam
DOB:  12/12/89            Age: 19:11
Dates of Evaluation: 11/20/09 & 12/10/09
Date of Report: 1/18/10
Examiner: Paul Andrews, Ph.D.

ASSESSMENT INSTRUMENTS:
> Clinical Interview
> Neurobehavioral Cognitive Status Exam (Cognistat)
> Wechsler Adult Intelligence Scale, 4th Edition (WAIS IV)
> Stanford-Binet Intelligence Scales, 5th Edition (SB-5)
> Wide Range Achievement Test, 4th Edition (WRAT 4)
> Trail Making Test, Parts A & B
> Wisconsin Card Sort Test, Revised (WCST-R)
> Controlled Oral Word Association (COWA)
> Symbol Digit Modalities Test (SDMT)
> Word Memory Test (WMT)
> Test of Malingered Memory (TOMM)
> Rey Auditory Verbal Learning Test (RAVLT)
> Rey-Osterrieth Complex Figure (ROCF)

REASON FOR REFERRAL:
> The client was referred for neuropsychological evaluation by his attorney, Mr. Rick Hagan.  The reasons for referral were discussed with the examinee  who gave permission for the assessment and for a copy of the report to be sent to his attorney.

BACKGROUND INFORMATION:
> The following summary is based on information obtained from the examinee during interview  and has not been verified from other sources unless noted.

> Mr. Blaine Milam, a white male who was nineteen at the time of testing but within a few days of his twentieth year, reported he is the youngest of three children born to his parents.  He said his mother remains alive but said his father died in 2008, an event that reportedly affected the examinee harshly.  He reported family history of substance abuse and some family violence although not in recent years.  He said he made average grades in school but was in speech

therapy. He said he never repeated any years but went to summer school after the fifth grade. He stopped attending public school during the sixth grade after being paddled by the principal and was home schooled to finish out the year. He eventually completed about half of the seventh grade curriculum in a couple of home school arrangements and then went to work with his father doing repairs on natural gas equipment until the age of sixteen. At that point, he took a job at an oil change shop and later at a tire store. He said he had been incarcerated since December 2, 2008.

This young man reported he has a history of hypertension that had led to kidney problems and surgery at age seven. He said he now has migraine headaches every other day. He said he had never been knocked unconscious nor suffered stroke or seizure but experienced a hard blow to the head in a vehicle accident in December, 2008; he said he received no medical care. He said headaches have been worse since that event. He reported he had once been sent to see a psychiatrist for medication for depression and stress but refused to take the medicine because he thought it would interfere with his use of methamphetamine. He said he had "always been a little suicidal" and had cut his wrist in November, 2008; he said he was evaluated but not kept at hospital. He reported two other suicide attempts (overdose on Vicodin; attempt to shoot self but interrupted by girlfriend) but no psychiatric hospitalization, medication, nor counseling.

The examinee said he first started sneaking use of alcohol at age thirteen and by age fifteen was drinking a pint of schnapps a day. By sixteen, he started using methamphetamine and cut back sharply on his alcohol use. He said he had experienced several alcohol related blackouts before he stopped using and had received one ticket for Minor in Possession. He said his last use of alcohol was at the time of his father's funeral in 2008. He reported use of marijuana starting at age twelve but no regular use. His last reported use was in October, 2008. He said he used cocaine extensively for a brief time in 2008 until a friend overdosed but survived. He reported use of methamphetamine on a weekly basis for about a year starting at age sixteen; he cut back and finally stopped using until his father's death in 2008 at which point he continued to use regularly until incarcerated. He stated he had misused Vicodin and had tried Ecstacy but no other street drugs.

The examinee said he was in trouble for Minor in Possession at age sixteen and for Aggravated Sexual Assault (occurred at sixteen but case resolved at age eighteen). He said he is currently in jail on a charge of Capital Murder. He said he had been in few fights, had not been involved in vandalism nor been truant from school, but had been involved in some other conduct disorder type behaviors when using drugs. He also reported a history of problems with gambling when using drugs. He said he has never been married and has no children that he knows about. Prior to being locked up, he was living with his mother, his brother, and his eighteen year old girlfriend.

BEHAVIORAL OBSERVATIONS/MENTAL STATUS EXAM:
The examinee was dressed in jail attire and showed no problems with hygiene at either of the two evaluation sessions. He was in a good mood and talked spontaneously with the

examiner. He recalled the examiner's name at the time of the second session and also recalled some of the tests he had taken during the previous session. He was cooperative with interview and testing. He showed apparent good recall for life events and pegged events being asked about to other specific events in his life. He said he was reading his Bible on a daily basis and found help from doing so since being in jail.

This man said he has trouble getting to sleep and remaining asleep but also sleeps about four hours during the daytime. He said he has "always" had trouble sleeping. He said he has nightmares four or five times a week, an experience he has had since before jail. He said he has always had problems with concentration but has never been diagnosed with Attention Deficit Disorder. He said he has been depressed for a long time but increasingly so since being in jail; he said he is weepy about every other day, eats more, and feels hopeless but not suicidal or homicidal. He said he has intrusive thoughts and images of his father in a coffin and thinking how he is unable to help his mother. He said he worries and experiences headaches and diarrhea as a result of worry; he also reported a lifelong history of startle response. He reported having felt paranoid when taking drugs but not otherwise. He reported no history of hypomanic episodes, hallucinations, or obsessive/compulsive behaviors.

TEST RESULTS AND INTERPRETATION:

ORIENTATION:
This man was oriented to person, place ("Henderson, in jail"), and date. There was never any indication during the six hours of interviews and testing that he was unaware of his circumstances nor was disoriented.

ATTENTION:
During the two interview and testing sessions, there was never any indication the examinee was distracted by internal stimuli such as hallucinations. The client scored in the Low Average range (Scale Score 7, range 1-19) on the Digit Span subtest of the Wechsler Adult Intelligence Test, 4th Edition (WAIS IV). This test is one that measures attention and immediate memory. Working Memory Index of WAIS IV was in the Borderline Intellectual Functioning range but consistent with the Full Scale IQ score on that test. The Working Memory Index score of the Stanford-Binet, 5th Edition (SB-5) was in the Low Average range and again consistent with the Full Scale IQ score on that test.

However, there were some test results that could indicate greater problems with attention. For instance, the examinee scored in the Moderately Impaired range for a task involving divided attention (Trail Making Test, Part B) and appeared to have difficulties attending to verbally presented memory tasks (Rey Auditory Verbal Learning Test, Word Memory Test). In addition, on Controlled Oral Word Association he lost track of the letter being used to generate a word list and reverted to an earlier used letter.

INTELLIGENCE & ACHIEVEMENT:

On the WAIS IV, the examinee obtained a Full Scale IQ score of 71(Borderline Intellectual Functioning range, 3rd percentile of normal population; 95% confidence range 68-76). Other Index scores were: (mean = 100, standard deviation = 15)

Verbal Comprehension 74
Perceptual Reasoning 84
Working Memory 74
Processing Speed 68

Specific subtest scores were: (mean = 10, standard deviation = 3)

| Block Design | 5 | Similarities | 5 |
|---|---|---|---|
| Matric Reasoning | 5 | Vocabulary | 6 |
| Visual Puzzles | 12 | Information | 5 |
| Symbol Search | 5 | Digit Span | 7 |
| Coding | 3 | Arithmetic | 4 |

As the Full Scale IQ score was very near the cutoff level for mental retardation and there was some concern that limited schooling might have affected the results on the WAIS IV, a second IQ test was administered during the second session (Stanford-Binet, 5th Edition (SB-5)). On this test, the examinee's scores led to Full Scale IQ score 80 (Low Average range, 19th percentile of general population; 95% confidence level 76-84). As with the WAIS, mean is 100 with standard deviation of 15 points. Other scores were:

| Verbal IQ | 90 |
|---|---|
| Nonverbal IQ | 72 |
| Fluid Reasoning | 71 |
| Knowledge | 97 |
| Quantitative Reasoning | 78 |
| Visual Spatial | 88 |
| Working Memory | 80 |

There were no studies found by this examiner that directly compared WAIS IV and SB-5 scores. The best available information (found in the technical manuals for the tests) indicated SB-5 scores are generally lower than WAIS III (earlier version of WAIS IV) (5.5 points on Full Scale IQ, 5.7 points for Verbal IQ, 3.5 for Performance IQ). WAIS III scores are generally lower than WAIS IV scores also though by smaller numbers (2.9 points for Full Scale IQ, 2.7 for Verbal IQ, 2.2 for Performance IQ). Although it would not be appropriate to merely add or subtract these numbers in order to compare scores, it appears that generally a person who takes both WAIS IV and SB-5 IQ tests would be expected to score lower on SB-5 by at least a few points. This man's IQ scores did not reveal such a pattern but a reverse pattern; in addition, his Full Scale IQ scores had only a single point overlap for the 95% confidence interval (68-76 on WAIS IV and 76-84 on SB-5).

On the Wide Range Achievement Test, 4th Edition (WRAT 4), the client produced low scores. Specific subtest scores and grade levels were: (mean = 100, standard deviation = 15)

| Subtest | Standard Score | Grade Equivalent |
|---|---|---|
| Sentence Comprehension | 64 | 6:5 |
| Math Computation | 55 | 2:7 |

EXECUTIVE FUNCTIONING/PROBLEM SOLVING:

The examinee was given Trail Making Test, Parts A & B, which require the person to draw lines connecting randomly placed circles in order depending on the numbers or letters contained in the circles. On the more simple task which involved only numbers, the examinee made one error and completed the task in 43 seconds to score in the Mildly Impaired range. However, on the more complex task which involved alternating between numbers and letters in a consecutive manner, he made three errors and took 183 seconds to score in the Moderately Impaired range. Results suggested he is probably has difficulty in sustaining divided attention.

Another problem solving test given to the examinee was the Wisconsin Card Sorting Test-Revised (WCST-R). This task requires a person to sort colored cards to undisclosed patterns given only minimal feedback from the examiner and tests a person's ability to form, test, and modify hypotheses. The examinee was able to sort six categories with only one loss of focus (Failure to Maintain Set). Scores were in the Low Average to Mildly Impaired ranges and suggest no severe impairment in abilities to shift perception, use instructions and feedback, and to engage in flexible thinking in a novel problem solving task.

Other timed tasks requiring problem solving and/or visual-motor speed suggested difficulties. On Symbol-Digit Modalities Test, a coding task involving numerals and symbols, this man scored in the Severely Impaired range for the written part but faired better with oral responses (Mildly to Moderately Impaired range) as he had on Symbol Search on the WAIS IV. He also scored in the Mildly to Moderately Impaired range for Controlled Oral Word Association (COWA), a timed task requiring the examinee to name words starting with particular letters.

Fluid Reasoning Index on the SB-5, a measure of verbal and nonverbal problem solving abilities, was the lowest index score on this test (71; Borderline Impaired range, 3rd percentile). Verbal problems were solved better (Low Average range) than were nonverbal problems (Moderately Impaired range).

MEMORY:

On the Rey Auditory Verbal Learning Test (RAVLT), a learning and memory test involving an orally presented list of non-related words, this man scored in the Severely Impaired range for ability to learn the word list efficiently. He scored in the Low Average range for ability to recall the items from the list after an interference task and in the High Average range for ability to accurately recognize words from the list versus foils. Results suggest difficulties learning new material very efficiently but good abilities to retain what is learned.

Results of the Word Memory Test (WMT) were problematic. On the first day of testing, this man's scores for the memory component averaged 53% which is far below what is seen in the general population or even clinical cases of head injured patients thought to be making good effort. In addition, the scores for the motivation component ranged from 75% to 95% correct which is suggestive of significant fluctuation of motivation.

The WMT was presented again during the second session of testing at which time the examinee's scores on the memory part were essentially the same (average 55%) with lower scores on the motivation component (65% to 80%). Again, results suggest fluctuating level of motivation and in fact are thought to represent poor effort and/or attempts feign cognitive difficulties according to the test author (Green, 1995).

The Test of Memory Malingering (TOMM), a task requiring memory for visually presented items, was presented later on the second day of testing. On this test, the examinee missed three on the first trial, had a perfect score on the second trial, and missed only one in the retention component. Scores were in the normal range and did not indicate any problems with poor participation or feigning memory problems. While this test has not been shown to be as sensitive to poor effort as the WMT, such good scores on this test would argue against deliberate efforts to "look bad." Discrepancies between these results and those from the WMT might be explained by difficulties in verbal memory, problems attending to oral stimuli, or fluctuation in motivation depending on nature of stimuli.

VISUAL/SPATIAL:
The examinee showed some difficulties with visual/spatial processing. His score on the Block Design subtest of the WAIS IV was in the Mildly to Moderately Impaired range (Scale Score 5, range 1-19) although the Perceptual Reasoning Index score (heavily reliant on visual processing and problem solving) was in the Low Average range and the Visual Puzzles score in the Average to Above Average range (Scale Score 12, range 1-19). Visual Spatial Index on the SB-5 was in the Low Average range.

However, on a task requiring copy of a complex geometric figure (Rey-Osterrieth Complex Figure (ROTC)), this man showed poor ability to organization the reproduction and scored in the Severely Impaired range although he got the overall gestalt of the figure. Scores for immediate and delayed recall of the figure were in the Mildly and Mildly to Moderately Impaired ranges respectively but began to show problems with both overall gestalt and internal detail.

LANGUAGE:
On the Cognistat, the client scored in the Average range for tests of language comprehension, sentence repetition, and object naming. Results do not suggest problems with language comprehension or production. Results of word production on COWA were in the Mildly to Moderately Impaired range; deficits could be attributable to problems with attention as well as to difficulties with language skills (word knowledge) for this task.

DIAGNOSTIC IMPRESSIONS:
     The following diagnostic impressions are offered based on criteria from the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, Text Revision (DSM IV TR).  Axis I lists clinical disorders which are usually the focus of mental health treatment.  Axis II is sued to note more chronic conditions such as mental retardation or personality disorders.  Axis III is the location for listing medical problems.  Axis IV lists current psychosocial stressors, and Axis V is an estimate of current functioning and difficulties based on a list of behavioral descriptors.

| | |
|---|---|
| Axis I | Adjustment Disorder with Anxiety and Depressed Mood (309.28) Mild, Provisional |
| | Mild Neurocognitive Disorder (294.9) Provisional |
| | History of polysubstance abuse, reported remission in controlled setting |
| Axis II | Deferred |
| Axis III | Reported history of head injury, migraine headaches, hypertension, and kidney problems |
| Axis IV | Incarcerated; facing capital murder charge |
| Axis V | GAF (range 1-100) Current: 60 - 65   (Mild to Moderate symptoms) |

SUMMARY AND RECOMMENDATIONS:
     Mr. Blaine Milam, who was near age twenty at the time of testing, was evaluated at the request of his attorney in order to provide information about cognitive functioning.  Two different standard IQ tests indicated scores in the Borderline Intellectual Functioning (WAIS IV) or Low Average range (SB-5).

     Overall results indicated several areas of possible deficits.  There were consistently seen problems with processing speed which deteriorated even further with a complex task or with a psychomotor component.

     There was some evidence for problems with reasoning skills, particularly with some nonverbal tasks detecting patterns; however, one nonverbal reasoning task resulted in a strong score (High Average score on Visual Puzzles on WAIS IV).  There also appears to be some difficulty with attention and memory skills as well although scores showed variation from Severely Impaired to Average.  Visual spatial skills also showed areas of deficit although again there was great variation of scores (Severely Impaired to High Average).  Fluctuating level of motivation may be part of the explanation as suggested by one test of response bias that the examinee failed.  However, on another test of motivation, he obtained almost perfect scores.

     Please contact me if you have questions regarding this report or recommendations .

Paul Andrews, PhD           1.17.10
Paul Andrews, Ph.D., ABPP (Forensic)
Texas License No. 25607

## Summary of Test Scores

Name: Blaine Milam                     DOB: 12/12/1989
Date of Evaluation: 11/20/09

WAIS IV                                WMT
    FSIQ  71                      Memory component   53% (avg)
    VCI    74                  Motivation component   83% (avg)
    PRI    84
    WMI  74
    PSI    68

Date of Evaluation: 12/10/09
SB-5                                   WMT
    FSIQ  80                      Memory component  55% (avg)
    NVIQ  72                      Motivation component   75% (avg)
    VIQ    90
    FRI    71              TOMM (raw scores)
    KNI    97                  47, 50, 49
    QRI    78
    VSI    88              ROCF (scale scores)
    WMI  80                      Copy SS 1
Trails                                     Immediate SS 6
  A 43" 1 error                        Delay SS 5
  B 183" 3 errors
                                       RAVLT (raw scores)
                                         1-5 learning = 34
                                         Recall = 10      Recognition = 15/15
WCST-R (raw scores)
  Categories 6, 128 sorts           COWA (raw scores)
  FMS 1    Errors 45                  C = 6  F = 12  L = 4
  Perseverations 25
  Conceptual Level Responses 70     SDMT (raw scores)
                                         Written = 29  Oral = 45
WRAT 4 (raw scores)
  Sentence Comprehension = 33       Cognistat (raw scores)
  Math Computation = 23               Average range except for Calculation (2/4)

Exhibit 10



UNIVERSITY *of* HOUSTON
Department of Psychology

**Jack M. Fletcher, Ph.D.**
**Department of Psychology**
**126 Heyne**
**3695 Cullen Blvd**
**Houston TX 77204-5022**
**832-842-2004**
**jack.fletcher@uh.edu**

January 5, 2019

To whom it may concern:

I, Jack M. Fletcher, declare under penalty of perjury as follows:

**CREDENTIALS**

My name is Jack M. Fletcher.  I am over eighteen years of age, and I am competent to make this declaration. I am the Hugh Roy and Lillie Cranz Cullen Distinguished University Professor of Psychology, and Chair, Department of Psychology at the University of Houston.  For the past 35 years, I have completed research on children and adults with neurodevelopmental disabilities, including congenital brain disorders, traumatic brain injury, intellectual disabilities, and learning and attention disorders.  I received a doctoral degree in Clinical Psychology from the University of Florida in 1978.  I am a licensed psychologist in the State of Texas and am board-certified as a clinical neuropsychologist by the American Academy of Clinical Neuropsychology, American Board of Professional Psychology.  At the University of Houston, I teach courses on the assessment of children and adults, including developmental disabilities.  These courses include intelligence, adaptive behavior, and neuropsychological assessments.

I routinely conduct assessments for intellectual and other disabilities in clinical settings almost exclusively outside forensic settings.  I have specific expertise in classification and measurement issues pertaining to the diagnosis of people with disabilities. Mental Retardation today is known as Intellectual Disability and I have referenced my comments to intellectual disability rather than mental retardation because of the change in accepted terminology.  I am a member of the International Neuropsychological Society, American Psychological Association, Association for Psychological Science, and the International Dyslexia Association.  I am Past-President of the International Neuropsychological Society, and a Fellow of Divisions 12 (Clinical Psychology) and 40 (Clinical Neuropsychology) of the American Psychological Association, and a Fellow of the American Psychological Society.  I served on and chaired the Mental Retardation/Developmental Disabilities review committee at the National Institute of Child Health and Human Development.  I served on the President's Commission on Excellence in Special Education and the National Research Council Committee on Scientific Principles in Education Research.  I have published three books and over 400 articles usually involving children and adults with a variety of disabilities, including diagnosis of neurodevelopmental disabilities, cognitive and neurobiological correlates, assessment, and intervention.

**BACKGROUND FOR THE ASSESSMENT**

I was asked by attorneys representing Blaine Milam to review records pertaining to the issue of his overall level of developmental functioning, including his level of intellectual functioning and adaptive behavior, in relation to the question of whether Mr. Milam meets criteria for an intellectual disability diagnosis. These records included reports and testimony from four professionals who had evaluated Mr. Milan in the period of 2009-2010. The professionals included three licensed psychologists, Drs. Paul Andrews, Timothy Proctor, and Mark Cunningham, and a psychiatrist, Dr. Edward Gripon. I reviewed a declaration from Dr. Dale Watson, who reviewed the reports and the scoring of the IQ and effort testing completed by Drs. Andrews and Proctor. I also reviewed affidavits and testimony from people who knew Blaine Milam in school, his family, and the community, including teachers (Nelda Thornton, Carolyn McIlhenny, Sherry Brown, Juanita Bradford); family members (Shirley Milam, Teresa Milam Shea); two childhood friends (Chris Lee, Kimberly Graham); a co-worker at Nichols Marine (James Wallace), and a supervisor (Gary Jenkins) and the manager at Big 5 Tire (Bryan Perkins); and Mr. Milam's Sunday school teacher (Milton Bennett).

Records from the Texas Education Agency indicate that he completed fourth grade and according to family members, was homeschooled for somewhere between six months and 2 years with little success. He then began to work with his deceased father in mechanical work. At about 16 years of age, he began a series of jobs doing routine automobile maintenance, including changing oil, air filters, fluids, and tires. He did not do work on engines or other more significant mechanical work. Mr. Milam struggled in school and was frequently absent. He had particular difficulties with speech, math, writing, and reading. He received services for speech difficulties and according to his fourth grade teacher, Juanita Bradford, participated in resource classes in Grade 4 before he was removed from school. The fact that he received speech services and subsequent resource services indicates that Mr. Milam was identified for special education early in schooling. He would need a formal evaluation to be eligible, which means that his family would need to consent. An email from Cindy Smith of the Rusk County Special Education cooperative indicates that his special education records were destroyed in 2007. However, he had a Full and Independent Evaluation in 2000 when he was in the fourth grade indicating a speech impairment. This label should be understood as providing the category of eligibility for special education and likely was carried forward from the previous evaluation at an earlier grade that gave him access to speech therapy. It appears that this would have been the required three- year evaluation, which would not require a teacher referral, but is mandatory. Once eligible by virtue of any of the 13 categories in US and Texas special education guidelines, a student can receive services in any area based on individual needs through an Individual Education Plan. A formal diagnosis of intellectual disability would not be required because eligibility under the speech and language category would be sufficient to receive special education services. It is well known that schools typically serve the lowest achievers and avoid intellectual disability labels in favor of other presumably less pejorative labels, such as specific learning disability or speech and language impairment (MacMillan & Siperstein, 2002). As Dr. Daniel Reschly stated "School diagnoses of [mental retardation] have become increasingly rare over the last 30 years…Schools increasingly become reluctant to diagnose [mental retardation] even with persons who were clearly eligible on relevant criteria." (Reschly, 2009).

Mr. Milam had a serious kidney problem requiring surgery at age 7. He had significant interpersonal difficulties at school because he was shy, awkward, and frequently bullied by other children. He entered a relationship with Jesseca Carson around the age of 18. During that relationship, Ms. Carson's child by another man was killed, resulting in Mr. Milam's incarceration since 2008.

**DIAGNOSTIC CRITERIA FOR AN INTELLECTUAL DISABILITY**

The determination of an intellectual disability is a three-pronged set of criteria defined by the manual of the American Association of Intellectual and Developmental Disabilities (AAIDD, 2010) and by the Diagnostic and Statistical Manual (DSM-5) of the American Psychological Association (APA, 2013). These criteria represent current medical and psychological diagnostic criteria routinely used in clinical practice and are very similar.

First, there should be evidence of subaverage general mental or intellectual functioning traditionally defined as a score on a multifactorial intelligence (IQ) test at least two standard deviations below average and usually defined as an IQ score of approximately 70 or below on a test standardized with an average of 100 and a standard deviation of 15. However, the determination of intellectual functioning is not a bright line because of the measurement error of the test, typically around 5 points in order to be sure that if a person were tested 100 times, their score would fall into the confidence interval defined at the 95% level 95/100 times. In the AAIDD and DSM-5 manuals, this is expressed as an IQ range of 65-75. The range is important because intelligence is not immutable and different scores will be obtained on the same test over time and across different tests. In the DSM-5 criteria, there is an explicit attempt to reduce the emphasis on IQ scores and increase reliance on adaptive behavior assessments.

Second, there needs to be evidence of adaptive behavior deficits at least two standard deviations below average. These deficits are defined in three areas: conceptual, social, and practical. Conceptual deficits include language, reading and writing, math, number and time concepts, money management, and learning from experience. Social deficits represent problems with interpersonal skills, relationships, self-esteem, gullibility and being easily led by others, and naiveté. Practical skills involve activities of daily living, including personal care, work, and use of money, health care, and safety. Diagnosis of intellectual disability requires the identification of significant weaknesses in any of the three domains or in overall adaptive functioning. The presence of pockets of adaptive strengths does not mean a person who has significant adaptive deficits is not intellectually disabled. A single adaptive behavior domain deficit is sufficient for diagnosis because it indicates problems with independent functioning in the home, community, and other settings if the overall score or the score in any of the three domains is approximately two standard deviations below average. Adaptive behavior is not assessed based on maladaptive behavior. It is assessed informally by interviews with people familiar with the person in the developmental period (traditionally birth to 18 years) and formally through administration of rating scales and semi-structured interviews, such as the Adaptive Behavior Assessment System (ABAS), the Vineland Adaptive Behavior Scales, and the Adaptive Behavior Scales. All of these scales ask about behaviors that are completed *habitually* by the person, not whether the person is capable of a particular behavior.

Third, there must be evidence of deficits in IQ (general mental functioning) and adaptive behavior in the developmental period, defined by the AAIDD as up to 18 years and with no specification of a specific upper limit in the DSM-5 criteria, but it is still understood as manifested in the developmental period.

**ASSESSMENT OF MR. MILAM**

**Intellectual Functioning**

In terms of the first prong, Mr. Milam has received intellectual assessments four times since his incarceration. In 2009 and early 2010, he received the WAIS-IV and the Stanford-Binet-5 IQ tests from Dr. Andrews. These are both multifactorial IQ tests, meaning that they are comprehensive assessments of general mental ability. They are highly correlated, meaning that they measure similar abilities. On the WAIS-IV, Mr. Milam obtained a Full Scale IQ of 71. The Stanford-Binet-5 revealed a composite score of

80. In 2010, Dr. Proctor administered the WAIS-IV and a narrow band IQ test called the Reynolds Intellectual Assessment Scales (RIAS). On the WAIS-IV, Mr. Milam obtained a Full Scale IQ score of 68. The RIAS yielded a score of 80.

If one assumes these scores are correct, it is not uncommon for different IQ tests to yield a range of scores, even considering the confidence intervals used to take into account the measurement error of the tests. This range of scores is especially apparent at the lower and upper ends of the score distribution because the number of items available to compute the ability score is reduced. The RIAS was not designed to assess the full range of abilities captured by either the WAIS-IV or the Stanford-Binet-5. It is not highly correlated with the WAIS-IV or the Stanford-Binet-5 and does not measure memory or processing speed in computing the composite IQ score. The RIAS is a short test of IQ designed to be completed quickly and is best represented as a screening test. One would not use the RIAS to assess for an intellectual disability, just as one would not use the shorter form of the Wechsler Abbreviated Scales of Intelligence (WASI) to assess for an intellectual disability. Drs. Andrews and Proctor also exaggerate the discrepancy between the Stanford-Binet-5 and WAIS-IV. In addition, Dr. Watson documents a scoring error that changes the Stanford-Binet-5 composite score to 78. Dr. Watson rightly adjusts all three scores for differences in the normative periods, applying the Flynn correction of 0.3 points per decade. This correction gives a Stanford-Binet-5 score of 75 and WAIS-IV scores of 70 for Andrews and 67 for Proctor, all consistent with significantly subaverage intelligence.

Application of the Flynn Correction is common practice in psychological evaluations, especially in situations involving high stakes decision making. The validity of the Flynn Effect and the 0.3 per year correction are well documented. Two independent meta-analyses (Pietschnig & Voracek, 2015; Trahan, Stuebing, & Fletcher, 2014) have validated the Flynn Effect and the correction, with Trahan et al. reporting that the correction was not different for Wechsler and Stanford-Binet tests. For modern tests normed since 1972, Trahan et al. (2014) found an average Flynn Effect of 2.93 points per decade with a confidence interval of 2.30 to 3.50 and a standard error of 0.35. This standard error is small and the confidence interval is tight. Contrary to suggestions that the FE is different at different ages and ability levels, age or ability level did not influence the FE estimate, which means that similar estimates are appropriate at lower and upper IQ levels and across the age spectrum. Note that Psychological Bulletin is the second highest rated behavioral science journal in the world in terms of impact factor (14.39) and accepts 18% of submitted articles.

Psychological Science published Pietschnig and Voracek (2015), which is one of the top 10 rated empirical journals in the behavioral sciences. It accepts 11% of all submissions and has an impact factor of 6.16. This meta-analysis was completely independent of Trahan et al (2014), not citing them. This study identified 271 independent samples with 4,000,000 participants from 31 countries. The mean FE was 2.80 points per decade for a composite IQ score required for the diagnosis of intellectual disabilities (i.e., Full Scale IQ). The confidence interval and standard error were not reported, but 93% of the studies reported a positive effect (IQ scores higher on the older test. What is most important is the similarity of estimates across the two meta-analyses, all close to .3 points per year, the established clinical convention for norms obsolescence, i.e., the Flynn Effect.

The WAIS-IV and Stanford-Binet-5 tests are highly correlated, indicating that they measure similar constructs. There is no literature consistently showing that scores on one test are systematically higher than scores on the other test. Some studies find higher scores on the Stanford-Binet -5 and others on the WAIS-IV. However, no study has been designed to explore differences in the range of scores, which is a scaling issue reflective of differences in item content and the standardization of the tests. Both Dr. Andrews and Dr. Proctor misstate the interpretation of confidence intervals, which is not that there is a 95% probability that the obtained score is the true score. Rather, a 95% confidence interval indicates that there is a 95% chance

that the interval includes the TRUE score, and a 5% chance that it excludes the TRUE score. Having two scores on the same test increases the probability that the TRUE score falls in the 65-75 interval. The most reliable finding and the one that should be weighted most highly in Mr. Milam's evaluation is the close proximity of the two WAIS-IV scores of 70 and 67 and the fact that both are within the 95% confidence interval of 65-75 established for the WAIS-IV. The corrected Stanford-Binet-5 score is also within the range of 65-75 commonly accepted as indicating a mild intellectual disability, but is less important than the two similar scores of the WAIS-IV. The Wechsler scales are also the most widely used assessments of intelligence, especially in high stakes decision-making. There are different versions of the Wechsler Adult Intelligence Scales depending on the date of the normative standardization, but at the time of the assessments in 2010 and 2011, the WAIS-IV was the most current version. Further, the guidelines in the DSM-V (p. 37) indicate that if there are discrepancies in assessments of the first prong, the assessment of adaptive behavior necessary to establish the functional consequences of low intelligence. There is no controversy among different examiners, including Dr. Gripon, as to whether Mr. Milam has subaverage intelligence.

Drs. Proctor and Andrews raised issues about effort based on performance on a variety of performance-based effort measures. Dr. Watson's report updates and corrects the interpretation of the effort measures and does not find evidence that effort was an issue affecting test performance. Moreover, in his own assessment, Dr. Proctor obtained WAIS-IV IQ scores that were similar to Dr. Andrews and certainly not consistent with effects of prior exposure (practice effects) because the scores he obtained were slightly lower than the scores obtained by Dr. Andrews. More generally, studies of effort measures in samples of people with low intelligence raises questions about the validity of effort scores in this population. For example, Dean et al. (2008) evaluated nine indicators of effort in participants with IQ scores ranging from 50-79. In the 60-69 range, 44% obtained scores indicating lack of effort. From my reading of the reports, Marshall and Happe (2007) did not identify any of the effort measures used by Drs. Proctor and Andrews as reliable indicators of inadequate effort in a sample of people with intellectual disabilities. The consensus statement on effort testing, response bias, and malingering from the American Academy of Clinical Neuropsychology (Heilbronner et al., 2009) indicates caution because of inadequate research and evidence that the effort measures are less valid in special populations, including low IQ. This report also notes that assessments of effort should also involve a variety of sources of information, including behavioral observations and the reliability of the informants in providing history. None of the individuals who evaluated Mr. Milam observed direct evidence of inadequate effort and all characterized him as an adequate historian with no efforts to feign appearances or deceive. The best evidence of adequate effort is the close proximity of the two WAIS-IV scores.

**Assessment of Adaptive Behavior**

**Methodology**
To assess the second prong, I administered the Vineland Scales of Adaptive Behavior-2 to his mother, Shirley Milam, and his sister, Teresa Milam Shea by telephone, the former on December 19 2018, and the latter on December 20, 2018. I did not examine or interview Mr. Milam because outside respondents provide a more reliable basis for assessment than the individual does. People with intellectual disabilities may over or underestimate their abilities. [AAIDD Manual, p. 51]. An international expert in the assessment of adaptive behavior, Dr. Mark Tasse, who in his article supports my approach, stated, "as many researchers have documented numerous times, individuals with low IQ may not always be reliable self-reporters." (Tasse, 2009, p. 16.).

When administering adaptive behavior assessments, the assessor examines adaptive behavior to identify limitations that make it difficult for a person to function independently in society. People with intellectual disabilities have strengths in certain areas and can learn to drive cars, work, and get married. In Mr. Milam's

case, the fact that he could learn to change oil and filters, change fluids, and do tire work but not higher level mechanical tasks is expected and a desirable outcome for people with mild intellectual disabilities. They typically learn tasks that are repetitive and routine, often through demonstrations and multiple experiences. Mr. Milam's father began to teach him basic mechanical skills, where Mr. Milam felt comfortable and accomplished. He had a series of jobs where he could complete such tasks satisfactorily, as attested by his supervisor, Mr. Jenkins, and the manager of Big 5 Tires, Mr. Perkins. However, as both testified, he was not able to progress beyond this point to more complex mechanical work, which was left to Mr. Jenkins. Although Mr. Perkins testified that he was training him for sales and to operate a computer, this description is inconsistent with other descriptions of his difficulties managing money, writing, and understanding abstract concepts. Mr. Perkins fired Mr. Milam for inappropriate work behavior and missing work shortly after he began to train him in these areas. Note that his co-worker at Nichols Marine, James Wallace, indicated that Mr. Milam was not successful working at that company. His job required him to clean boats. He could not complete these tasks independently because he was "not smart." He also indicated that Mr. Milam was limited in the range of his conversational skills and was a follower who generally was led by his brother, Danny. Mr. Bennett, who was Mr. Milam's Sunday school teacher, reported that as a young teenager, he hired Mr. Milam to help him with tasks around the home, such as raking leaves, dealing with trash, and repairing buildings. Mr. Milam did not work independently and did not transfer what he was taught from one work session to another (i.e., did not learn from experience). He could not compute his pay based on his hourly rate and the number of hours that he worked. He noted that Mr. Milam did not read as well as other children in the class.

I chose the Vineland because it is a standardized procedure. I administered the Vineland as a semi-structured interview instead of a checklist to minimize response bias of the respondents. As summarized in the Vineland manual (Sparrow et al., 1984), the assessment has always been delivered in a semi-structured interview to minimize responder bias because the respondent does not know the questions or the scoring criteria. The interview administration permits greater rapport because it is completed as a conversation about the person's development with no right or wrong answers and no sense of what constitutes an appropriate answer. It is done with caregivers instead of the person to minimize self-report. Rating scales are easily subjected to response bias and perceptions the respondent may have as to a socially desirable answer. In the interview administration, the items are not read to the respondent. Rather, the respondent is asked to describe broadly developmental situations that involve adaptive abilities and scores are based on the interview. The Vineland generates a set of scores in Communication (Conceptual), Daily Living (Practical) and Socialization (Social) that I compare to normative tables based on the age at which Mr. Milam's adaptive behavior was assessed. I have administered hundreds of Vinelands, understand the proper protocol, and I have used retrospective assessments in the past to determine levels of functioning prior to a traumatic brain injury (Fletcher et al., 1990). I am very familiar with the protocol through my research and practice. Most recently, I served as the lead psychologist on a national study of outcomes after fetal surgery for spina bifida. The Vineland was chosen as the primary outcome because it does not require performance by the individual, can be done by telephone for families that decline to return to the hospital where the child underwent surgery, minimizes response bias, and allows incorporation of even the lowest functioning individuals into a formal assessment of outcome.

The Vineland assesses adaptive behavior in three domains aligned with AAIDD and DSM-5 criteria: Communication (Conceptual), Daily Living (Practical), and Socialization (Social). It also yields a composite score of items from all three domains. The Motor scale is not administered in developmental periods under 6 years of age.

To administer the Vineland, I helped identify people who were most familiar with Mr. Milam during his developmental period and prior to incarceration. I selected his mother, Shirley Milam, who knew Mr.

Milam throughout his development. I asked her to focus on a specific period of his development, which was the age range of 17-18 years before he left home. I selected his sister, Teresa Milam Shea, because his mother indicated that she had participated in his care before she left home at about the age of 20. She helped home school him and cared for him while her parents worked. We focused on the age of 9-10 years because it was a clearly demarcated period for her in her caretaking relationship with Mr. Milam. Although a retrospective adaptive behavior assessment can be challenging, it is "often considered as the only viable option when the assessed individual is incarcerated. Interviewing a respondent while asking them to recall a time prior to the individual's incarceration is the proposed means of capturing the individual's typical adaptive behavior in the community and establishing a retrospective diagnosis." (Tasse, 2009, p. 151). In conducting retrospective assessments, I followed guidelines laid out by Dr. Tasse, who recommended that the assessor very carefully define the developmental period in which the interview will occur and then conduct the interview and establish with the respondent what that time period is going to be. (Tasse, 2009).

In the past, I contacted the developer of the Vineland, Dr. Sara Sparrow, and asked her if she felt that retrospective interviews were appropriate and whether telephone interviews were appropriate. Dr. Sparrow responded that both methods were sound. She indicated there was no difference in conducting a face-to-face interview versus a telephone interview based on her prior studies. Both Dr. Sparrow and I have conducted Vinelands by telephone. Because it is an interview procedure, there is less concern about deviating from normative approaches because interviews always depend on recollections and because responses over the telephone would not be expected to yield significantly different results. To address these possible weaknesses of a retrospective assessment, I used multiple respondents and reviewed the reports of others who knew Mr. Milam in the developmental period. In my 1990 paper, the retrospective assessments corresponded to normative expectations and showed no major changes before and after a mild traumatic brain injury versus major declines in adaptive behavior that continued to decline after a severe traumatic brain injury.

**Mr. Milam's Adaptive Functioning**

Using age 17 as a conservative estimate for normative purposes, the Vineland results from Ms. Milam indicated scores of 62 in the Communication domain, 66 in the Daily Living Skills domain, 73 in the Socialization domain, and an adaptive behavior composite of 65 (first percentile). At this age, the standard error of measurement is 7 points on either side of the obtained score, or 58 to 72. All of these scores are consistent with a mild intellectual disability, with priority given to the composite score of 65 because it is the most reliable estimate.

These scores were consistent with the Vineland results obtained from Ms. Shea. Using age 9 as a conservative estimate for normative purposes, the scores were 67 for Communication, 68 for Daily Living Skills, and 73 for Socialization, with an adaptive behavior composite of 67 (first percentile). The standard error of measurement at this age for a 95% confidence interval is 5 points on either side of the obtained score, or 62 to 72. All of these scores are consistent with a mild intellectual disability, with priority given to the composite score of 67 because it is the most reliable estimate.

Dr. Cunningham completed the only other assessment-based interview of Mr. Milam. With Ms. Milam as the respondent, the Adaptive Behavior Scale-Residential and Community revealed adaptive deficits in 9/10 domains of adaptive behavior consistent with individuals place in community and residential facilities for people with intellectual disabilities. Other than the physical (motor) domain, no domains yielded an age equivalent greater than 8 years, 3 months, which is consistent with adaptive behavior scores on the Vineland in the range of 60-65.

These adaptive deficits are clearly related to his intellectual deficits, most obviously in the Conceptual domain, but also clearly in the Practical domain. He also shows difficulties in the Social domain because of social isolation and difficulty comprehending social situations as well as poor judgment.

**Conceptual domain**
Both Ms. Milam and Ms. Shea indicated Mr. Milam had difficulties with writing and math and general problems in school. Carolyn McIllhenney, his second and third grade teacher, corroborated such difficulties. She indicated that Mr. Milam struggled in school and required considerable individual attention. He needed modified instructions and had the lowest intellectual functions in the class. Another teacher, Sherry Brown, assisted his Grade 1 teacher with students who needed additional assistance, which included Mr. Milam. His first grade teacher, Nelda Brown, did not remember much about him and he did not stand out to her. Juanita Bradford, who taught Mr. Milam in the fourth grade, described him as "a really slow student" and required significant individual attention. As mentioned above, she reported that he spent three hours per day in "resource classes" that are smaller learning groups for students unable to perform in the general education classroom. Although few school records are available, Mr. Milam received speech therapy and resource classes, which means that he was identified for special education. Ms. Shea, who worked with him closely on schoolwork, said his writing was hard to read and it was difficult for him to write in sentences. He had considerable difficulty with math. His mother indicated that handling money was difficult for him at a later age and that while his reading was stronger, math and writing remained difficult. She completed applications for him to work. Like Ms. McIllhenney, both Ms. Shea and Milam indicated that he had difficulty following directions, paralleling descriptions from his co-worker and supervisor, Mr. Wallace at Nichols Marine. Mr. Bennet described difficulties calculating his salary, problems with reading, and difficulties learning to use a tape measure. In formal academic assessments by Drs. Proctor and Andrews, he does not have age appropriate development of reading, writing, and math skills. The presence of difficulties in the conceptual domain were also observed by Dr. Gripon, the psychiatrist, who interviewed him and described him as simple, naïve, gullible, and easily led, with an IQ range of 65-75 and adaptive behavior deficits.

**Social domain**
Socially, his childhood friends Chris Lay and Kimberly Graham described him as shy and socially awkward. Both indicated that other children often teased him. Ms. Shea indicated that Mr. Lay was the only close friend he ever had as a child, which Mr. Lay corroborated. Ms. Graham indicated that she was friends with Mr. Milam from age 7 until, they were teenagers. He had a particularly difficult time with girls and withdrew from most friendships after he met Ms. Carson. Ms. Shea and Ms. Milam indicated that he was socially isolated and that he did not have age appropriate social skills. Ms. McIlhenny and Ms. Bradford both report that socially, he was shy and isolated. His employer Jim Wallace indicated that Mr. Milam did not have many friends. Mr. Bennet was positive about his character and reported that Mr. Milam got along with other children in Sunday school, but had low self-esteem.

**Practical domain**
Practically, Ms. Shea and Milam had to do many things for him. At a younger age, his self-care skills were under-developed and he needed many reminders to do simple tasks like brush his teeth. When he was older, he sometimes missed work and did not notify employers. He needed considerable support for any form of independent living. He had problems at work described in the conceptual domain that reflect his problems with reading, writing, and math that are much greater and pervasive than is characteristic of a child with a speech and language impairment or learning disability, where the adaptive impairment is narrow and specific to the language and academic impairment. He had problems managing money, judging time, keeping to schedules (at times), and needed help completing job applications.

8

**Age of Onset**

The third prong is evidence that the intellectual disability occurred in the developmental period before 18years. The difficulties described by Ms. Shea and Ms. Milam, and corroborated by others, clearly occurred early in his development and persisted.

**CONCLUSIONS**

It is my opinion that Mr. Milam meets all three prongs for a diagnosis of a mild intellectual disability. He has significantly subaverage intelligence on two different administrations of the WAIS-IV, with composite scores of 67 and 70. The Stanford-Binet-5 score of 75 is also within the range associated with significantly subaverage intellectual functioning, but by itself is less reliable than two administrations of the same test, the WAIS-IV. The presence of significant deficits in conceptual, practical, and social domains of adaptive behavior is apparent on two formal assessments on the Vineland, with composite scores of 65 and 67 from respondents who lived with Mr. Milam at two different periods of development and is corroborated by the information provided by his teachers, employers, and friends. These findings are consistent with the only other formal assessment of adaptive behavior by Dr. Cunningham. The problems clearly occurred during the developmental period.

My name is Jack M. Fletcher and my address is Department of Psychology, University of Houston, 3695 Cullen Blvd., 126 Heyne, Houston, Texas 77204-5022.  I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, State of Texas, on the 5th day of January, 2019.

_____

Jack M. Fletcher, Ph.D., ABPP
Hugh Roy and Lillie Cranz Cullen Distinguished Professor
Chair, Department of Psychology
Vice President for Research Administration

Exhibit 10A

Jack M. Fletcher, Ph.D.
1703 Hazard St.
Houston TX 77019

September 17, 2020

To whom it may concern:

I, Jack M. Fletcher, declare under penalty of perjury as follows:

1.      I am over eighteen years of age, and I am competent to make this declaration. I am a licensed psychologist in the State of Texas and am board-certified as a clinical neuropsychologist by the American Academy of Clinical Neuropsychology, American Board of Professional Psychology.

2.      I was retained as an expert witness by counsel for Blaine Milam in November 2018. I was asked to review records pertaining to the issue of Mr. Milam's overall level of developmental functioning, including his level of intellectual functioning and adaptive behavior, in relation to the question of whether Mr. Milam meets criteria for an intellectual disability diagnosis. On January 5, 2019, I submitted a signed declaration evaluating Mr. Milam's intellectual functioning and adaptive behavior and in which I concluded that it is my opinion that Mr. Milam meets all three prongs for a diagnosis of a mild intellectual disability.

3.      Subsequent to the submission of my signed declaration, I discovered a small error in the scoring of the Socialization scale of Vineland Scales of Adaptive Behavior-2 I administered to his sister, Teresa Milam Shea. In my January 5, 2019, declaration, I reported that the Vineland scores obtained from Ms. Shea were 67 for Communication, 68 for Daily Living Skills, and 73 for Socialization, with an adaptive behavior composite of 67 (first percentile). With the correction in score calculation, the Vineland scores obtained from Ms. Shea remained 67 for Communication, 68 for Daily Living Skills, and changed to 75 for Socialization, with an adaptive behavior composite of 69 (first percentile). The standard error of measurement for a 95% confidence interval is 5 points on either side of the composite score, so it would be 64 to 74.  This minor discrepancy in scoring on Ms. Shea's Vineland does not alter the interpretation of the Vineland results or my opinion that Mr. Milam meets all three diagnostic criteria for mild intellectual disability.

My name is Jack M. Fletcher and my address is 1703 Hazard St., Houston TX 77019.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, State of Texas, on the 17th day of September, 2020.

Jack M. Fletcher, Ph.D., ABPP
Hugh Roy and Lillie Cranz Cullen Distinguished Professor
University of Houston


Exhibit 11

# UNSWORN DECLARATION OF DALE G. WATSON, PH.D.

I, Dale G. Watson, declare under the penalty of perjury as follows:

1.  I am licensed as a clinical psychologist by the State of California. I specialize in clinical and forensic neuropsychology. I am a member of the American Psychological Association (APA) and subdivisions of that organization including Division 33 (Intellectual and Developmental Disabilities), Division 40 (Society for Clinical Neuropsychology), and Division 41 (American Psychology – Law Society). I am also a member of the International Neuropsychological Society (INS), the National Academy of Neuropsychology (NAN), the International Society for Intelligence Research (ISIR), and the American Association on Intellectual and Developmental Disabilities (AAIDD).

2.  I received my Bachelor of Arts degree, with a major in psychology, from California State College, Sonoma in 1975. I received my Master of Arts degree in Clinical Psychology from John F. Kennedy University in Orinda, California in 1980. In 1988, I earned a Ph.D. in Clinical Psychology from the California School of Professional Psychology (CSPP) in Berkeley, California. CSPP is accredited by the APA and is now a school within Alliant International University with a campus in San Francisco, California.

3.  I have been in private practice in the Bay Area of California since 1990. In addition, I am an adjunct faculty member at the Wright Institute, an APA accredited graduate institution in Berkeley, California, where I teach a 3-trimester course in Graduate

1

Level Psychodiagnostic Assessment focusing on intellectual, academic and psychological evaluation. This course covers the broad array of psychological assessment instruments utilized within the field of assessment and includes modules on the assessment of intellectual functioning, performance validity, academic skills, and personality assessment.

4. I have been qualified as an expert and testified in the Superior Courts for the California counties of Contra Costa, Alameda, Fresno, Los Angeles, Marin, Monterey, Riverside, Sacramento, San Mateo, Santa Clara, San Francisco, and Shasta. I have also been qualified and testified as an expert in Howard County, Arkansas; Custer County, Montana; King and Whatcom Counties, Washington; Harris County, Texas; Butts County, Georgia; Latah County, Idaho, Anderson County, South Carolina, Maricopa County, Arizona, Caddo Parish, Louisiana, Harrison County, Mississippi, and the York County – Poquoson Circuit Court of Virginia. In addition, I have testified in United States District Courts in Arkansas, California, Montana, Oklahoma, and the Middle District of Tennessee. From the early 1990s until 2003, I was on the panel of forensic examiners for the Superior Court in Contra Costa County, California. In that role, I regularly examined criminal defendants referred by the court for the evaluation of competency to stand trial and insanity.

5. I served as a Consulting Neuropsychologist to Neurobehavioral Cognitive Services (NCS) of Dixon, California, a residential/outpatient brain- injury rehabilitation program, between 2000 and 2016. In that role, I was involved in the evaluation of

individuals with moderate to severe brain injuries resulting from trauma, stroke, and other neuropathological processes.

6.  I was a Clinical Neuropsychologist for NeuroCare in Concord, California from 1989 to 1992. In that role, I conducted neuropsychological evaluations, and was involved in post-acute rehabilitation of the brain-injured, treatment planning, psychotherapy for individual, couples, and groups, substance abuse treatment, cognitive rehabilitation and crisis intervention. From 1986 to 1989, I was on staff at Specialized Rehabilitation Services in Fremont, California. In that capacity, I coordinated the Treatment Team for the Brain Injury Rehabilitation Program (1986-87), and conducted case management, patient education, and individual and group psychotherapy for the Chronic Pain Management Program.

7.  I have given numerous presentations throughout my career to professional, academic, and legal organizations. Topics of my presentations have included the neuropsychology of intellectual disabilities, the neuropsychology of schizophrenia, neuropsychological assessment and brain impairment, brain functions including executive functioning, the roles of psychology and neuropsychology in forensic evaluations, and the impact of norms on neuropsychological evaluation.

8.  I have completed several "*Atkins*" evaluations assessing intellectual disabilities in my role as a forensic neuropsychologist. I am also the author of a chapter entitled "Intelligence Testing," which was included in *The Death Penalty and Intellectual Disability,* edited by Edward A. Polloway (2015), a publication of the American

Association on Intellectual and Developmental Disabilities (AAIDD). [1]

9.  My curriculum vita is attached to this declaration as Appendix 1.

10. I was retained by current defense counsel to review the raw data obtained from intelligence and effort testing administered by Dr. Paul Andrews and Dr. Timothy Proctor to Blaine Milam, as well as the reports produced by these mental health experts in anticipation of Mr. Milam's trial.

11. This declaration is a summary of my findings with regards to mental health experts' recording and calculation of the raw data obtained from intelligence and effort testing, their interpretation and characterization of those scores, and my recalculation of the raw data and interpretation of the scores I obtained.

12. I also calculated the scores considering the Flynn Correction. All IQ tests are norm-referenced, meaning that a score places the subject at a specific percentile of the norming population at a particular time in history. Every edition of the Wechsler Adult Intelligence Scale (WAIS) and of the Stanford-Binet is carefully standardized and normed to reflect the general population at the time. Norms are toughened for each succeeding generation of tests to reflect improved average performance of the population over time, *i.e.*, increasing performance on intelligence tests. This phenomenon, known as the Flynn Effect, applies to all major intelligence tests, including the WAIS and the Stanford-Binet. Flynn

---

[1] Watson, D. G. (2015). Intelligence testing. In E. A. Polloway (Ed.), *The death penalty and intellectual disability* (pp. 113-140). Washington, DC: AAIDD.

Corrections are calculated according to the following formula: obtained score – (.3 x number of years between the mid-year norming date and administration.

13. I have reviewed raw data from Dr. Andrews's administration of the following psychological testing:

- Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV");

- Stanford-Binet, Fifth Edition ("SB5");

- Word Memory Test ("WMT");

- Test of Memory Malingering ("TOMM").

14. I also reviewed Dr. Andrews's report.

15. **WAIS-IV:** Dr. Andrews administered the WAIS-IV on November 20, 2009. The testing yielded a full-scale IQ ("FSIQ") score of 71.

16. Dr. Andrews's scoring of the WAIS-IV was accurate. The test results were as follows:

**Composite Score Summary**

| Scale | Sum of Scaled Scores | Composite Score | | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|---|---|---|---|---|---|---|
| Verbal Comprehension | 16 | VCI | 74 | 4 | 69-81 | Borderline |
| Perceptual Reasoning | 22 | PRI | 84 | 14 | 79-91 | Low Average |
| Working Memory | 11 | WMI | 74 | 4 | 69-82 | Borderline |
| Processing Speed | 8 | PSI | 68 | 2 | 63-80 | Extremely Low |
| Full Scale | 57 | FSIQ | 71 | 3 | 68-76 | Borderline |
| General Ability | 38 | GAI | 77 | 6 | 73-83 | Borderline |

Confidence Intervals are based on the Overall Average SEMs. Values reported in the SEM column are based on the examinee's age.
The GAI is an optional composite summary score that is less sensitive to the influence of working memory and processing speed. Because working memory and processing speed are vital to a comprehensive evaluation of cognitive ability, it should be noted that the GAI does not have the breadth of construct coverage as the FSIQ.

17. The WAIS-IV was normed between May 2007 and April 2008, resulting in a mid-year norming date of 2007. The Flynn Correction on the score obtained by Dr. Andrews should be as follows:

    71 - .6 = 70.4 rounded to 70

18. The Reliable Digit Span ("RDS") is an embedded validity measure derived from the WAIS-IV. Mr. Milam's score was 8 – above the cutoff of $\leq$ 7 for a valid response pattern. As described by Lezak et al., (2012), "The measure is the sum of the longest string of digits recalled on both of each digit length for both forwards and backwards conditions."[2] In some studies, the index has been able to identify litigants, with expected poor effort, from non-litigants successfully, though the measure should be used cautiously and in the context of other findings. Nonetheless, this finding reflects good effort and supports the validity of the WAIS-IV FSIQ score.

19. **SB5:** Dr. Andrews administered the SB5 on December 10, 2009. Dr. Andrews scored the SB5 as yielding a FSIQ of 80.

20. Dr. Andrews made an error when transferring data onto the face sheet of the SB5 form. This caused an error in calculating the verbal IQ ("VIQ") and FSIQ. The

---

[2] Lezak, M. D., Howieson, D. B., Bigler, E. D., & Tranel, D. (2012). *Neuropsychological assessment* (5th ed.). Oxford: Oxford University Press, p. 837.

FSIQ, when scored accurately, is 78 and not 80. This error also resulted in his mis-reporting Factor Index scores as well. The VIQ was 87 and not 90.

21.  The corrected SB5 IQ and Factor scores are as follows:

**IQ and Factor Index Score Results**

| | Sum of Scaled Scores | Standard Score | Percentile | 90% Confidence Interval | | Descriptive Classification |
|---|---|---|---|---|---|---|
| | | | | Score Range | Percentile | |
| **IQ Scores** | | | | | | |
| Full Scale IQ (FSIQ) | 68 | 78 | 7 | 75–81 | 5–10 | Borderline Delayed |
| Nonverbal IQ (NVIQ) | 28 | 72 | 3 | 68–78 | 1–7 | Borderline Delayed |
| Verbal IQ (VIQ) | 40 | 87 | 19 | 83–93 | 13–32 | Low Average |
| Abbreviated IQ (ABIQ) | 13 | 79 | 8 | 74–88 | 4–21 | Borderline Delayed |
| | | | | | | |
| **Factor Index Scores** | | | | | | |
| Fluid Reasoning (FR) | 9 | 68 | 2 | 64–78 | <1–7 | Mildly Delayed |
| Knowledge (KN) | 19 | 97 | 42 | 91–103 | 27–58 | Average |
| Quantitative Reasoning (QR) | 12 | 78 | 7 | 74–86 | 4–18 | Borderline Delayed |
| Visual Spatial (VS) | 15 | 85 | 16 | 80–92 | 9–30 | Low Average |
| Working Memory (WM) | 13 | 80 | 9 | 75–89 | 5–23 | Low Average |

*Note:* The Standard Score is a normalized score with a mean of 100 and a standard deviation of 15.

22.  The SB5 was normed in 2001. The Flynn Corrections are as follows:

$$78 - 2.7 = 75.3 \text{ rounded to } 75$$

23.  Dr. Andrews relied upon an understanding of the relationship between the Wechsler and Stanford-Binet scales that was uncertain and compounded by his error in calculating the FSIQ of the SB5. On previous versions of the Wechsler and Stanford-Binet scales (*i.e.*, the WAIS-III and the SB-4), the former typically resulted in higher scores than the latter. This does not necessarily appear to be the case with the current version, particularly when considering individual variability. There is little research on the relationship between the scores between the WAIS-IV and the SB5. The results on both tests appear to be valid. Any differences are due to differences in test construction or individual variability.

24. Dr. Andrews's report expressed concern regarding effort expended on testing, particularly based on scores obtained from the administration of the WMT. Dr. Andrews relied on both the TOMM and the WMT as measures of effort.

25. **TOMM:** Mr. Milam obtained the following scores: Trial 1 = 47; Trial 2 = 50; Retention Trial = 49. The test indicated a valid performance (*i.e.*, adequate effort).

26. **WMT:** The WMT was administered twice. Dr. Andrews interpreted the results as potentially indicating inadequate effort; however, he did not use the Advanced Interpretation (AI) software by Green, the author of the test, as it was likely not available at the time. The AI software was developed to analyze data from those with a "Genuine Memory Impairment Profile," that is, individuals who failed the effort subtests of the WMT due to actual memory impairment, which was evident because of the subsequent failure on the memory subtests of the WMT as well as consistency with their known history.

27. With the re-interpretation using the AI software, the first test was likely valid and should have been interpreted as such. The second administration may not have been valid but the effect of presenting it twice could have distorted the relationships between the indices – leading to an invalid interpretation. Further, in my experience, administration of the WMT to individuals with low intellectual functioning may present problems, and should only be used cautiously with individuals in low IQ ranges. Green has provided an additional, simpler, measure, *Green's Medical Symptom Validity Test (MSVT)*, that can be used in such circumstances.

28. There were concerns voiced by Dr. Andrews as to Mr. Milam's effort. However, in my view, these were based upon faulty assumptions that have uncertain validity based upon more recent science. Mr. Milam passed the TOMM during both examinations. He also passed the embedded Reliable Digit Span measure on both WAIS-IV administrations. The Word Memory Test was likely valid on the first administration, and the second administration may have distorted the relationships between the scores making it difficult to analyze. Mr. Milam also passed the Rey 15 item test, although the test is considered unsuitable for forensic use. My opinion is that, in totality, Mr. Milam's scores on the effort tests administered were consistent with adequate effort. This opinion is buttressed by the relative consistency between measures of intelligence.

29. I have also reviewed raw data obtained from Dr. Proctor's administration of the following psychological testing:

   - WAIS-IV;

   - Reynolds Intellectual Achievement Scale ("RIAS");

   - TOMM;

   - Rey 15 Item Test;

   - RDS.

30. I also reviewed Dr. Proctor's report.

31. **WAIS-IV:** Dr. Proctor administered the WAIS-IV on March 26, 2010. The testing yielded a FSIQ score of 68, at the 2nd percentile, and in the Extremely Low range.

32. Dr. Proctor's scoring of the WAIS-IV was accurate. Dr. Proctor also appropriately pro-rated the data due to an error in the administration of the Similarities subtest. Dr. Proctor's notes and report included a discussion of the impact of the pro-ration.

33. Mr. Milam's WAIS-IV profile was "flat," meaning that there was little variability across indices. This type of profile is common in Intellectual Disability. His composite WAIS-IV scores were as follows:

**Composite Score Summary**

| Scale | Sum of Scaled Scores | Composite Score | | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|---|---|---|---|---|---|---|
| Verbal Comprehension | 15 | VCI | 72 | 3 | 67-79 | Borderline |
| Perceptual Reasoning | 18 | PRI | 77 | 6 | 72-84 | Borderline |
| Working Memory | 10 | WMI | 71 | 3 | 66-80 | Borderline |
| Processing Speed | 9 | PSI | 71 | 3 | 66-82 | Borderline |
| Full Scale | 52 | FSIQ | 68 | 2 | 65-73 | Extremely Low |
| General Ability | 33 | GAI | 72 | 3 | 68-78 | Borderline |

Confidence Intervals are based on the Overall Average SEMs. Values reported in the SEM column are based on the examinee's age.
The VCI is prorated. The FSIQ is derived using the prorated VCI.
The GAI is an optional composite summary score that is less sensitive to the influence of working memory and processing speed. Because working memory and processing speed are vital to a comprehensive evaluation of cognitive ability, it should be noted that the GAI does not have the breadth of construct coverage as the FSIQ.
The VCI is prorated. The GAI is derived using the prorated VCI.

34. As mentioned above, the WAIS-IV mid-year norming date was 2007. The Flynn Corrections on the score obtained by Dr. Proctor are as follows:

    68 - .9 = 67.1 rounded to 67

35. **RDS**: The WAIS-IV RDS was 8 suggesting a valid WAIS-IV. Notably, it is identical to that obtained by Dr. Andrews.

36. **RIAS:** The administration of the RIAS yielded a score of 80. Dr. Proctor's scoring of the RIAS was accurate.

37. The RIAS was normed in 2000. The Flynn Corrections are as follows:

$$80 - 3 = 77$$

38. The RIAS is a four subtest (brief) measure of intelligence. The RIAS correlates with the Wechsler scales less strongly than other measures. For example, the RIAS manual provides of correlation co-efficient of .75 between the WAIS-III FSIQ and the RIAS Composite Intelligence Index (CIX), This means that the shared variance between the tests is just 56.25%. Recall that the WAIS-IV and SB5 correlated at r = .90, measuring 81% of the same construct. The RIAS and Wechsler scales in particular are measuring different elements of intelligence and the scores would not be expected to necessarily agree. Also, given that this is a briefer IQ test the results of the more extensive tests should be emphasized.

39. **TOMM**: The copy quality for Trial 1 was very poor; however, the scoring appears to have been accurate. The following results were obtained: Trial 1 = 49; Trial 2 = 49; the Retention trial was not administered. These scores reflect good effort.

40. **Rey 15 Item Test:** Mr. Milam obtained a score of 11/15 correct. Various cutoffs have been used, ranging from 7 items correct or fewer to 11 items, to determine suboptimal performance. Scores are related to both education and intelligence, and therefore the "FIT may be inappropriate for individuals with less than average IQ/education."[3] These authors added, "However, it should be noted that the FIT… does not meet the Daubert standard for admissibility of scientific evidence based on its failure to achieve a criterion of PPV of 80% or higher using a base rate of

---

[3] Straus, Sherman, & Spreen (2006). *A compendium of neuropsychological tests.* New York: Oxford University Press, p. 1167.

suspect effort of 30% (Vallabhajosula & van Gorp, 2001)."[4] Given this understanding, little weight can be given the results of the FIT, even though Mr. Milam passed the instrument.

41. My analysis indicates that the apparent discrepancies between the various tests administered, that Dr. Andrews and Dr. Proctor believed to exist, are not that extreme and are consistent with deficits in intellectual functioning of approximately two standard deviations below the mean. In order to confirm this diagnosis, Mr. Milam will have had to have had concurrent deficits in adaptive functioning (behaviors) during the developmental period. It is also important to recognize the shifting emphasis given to adaptive functioning relative to IQ findings in current diagnostic schema. That is, deficits in adaptive function are now seen to receive greater emphasis than deficits in intellectual functioning.

My name is Dale G. Watson, and my address is:

> 3377 Deer Valley Road, # 310
> Antioch, CA 94531

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Contra Costa County, State of California, on the 4th day of January 2019.

Dale G. Watson, Ph.D.

---

[4] *Id.,* p. 1170.

12

Appendix 1

# DALE G. WATSON, PH.D.

*Clinical & Forensic Neuropsychology*
*Mail: 3377 Deer Valley Road, PMB 310, Antioch, CA 94531*
*Office: 866-536-5301 / Fax: 925-757-3690*
*Email: watson.dale@comcast.net*

---

## EDUCATION:

| | | |
|---|---|---|
| 1988 | Ph.D. | California School of Professional Psychology-Berkeley/Alameda |
| | | Clinical Psychology (APA accredited) |
| 1980 | M.A. | John F. Kennedy University, Orinda, CA. |
| | | Clinical Psychology |
| 1975 | B.A. | California State College, Sonoma, Rohnert Park, CA. |
| | | Psychology |

## PROFESSIONAL EXPERIENCE:

**1990-**      **Private Practice**
Pinole, CA.
- Forensic Evaluation/Trial Consultation.
- Comprehensive Neuropsychological/Psychodiagnostic Assessment services.
- Mental Retardation "*Atkins*" evaluations.
- Adjudicative Competency & to be Executed, Insanity, Mitigation and Future Dangerousness.
- Trial testimony in Superior and Federal District Courts.
- Individual Psychotherapy.

**2007-**
**1994-2000**    **Adjunct Faculty**
The Wright Institute, Berkeley, CA. (APA accredited)
- Teaching 3-trimester courses in Graduate Level Psychodiagnostic Assessment including intellectual and psychological evaluation and neuropsychological screening.
- Dissertation supervision.

**2000-2016**    **Consulting Clinical Neuropsychologist**
Neurobehavioral Cognitive Services, Dixon, CA.
- Neurocognitive rehabilitation services including consultation and treatment planning.
- Individual and Group Psychotherapy with neurologically impaired patients.
- Neuropsychological and Psychodiagnostic Assessment.

**1990-1992**    **Clinical Neuropsychologist**
NeuroCare, Concord, CA.
- Acting program director (July 1991).
- Psychology team leader.
- Supervision of interns and the behavioral technician.
- Post-acute rehabilitation of the brain-injured.
- Neuropsychological evaluation.
- Treatment planning.
- Individual/Couples/Group Psychotherapy.
- Substance Abuse treatment/Cognitive Rehabilitation/Crisis Intervention.

## PROFESSIONAL EXPERIENCE (CONTINUED):

**1989-1990**    **Psychological Assistant**
Supervisor: James Cole, Ph.D.
NeuroCare, Concord, CA.
- Post-acute rehabilitation of the brain-injured.
- Neuropsychological evaluation.
- Treatment planning.
- Individual/Couples/Group Psychotherapy.
- Substance Abuse treatment/Cognitive Rehabilitation/Crisis Intervention.

**1988-1990**    **Psychological Assistant**
Supervisor: Virginia Wulf, Ph.D., Pinole, CA.
- Individual/Couples Psychotherapy.

**1988-1989**    **Psychological Assistant**
Supervisor: Norbert Ralph, Ph.D.
Comprehensive Assessment Services/Sausalito Professional Clinic Sausalito, CA.
- Psychodiagnostic evaluations of hospitalized, adolescent substance abusers.
- Hospital Consultation (New Beginnings - Modesto).

**1986-1989**    **Psychological Assistant**
Supervisors:  Michael Shore, Ph.D./Harry Noda, Jr., Ph.D.
Specialized Rehabilitation Services
An affiliate of Transitions / Bay Area Recovery Centers, Fremont, CA.

Brain Injury Rehabilitation Program (1986-1987)
- Coordinating the Treatment Team.
- Neuropsychological and Psychodiagnostic Evaluation.
- Cognitive Rehabilitation.
- Individual Psychotherapy/Case Management.

Chronic Pain Management Program
- Individual/Group Psychotherapy.
- Case Management.
- Biofeedback Training.
- Patient education.

**1981-1986**    **Clinical Coordinator/ Psychological Assistant**
Supervisors:  Sheila Bastien, Ph.D./Ann Hoff, Ph.D.
Spectrum Psychology Associates, Berkeley, CA.
- Clinical Coordination.
- Neuropsychological, Psychodiagnostic and Vocational Evaluation.
- Evaluation of the Developmentally Disabled
- Individual Psychotherapy.
- Forensic psychology.

**1984-1985**    **Clinical Psychology Intern (Academic Year)**
Supervisor:  Neil Young, Ph.D.
Community Education and Counseling Center, Fremont, CA.
- Individual Psychotherapy within a Control Mastery framework.
- Group and Couples Psychotherapy.
- Community Needs Assessment (Program Evaluation).

## PROFESSIONAL EXPERIENCE (CONTINUED):

**1983-1984**   **Clinical Psychology Intern (Academic Year)**
Supervisor:  Joan Roth, Ph.D.
Northern California Reception Center,
California Medical Facility, Vacaville, CA.
- Psychodiagnostic Evaluation of court referred criminal offenders.
- Group Psychotherapy with Category "B" inmates (Pre-operational Transsexuals).
- Individual Psychotherapy.

**1983**   **Teaching Assistant**
Neuropsychological Measurement Laboratory
California Graduate School of Marital and Family Therapy, San Rafael, CA.
- Taught the laboratory section of Neuropsychological Assessment using the Halstead-Reitan Battery.

**1983**   **Clinical Psychology Intern**
East Bay Activities Center, Oakland, CA.
- Milieu therapy in classroom setting with emotionally disturbed children.

**1983**   **Co-Leader: Neuropsychological Assessment - An In-service Training Workshop.  Sonoma County Office of Education.**
- 1-day in-service training workshop with psychologists and nurses.

**1982**   **Teaching Assistant**
Neuropsychological Measurement Laboratory
California School of Professional Psychology, Berkeley, CA.
- Taught the laboratory section of Neuropsychological Assessment using the Halstead-Reitan Battery.

**1982**   **Teaching Assistant**
Neuropsychological Measurement Laboratory
California Graduate School of Marital and Family Therapy
San Rafael, CA.
- Taught the laboratory section of Neuropsychological Assessment using the Halstead-Reitan Battery.

**1979-1980**   **Counselor Intern**
Contra Costa County Alcoholism Information and Rehabilitation Service (AIRS), Antioch, CA.
- Conducted Alcoholism Education Orientations.
- Individual, Marital and Group Psychotherapy.

**1978-1979**   **Counselor Intern**
John F. Kennedy University Community Counseling Center, Concord, CA.
- Individual, Marital, and Family Psychotherapy.
- Peer Supervision.

**1975**   **Staff Counselor**
New Horizons Center, Pittsburg, CA.
- Milieu treatment of developmentally disabled and psychotic adolescents and young adults.
- Liaison to Consulting Psychiatrist.

## PROFESSIONAL TRAINING:

2018   "California Law and Ethics for Psychologists: Key Concepts Review." Ce4Less.com, March 27, 2018.

2018   "A Critical Review of RPAS." Society for Personality Assessment, March 17, 2018, Washington, D.C., 2 CE Units.

2018   "Symposium E: Exploring the Dynamics of Criminal and Violent Behavior: Theoretical Considerations and Rorschach Findings." Society for Personality Assessment, March 17, 2018, Washington, D.C., 2 CE Units.

## PROFESSIONAL TRAINING (CONTINUED):

2018    "Clinical and Forensic Assessment of Alexithymia: Concept, Construct, and Experience." Society for Personality Assessment, March 15, 2018, Washington, D.C., 2 CE Units.

2018    "Assessment of Psychological Vulnerabilities in Disputed Confession Cases." Society for Personality Assessment, March 15, 2018, Washington, D.C., 3.5 CE Units.

2018    "Roundtable Discussion Q: Graduate Training in Test Administration and Scoring: Barriers, Processes and Rubrics." Society for Personality Assessment, March 15, 2018, Washington, D.C., 2 CE Units.

2018    "Using the Inventory of Problems – 29 (IOP-29) to Discriminate Feigned from Bona Fide Mental or Cognitive Disorders." Luciano Giromini & Donald Viglione, Society for Personality Assessment, March 14, 2018, Washington, D.C., 3.5 CE Units.

2017    "R-PAS Coding Solutions." Donald J. Viglione, Ph.D., Society for Personality Assessment, March 19, 2017, San Francisco, CA 7 CE Units.

2017    "Proficiency in Personality Assessment: Producing an Integrated Report." Hades Pade, Psy.D. & A. Jordan Wright, Ph.D., Society for Personality Assessment, March 15, 2017, San Francisco, CA 3.5 CE Units.

2017    "Developmental Amnesia: Memory Formation in the Absence of Remembering." Faraneh Vargha-Khadem, Ph.D., International Neuropsychological Society (INS) 45th Annual Meeting, February 1, 2017, New Orleans, LA 1 CE Unit.

2017    "Frontal Cortex and Human Behavior: Evidence from Intracranial Recording." Robert T. Knight, M.D., International Neuropsychological Society (INS) 45th Annual Meeting, February 1, 2017, New Orleans, LA 1 CE Unit.

2017    "Adult Aphasia: Classifications, Localization, and Neuroimaging." Nina Dronkers, Ph.D., International Neuropsychological Society (INS) 45th Annual Meeting, February 1, 2017, New Orleans, LA 3 CE Units.

2017    "Clinical Assessment of Frontal Lobe Functions: A Historical Perspective of the Application of the Boston VA Jamaica Plains VA Process Approach." Donald Stuss, Ph.D., International Neuropsychological Society (INS) 45th Annual Meeting, February 1, 2017, New Orleans, LA 3 CE Units.

2016    "21st Century Neuroimaging Applications in the Practice of Clinical Neuropsychology." Erin Bigler, Ph.D., National Academy of Neuropsychology, October 21, 2016, Seattle, WA. 3 CE Units.

2016    "Overview of Recreational and Medical Marijuana: Ethical, Scientific and Legal Issues Across the Lifespan." Godfrey Pearlson, Ph.D., National Academy of Neuropsychology, October 20, 2016, Seattle, WA. 2.0 CE Units.

2016    "Neuropsychological Assessment and Preclinical Alzheimer's Disease." Dorene Rentz, Ph.D., National Academy of Neuropsychology, October 20, 2016, Seattle, WA. 3 CE Units.

2016    "Historical, Conceptual, and Empirical Factors in Performance and Symptom Validity Assessment." Glenn Larrabee, Ph.D., National Academy of Neuropsychology, October 19, 2016, Seattle, WA. 3 CE Units.

2016    "Legal and Ethical Challenges Using the DSM-5: Best Practices." Pamela Harmell, Ph.D., Professional Psych Seminars, March 3, 2016. Online at http://www.psychsem.com/ 6 CE Units.

2015    "Behavioral Neurology: Integrating the Neurologic Examination for the Neuropsychologist: Neuroanatomic Localization of Common Pathologies, Interventions, and Higher Cognitive Functions." Lola Morgan, M.D., Annual Conference, National Academy of Neuropsychology, November 7, 2015, Austin, TX. 2 CE Units.

2015    "Moving Neuropsychology from the Backdoor to the Front Door: Embracing Outcomes in Research and Practice." Gordon J. Chelune, Ph.D., Annual Conference, National Academy of Neuropsychology, November 6, 2015, Austin, TX. 1 CE Units.

## PROFESSIONAL TRAINING (CONTINUED):

2015    "The New Metabolic Cascade and Comprehensive Model of Concussion: Looking to Drive Clinical Practice." Christopher Giza, M.D. and Michael McCrea, Ph.D., Annual Conference, National Academy of Neuropsychology, November 6, 2015, Austin, TX. 3 CE Units.

2015    "Improving the Methodology for Assessing Mild Cognitive Impairment in Children, Adults, and Older Adults." Grant L. Iverson, Ph.D., Annual Conference, National Academy of Neuropsychology, November 5, 2015, Austin, TX. 1 CE Units.

2015    "Performance Validity Testing in At-Risk Populations: Ethical Practices." Kyle Brauer Boon, Ph.D., Annual Conference, National Academy of Neuropsychology, November 5, 2015, Austin, TX. 3 CE Units.

2015    "Frontal Lobe Functioning: Clinicians Beware – Appearances May Be Deceiving." Donald T. Stuss, Ph.D., Annual Conference, National Academy of Neuropsychology, November 4, 2015, Austin, TX. 1 CE Units.

2015    "The Ethical Practitioner: Assessing Executive Functioning in an Emotional World." Yana Suchy, Ph.D., Annual Conference, National Academy of Neuropsychology, November 4, 2015, Austin, TX. 2 CE Units.

2015    "Decision Making: The Role of the Evidence-Based Practitioner." Gordon Chelune, Ph.D., Annual Conference, National Academy of Neuropsychology, November 4, 2015, Austin, TX. 2 CE Units.

2015    "R-PAS Intermediate Level Workshop: Sharpening Coding, Administration, and Interpretation Skills." Philip Erdberg, Ph.D., ABPP & Donald Viglione, Ph.D., ABAP, October 24-25, 2015, San Francisco, CA. 13 CE Units.

2015    "Neuro-Oncology for Neuropsychologists." Michael W. Parson, Ph.D., ABPP, 13th Annual Conference, American Academy of Clinical Neuropsychology, June 19, 2015, San Francisco, CA. 3 CE Units.

2015    "Chronic Issues and Controversies in Mild TBI." Rodney D. Vanderploeg, Ph.D., ABPP & Heather G. Belanger, Ph.D., ABPP, 13th Annual Conference, American Academy of Clinical Neuropsychology, June 19, 2015, San Francisco, CA. 3 CE Units.

2015    "Multiple Performance & Symptom Validity Tests in Neuropsychological Assessment." Glenn J. Larrabee, Ph.D., ABPP & Jeremy J. Davis, Psy.D., ABPP, 13th Annual Conference, American Academy of Clinical Neuropsychology, June 18, 2015, San Francisco, CA. 3 CE Units.

2015    "Current Controversies in Neuropsychology Computerized Brain Training: What's the Evidence?" Aaron Nelson, Elkhonon Goldberg, & Robert S. Wilson, 13th Annual Conference, American Academy of Clinical Neuropsychology, June 18, 2015, San Francisco, CA. 1 CE Unit.

2015    "Advanced Neuropsychological Report Writing." Jacobus Donders, Ph.D., ABPP, 13th Annual Conference, American Academy of Clinical Neuropsychology, June 18, 2015, San Francisco, CA. 3 CE Units.

2015    "Development, Revision, and Implementation of the HCR-20 Version 3." Kevin Douglas, Ph.D., Consolidated Continuing Education and Professional Training (CONCEPT), February 4, 2015, Webinar (3 CE units).

2014    "Ethics: Informed Consent, Confidentiality, and Diagnosing." At Health, Inc. and PsychoEducational Resources, Inc. February 1, 2014. Online http://www.athealthce.com, (1 CE unit).

2014    "From Exner to R-PAS: Surviving the Transition." Andrew Pojman, Ed.D. & Barbara Peterson, Ph.D. The Wright Institute Continuing Education Program. February 1, 2014. Berkeley, CA (6 CE units).

2013    "Statistics 2: Inference and Association." Michelle Everson. The Institute for Statistics Education at Statistics.com. October 10, 2013 – November 11, 2013. (5 CE units).

2013    "Cognitive Science, Technology, and Neuropsychological Test Development: A Look at the Past and Future." Dean Delis, Ph.D. Annual Conference of the National Academy of Neuropsychology (NAN). October 18, 2013. San Diego, CA (2 CE credits).

## Professional Training (Continued):

2013     "Brains in the 'Cloud': The Amnesic Patients H.M., E.P. and the Digital Brain Library. Jacopo Annese, Ph.D. Annual Conference of the National Academy of Neuropsychology (NAN). October 18, 2013. San Diego, CA (2 CE credits).

2013     "Unfolding, Unfurling, and Unraveling: Imaging of Brain Development in Adolescence, Early, and Middle Adulthood." Monte S. Buchsbaum, M.D. Annual Conference of the National Academy of Neuropsychology (NAN). October 18, 2013. San Diego, CA (3 CE credits).

2013     "Conners Continuous Performance Test: Revised Version of the Visual Paradigm and New Audio Paradigm." Gill Sitarenios, Ph.D. & Kent Lam, Ph.D. Annual Conference of the National Academy of Neuropsychology (NAN). October 17, 2013. San Diego, CA (2 CE credits).

2013     "Scientific Update on Mild Traumatic Brain Injury (MTBI). New Evidence for Diagnosis and Management." Michael McCrea, Ph.D. Annual Conference of the National Academy of Neuropsychology (NAN). October 17, 2013. San Diego, CA (3 CE credits).

2013     "Early Detection of Alzheimer's Disease." Ronald C. Petersen, M.D., Ph.D. Annual Conference of the National Academy of Neuropsychology (NAN). October 16, 2013. San Diego, CA (1 CE credits).

2013     "Emotion, Decision-Making, and the Prefrontal Cortex Across the Lifespan." Daniel Tranel, Ph.D. Annual Conference of the National Academy of Neuropsychology (NAN). October 16, 2013. San Diego, CA (3 CE credits).

2013     "Forensic Neuropsychology: A Scientific Approach to Forensic Neuropsychology." Glenn J. Larrabee, Ph.D. Annual Conference of the National Academy of Neuropsychology (NAN). October 16, 2013. San Diego, CA (3 CE credits).

2013     "Statistics 1: Probability and Study Design." Michelle Everson. The Institute for Statistics Education at Statistics.com. September 11, 2013 – October 12, 2013. (5 CE units).

2013     "Schizophrenia: The Role of Symptom Domain on Patient Outcomes." Henry A. Nazralla, M.D. & Joseph P. McEvoy, M.D. MCE LLC. Online http://www.naccme.com/node/6424/course/6707/presentation, January 24, 2013 (1.5 CME).

2012     "Meyers Neuropsychological Battery and Meyers Neuropsychological Software System." John E. Myers, Psy.D., ABN, ABPdN. The American College of Professional Neuropsychology, June 15-16, 2012. Irvine, CA (12 CE credits).

2011     "Introduction to the Rorschach Performance Assessment System: Practical Clinical Training and Case Illustrations." Donald Viglione, Ph.D. & Philip Erdberg, Ph.D. Alliant International University, June 3 & 4, 2011. San Francisco, CA (12.5 CE credits)

2011     "Biopsychosocial Outcome from Mild Traumatic Brain Injury." Grant Iverson, Ph.D. The American College of Professional Neuropsychology, March 12, 2011. Las Vegas, NV. (3 CE credits)

2011     "Reframing Nonverbal Learning Disorders: Identifying Clinical Subgroups." Gail M. Grodzinsky, Ph.D., ABPdN. The American College of Professional Neuropsychology, March 12, 2011. Las Vegas, NV. (3 CE credits)

2011     "From Movement to Thought: Subcortical Contributions to Psychiatric and Learning Disorders." Dana Chidekel, Ph.D., ABPdN & Deborah E. Budding, Ph.D., ABPdN, ABN. The American College of Professional Neuropsychology, March 11, 2011. Las Vegas, NV. (3 CE credits)

2011     "Neuropsychological Science and Forensic Competencies: Applications in Civil and Criminal Cases." Daniel A. Martell, Ph.D., A.B.P.P. The American College of Professional Neuropsychology, March 11, 2011. Las Vegas, NV. (3 CE credits)

2010     "Neuroanatomical Dissection: Human Brain and Spinal Cord." William E. Cullinan, Ph.D., David A. Baker, Ph.D., Subhash C. Bhatnagar, M.S.-CCC (SPL), Ph.D., James P. Herman, Ph.D., John R. Mantsch, Ph.D., & Robert C. Thompson, Ph.D. Marquette University, July 15 – 17, 2010. (21 hours)

2010     "Finding Balance: Legal & Ethical Issues of Boundaries & Privacy in Psychotherapeutic Services." Daniel Taube, J.D., Ph.D. John F. Kennedy University, March 12, 2010. Campbell, CA. (6 C.E. credits)

## PROFESSIONAL TRAINING (CONTINUED):

2010 "Neuropsychology and the Death Sentenced Inmate." Michael B. Charlton, J.D. Annual Conference of the American College of Professional Neuropsychology, February 27, 2010. Las Vegas, NV. (3 C.E. credits)

2010 "Introduction to Empirically Based Assessment: Developing an EBA Model for AD/HD." Steven J. Hughes, Ph.D., LP, ABPnN. Annual Conference of the American College of Professional Neuropsychology, February 27, 2010. Las Vegas, NV. (3 C.E. credits)

2010 "Central Auditory Processing in Children and Adolescents." Teresa Bailey, Ph.D., Ph.D. Annual Conference of the American College of Professional Neuropsychology, February 26, 2010. Las Vegas, NV. (3 C.E. credits)

2010 "What the Forensic Neuropsychologist Needs to Know about Death Penalty Litigation." Thomas J. Reidy, Ph.D., ABPP. Annual Conference of the American College of Professional Neuropsychology, February 26, 2010. Las Vegas, NV. (3 C.E. credits)

2010 "Reitan Society Meeting." Ralph Reitan, Ph.D., Deborah Wolfson, Ph.D., Jim Hom, Ph.D., & Janice Nice, Ph.D., February 24-25, 2010. Las Vegas, NV. (12 C.E. credits)

2009 "WAIS-IV/WMS-IV and the Advanced Clinical Solutions for WAIS-IV/WMS-IV: Clinical Application and Interpretation in Neurological and Psychiatric Disorders." James A. Holdnack, Ph.D. 29th Annual Conference of the National Academy of Neuropsychology, November 14, 2009. New Orleans, LA. (3 C.E. credits)

2009 "Neuroimaging Evidence in the Criminal Trial Process: Recent Developments, the Role of Attitudes, Some Unasked Questions, and Predictions for the Future." Michael L. Perlin, J.D. 29th Annual Conference of the National Academy of Neuropsychology, November 12, 2009. New Orleans, LA. (3 C.E. credits)

2009 "Psychometrics: Making Test Classification Decisions Practical." Richard Frederick, Ph.D. 29th Annual Conference of the National Academy of Neuropsychology, November 12, 2009. New Orleans, LA. (3 C.E. credits)

2009 "Functional Neuroanatomy of Memory: Three Amnesias or One?" Russell M. Bauer, Ph.D. 29th Annual Conference of the National Academy of Neuropsychology, November 11, 2009. New Orleans, LA. (3 C.E. credits).

2008 "Law and Ethics." Daniel O. Taube, J.D., Ph.D. John F. Kennedy University, March 10, 2006. Pleasant Hill, CA. (6 APA CE units).

2007 "Useful Clinical Ratings of CT and MRI in the Clinical Practice of Neuropsychology." Erin Bigler, Ph.D. 27th Annual Conference of the National Academy of Neuropsychology, November 14-17, 2007. Scottsdale, AZ (3 CE Credits).

2007 "The Amazing Halstead Finger Oscillation Test." George Prigatano, Ph.D. 27th Annual Conference of the National Academy of Neuropsychology, November 14-17, 2007. Scottsdale, AZ (3 CE Credits).

2007 "Introducing the MMPI-2-RF (Restructured Form)." Yossef Ben-Porath, Ph.D. 27th Annual Conference of the National Academy of Neuropsychology, November 14-17, 2007. Scottsdale, AZ (3 CE Credits).

2007 "Behavioral Teratology: Neuropsychological Effects of Prenatal Exposures. Sarah N. Mattson, Ph.D. 27th Annual Conference of the National Academy of Neuropsychology, November 14-17, 2007. Scottsdale, AZ (1.5 CE Credits).

2007 "Releasing Raw Data and Psychological Test Materials: Ethical Dilemmas, Legal Requirements, and Simple Solutions to Discovery Demands." Paul Kaufmann, J.D., Ph.D. 27th Annual Conference of the National Academy of Neuropsychology, November 14-17, 2007. Scottsdale, AZ (1.5 CE Credits).

2007 "The Neurobiology of Antisocial, Violent, and Psychopathic Behavior." Adrian Raine, Ph.D. 27th Annual Conference of the National Academy of Neuropsychology, November 14-17, 2007. Scottsdale, AZ (3 CE Credits).

2007 "Forensic Evaluation." Institute of Law, Psychiatry and Public Policy, School of Medicine & School of Law, University of Virginia under contract for the Virginia Department of Mental Health, Mental Retardation and Substance Abuse Services and the Office of the Attorney General, April 30 - May 4, 2007, Charlottesville, VA (30 APA CE Units).

## PROFESSIONAL TRAINING (CONTINUED):

2006    "Deepening Legal and Ethical Understanding in Clinical Practice." Daniel O. Taube, J.D., Ph.D. John F. Kennedy University, March 10, 2006. Pleasant Hill, CA. (6 APA CE units).

2004    "Assessment of Response Bias: Beyond Malingering Tests." Scott R. Millis, 24th Annual Conference of the National Academy of Neuropsychology, November 17-20, 2004. Seattle, WA. (3 APA CE units).

2004    "Neurochemistry and Medication Management of Aggression in Children, Adolescents, and Adults." Daniel Matthews, M.D. 24th Annual Conference of the National Academy of Neuropsychology, November 17-20, 2004. Seattle, WA. (3 APA CE Units).

2004    "Constitutional/Judicial Foundations for Criminal Forensic Neuropsychology: Competency to Stand Trial and Confess." Robert L. Denny, Psy.D. & James Sullivan, Ph.D., 24th Annual Conference of the National Academy of Neuropsychology, November 17-20, 2004. Seattle, WA. (3 APA CE Units).

2004    "Professional Issues." Antonio Puente, Leslie Rosenstein, & Patricia Pimental, 24th Annual Conference of the National Academy of Neuropsychology, November 17-20, 2004. Seattle, WA. (1.0 APA CE Units).

2004    "Pediatric Brain Injury: Neuroimaging, Clinical Presentation, and Neuropsychological Status, Dr. Paul C. Lebby, 24th Annual Conference of the National Academy of Neuropsychology, November 17-20, 2004. Seattle, WA. (3 APA CE Units).

2004    "What neuropathology can teach us about the neurobiology of the self." Todd Feinberg, 24th Annual Conference of the National Academy of Neuropsychology, November 17-20, 2004. Seattle, WA. (1.5 APA CE Units).

2004    "Imaging brain circuitry in the clinical neuropsychology of memory: fMRI, morphometry & DTI. Andrew J. Saykin, 24th Annual Conference of the National Academy of Neuropsychology, November 17-20, 2004. Seattle, WA. (3 APA CE Units).

2004    "Workshop in Clinical Neuropsychology: Significant Developments and Advanced Clinical Issues." Ralph Reitan, Deborah Wolfson, Jim Hom et al. Reitan Neuropsychology Laboratories, October 1-3, 2004. Phoenix, AZ (17 APA CE Units).

2004    "Spousal/Partner Abuse Assessment and Treatment: Domestic Violence Training." John F. Kennedy University, February 20, 2004. Pleasant Hill, CA. (7 APA CE unites).

2004    "6-Hour Ethics and the Law." Daniel O. Taube, J.D., Ph.D. John F. Kennedy University, February 6, 2004. Pleasant Hill, CA. (6 APA CE units).

2003    "A New Anatomical Framework for Neuropsychiatric Disorders: Systems Analysis and Hands-On Dissection of the Human Brain." Lennart Heimer, M.D. Saint Louis University School of Medicine Practical Anatomy Workshop, October 31-November 2, 2003. St. Louis, MO. (17 APA CE units).

2003    "Practical Issues and Clinical Methods of Practice with the Wechsler Scales." David Tulsky, Gordon Chelune & Josette Harris, 23rd Annual Conference of the National Academy of Neuropsychology, October 15-18, 2003. Dallas, TX. (3 APA CE units).

2003    "New Scores and Methods of Practice with the Wechsler Scales." Gordon Chelune, David Tulsky & Josette Harris, 23rd Annual Conference of the National Academy of Neuropsychology, October 15-18, 2003. Dallas, TX. (3 APA CE units).

2003    "Race and Education in Neuropsychological Testing." Jennifer Manly, 23rd Annual Conference of the National Academy of Neuropsychology, October 15-18, 2003. Dallas, TX. (3 APA CE units).

2003    "Neuropsychological Impairment and Environmental Risk Factors in Capital Murder Offenders." Robert A. Geffner, Elizabeth Lim, Barbara Hart & Robert Owen, 23rd Annual Conference of the National Academy of Neuropsychology, October 15-18, 2003. Dallas, TX.

2003    "Functional Neuroanatomy Primer: Clinical Presentation of Patients with Neuropsychological Conditions." Paul Lebby, Ph.D., 23rd Annual Conference of the National Academy of Neuropsychology, October 15-18, 2003. Dallas, TX.

## PROFESSIONAL TRAINING (CONTINUED):

2003 "The Atkins Decision and the Forensic Evaluation of Mental Retardation: Roles for the Neuropsychologist and Special Educator." J. Randall Price & Kay Stevens, 23rd Annual Conference of the National Academy of Neuropsychology, October 15-18, 2003. Dallas, TX. (3 APA CE units).

2003 "Increasing Diagnostic and Predictive Accuracy in Neuropsychology." David Faust, Ph.D., 2003 23rd Annual Conference of the National Academy of Neuropsychology, October 15-18, 2003. Dallas, TX. (3 APA CE units).

## PUBLICATIONS:

Thoma, J., & Watson, D. (2018). Working with Experts. In E. Kelley (Ed.) *Representing people with mental disabilities: A practical guide for criminal defense lawyers.* Chicago: American Bar Association.

Watson, D. G. (2015). Intelligence Testing. In E. A. Polloway (Ed.), *The death penalty and intellectual disability* (pp. 113-140). Washington, DC: American Association on Intellectual and Developmental Disabilities (AAIDD).

Blank, J., Evered, L., Watson, D., & Ruff, R. (2014). C-87Malingering Madness: Distress as a Diagnostic Alternative (Abstract). Archives of Clinical Neuropsychology, 29(6), 605.

McGrew, K.S., & Watson, D.G. (2012). Applied Psychometrics 101 Brief #14. Demographically adjusted neuropsych (Heaton) norm-based scores inappropriate for MR/ID dx. *Intellectual competence and the death penalty.* Retrieved from http://www.atkinsmrdeathpenalty.com/2012/07/ap-101-brief-14-demographically.html

Abueg, F., Woods, G.W., & Watson, D.G. (2000). Disaster Trauma. In Frank M. Dattillio & Arthur Freeman (Eds.) *Cognitive Behavioral Strategies in Crisis Intervention, Second Edition.* New York, N.Y.: Guilford Press.

Bastien, S., Peterson, D. & Watson, D.G. (1996). IQ abnormalities associated with chronic fatigue syndrome in repeated WAIS-R testing (Abstract). *Journal of Chronic Fatigue Syndrome,* 2(2/3).

## PRESENTATIONS:

2018 "Adolescent Brain Development." Presented at the Habeas Corpus Resource Center Fall Conference. Habeas Corpus Resource Center. October 11, 2018. San Francisco, CA.

2018 "Red flags for brain damage." Co-presented with Emily Paavola. Fifteenth National Seminar on the Development and Integration of Mitigation Evidence: Mitigation Updates – Neuroscience and More. Administrative Office of the US Courts. April 21, 2018. Miami Dadeland, FL.

2018 "Testing issues in Atkins cases, including clients whose native language is not English." Fifteenth National Seminar on the Development and Integration of Mitigation Evidence: Mitigation Updates – Neuroscience and More. Administrative Office of the US Courts. April 20, 2018. Miami Dadeland, FL.

2018 "Emerging Issues in Neuropsychology" Co-presented with Sean O'Brien. 2018 Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 17, 2018. Monterrey, CA.

2017 "Neuropsychological Development and Presenting Findings." Co-presented with Sean O'Brien. 2017 Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 18, 2017. San Diego, CA.

2017 "Neuropsychological Assessment: Overview of a Competent Assessment." Co-presented with Denise Gragg, Esq. 2017 Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 18, 2017. San Diego, CA.

2016 "New Issues in Atkins Cases." Co-presented with James Patton, Ed.D., & Sara Coebra. 13th National Seminar on the Development & Integration of Mitigation Evidence. Administrative Offices of the U.S. Courts. April 2, 2016. New Orleans, LA.

2016 "Traumatic Brain Injury." Co-presented with Jackie Walsh, Esq. CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 14, 2016. San Diego, CA.

## PRESENTATIONS (CONTINUED):

2016    "Emerging Issues in Neuropsychology." Co-presented with Michael Laurence, Esq. CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 14, 2016. San Diego, CA.

2015    "Neuropsychological Assessment." National Association of Criminal Defense Lawyers' Seminar, "Making the Case for Life," August 22, 2015, Las Vegas, NV.

2015    "Working with Mental Health Experts." Co-presented with Mark Olive, Esq. National Association of Criminal Defense Lawyers' Seminar, "Making the Case for Life," August 22, 2015, Las Vegas, NV.

2015    *"Atkins, Hall, and Brumfield."* Co-presented with Mark Olive, Esq. National Association of Criminal Defense Lawyers' Seminar, "Making the Case for Life," August 22, 2015, Las Vegas, NV.

2015    "Litigating Intellectual Disability Post-Hall: *Atkins, Hall, and Brumfield."* Co-presented with Stephen Harper, Esq. 36th Annual Death Penalty Training Conference, Airlie Conference Center, July 12, 2015, Warrenton, VA.

2015    "Understanding (and Avoiding the Pitfalls of) Neuroimaging." Twelfth National Seminar on the Development and Integration of Mitigation Evidence. Habeas Assistance and Training Counsel/Administrative Offices of the United States Courts. April 12, 2015, Baltimore, MD.

2015    "An Overview of IQ Scores and Testing." Twelfth National Seminar on the Development and Integration of Mitigation Evidence. Habeas Assistance and Training Counsel/Administrative Offices of the United States Courts. April 10, 2015, Baltimore, MD.

2015    "Litigating Atkins Claims at Trial and on Post-conviction Review." Co-presented with Mark Olive, Esq. CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 14, 2015. Monterey, CA.

2015    "Advanced Issues in Neuropsychology, including Presenting Data." Co-presented with Michael Laurence, Esq. CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 14, 2015. Monterey, CA.

2014    "Neuropsychological Assessment." Making the Case for Life conference. National Association of Criminal Defense Lawyers (NACDL). October 25, 2014. Charlotte, NC.

2014    "Intellectual Disability." CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 15, 2014. Monterey, CA.

2014    "Emerging Trends in Neuropsychology." Co-presented with Michael Laurence, Esq. CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 15, 2014. Monterey, CA.

2013    "What is Mental Retardation/Intellectual Disability?" Co-presented with Michael Burt, Esq. CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 16, 2013. Monterey, CA.

2013    "Neuropsychology 201: Neuropsychological Testing." Co-presented with Michael Laurence, Esq. CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 16, 2013. Monterey, CA.

2013    "Neuropsychology 301: Presenting Neuropsychological Evidence." Co-presented with Michael Laurence, Esq. CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 16, 2013. Monterey, CA.

2012    "Psychosis Risk and Attenuated Psychosis Syndromes: Current Understanding." Contra Costa Psychological Association. October 10, 2012 (2 CE units).

## PRESENTATIONS (CONTINUED):

2011    "Atkins and Neuro-Psychological Testing." Co-presented with Mark Olive, Esq. Capital Case Litigation Training Conference, Office of the Public Defender of the State of Delaware. October 13, 2011, Dover, Delaware.

2011    "The Neuropsychology of Fetal Alcohol Spectrum Disorders." Capital Mitigation – Beyond Atkins. Center for American and International Law. July 9, 2011. Houston, TX.

2011    "Uncovering Evidence of Brain Damage: Phineas Gage." Co-presented with Richard Burr, Esq. and Russell Stetler, National Mitigation Coordinator. National Capital Habeas Unit (CHU) Conference. Administrative Office of the United States Courts. April 8, 2011. Austin, TX.

2011    "Testing Issues in Intellectual Disability/*Atkins* Cases." Eighth National Seminar on the Development and Integration of Mitigation Evidence: Mitigation Narratives. Habeas Assistance and Training Counsel/Administrative Offices of the United States Courts. April 2, 2011, Chicago, IL.

2011    "Winning *Atkins* hearings: Case Studies." Co-presented with Michael Burt, Esq. Eighth National Seminar on the Development and Integration of Mitigation Evidence: Mitigation Narratives. Habeas Assistance and Training Counsel/Administrative Offices of the United States Courts. April 2, 2011, Chicago, IL.

2011    Plenary Presentation: "DSM-5 (Psychosis Risk Syndrome/Intellectual Disability)." CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 20, 2011. Monterey, CA.

2011    "Cross Examination of a Defense Mental Retardation/Intellectual Disability Expert." Co-presented with Edward Souza, J.D. CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 19, 2011. Monterey, CA.

2011    "Basic Neuropsychology (Brain Dysfunction)." CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 19, 2011. Monterey, CA.

2011    "Current Issues in Neuropsychology." Fourth National Seminar on Mental Health and the Criminal Law. Habeas Assistance and Training Counsel/Administrative Office of the United States Courts. January 15, 2011. New Orleans, LA.

2010    "DSM-5: Proposed Changes." Habeas Corpus Resource Center Spring Conference. Habeas Corpus Resource Center. May 17, 2010. San Francisco, CA.

2010    "Neuropsychology of Mental Retardation." CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 14, 2010. Monterey, CA.

2010    "Model Direct of a Mental Retardation Neuropsychologist." Co-presented with Edward Sousa, J.D. CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 14, 2010. Monterey, CA.

2009    "Presenting a Reason to Vote for Life via the Testimony of a Neuropsychologist." 2009 Death Penalty Defense Seminar. Oregon Criminal Defense Lawyers Association (OCDLA), October 23, 2009, Bend, Oregon.

2009    "The Neuropsychology of Intellectual Disabilities: Current Research on Intellectual Impairment." 14th Annual Federal Habeas Corpus Seminar. Administrative Offices of the U.S. Courts. August 22, 2009, Pittsburgh, PA.

2009    "The Neuropsychology of Schizophrenia." 14th Annual Federal Habeas Corpus Seminar. Administrative Offices of the U.S. Courts. August 22, 2009, Pittsburgh, PA.

2009    "Testing and Other Psychological Issues." Habeas Corpus Resource Center Spring Conference. Habeas Corpus Resource Center. June 19, 2009. San Francisco, CA.

2009    Plenary Presentation: "The Neuropsychology of Intellectual Disabilities: Current Research on Intellectual Impairment." Fifth National Seminar on the Development and Integration of Mitigation Evidence. Administrative Offices of the U.S. Courts. April 18, 2009, Philadelphia, PA.

2009    "Neuropsychological Assessment and Brain Impairment." Life in the Balance 2009. The National Legal Aid & Defender Association. March 7, 2009. New Orleans, LA.

2009    "Mental Health/Mental Retardation Testing." Life in the Balance 2009. The National Legal Aid & Defender Association. March 7, 2009. New Orleans, LA.

2009    Plenary Presentation: "The Neuropsychology of Psychiatric Disorders – Schizophrenia." CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 15, 2009. Monterey, CA.

2009    "New Developments in Psychological Testing." CACJ/CPDA Capital Case Defense Seminar.  California Attorneys for Criminal Justice/California Public Defender Association. February 15, 2009. Monterey, CA.

2008    "Executive Functioning." 2008 Capital Case Seminar. Los Angeles County Public Defender. October 17, 2008. Los Angeles, CA.

2008    "Recent Developments in the Science of Brain Damage and Observations on Interviewing Experts." Mitigation Workshop. Virginia Capital Representation Resource Center (VCCRC). September 25, 2008. Charlottesville, VA.

2008    "Intellectual Disabilities: IQ and Adaptive Functioning Evaluation." Life in the Balance 2008: Defending Death Penalty Cases. The National Legal Aid & Defender Association. March 8, 2008. Atlanta, GA.

2008    "Neuropsychological Evaluation." Life in the Balance 2008: Defending Death Penalty Cases. The National Legal Aid & Defender Association. March 8, 2008. Atlanta, GA.

2007    "The Roles of Psychology and Neuropsychology in Forensic Evaluations." Second Annual Solano County Public Defender Felony Transition Seminar. Office of the Solano County Public Defender. September 28, 2007. Fairfield, CA.

2007    "Attacks on Neuropsychological Norms." National Seminar on the Development and Integration of Mitigation Evidence in Capital Cases. Administrative Office of the US Courts. March 30, 2007. Washington, D.C.

2007    "Intelligence Testing." National Seminar on the Development and Integration of Mitigation Evidence in Capital Cases. Administrative Office of the US Courts. March 30, 2007. Washington, D.C.

2007    "Neuropsychological Evaluation: The Impact of Norms." 2007 CACJ/CPDA Capital Case Defense Seminar.  February 18, 2007. Monterey, CA.

2007    "Frontal and Temporal Brain Systems and Functions." Co-presented with Karen Froming, Ph.D. 2007 CACJ/CPDA Capital Case Defense Seminar. February 18, 2007. Monterey, CA.

2006    "Neuropsychological Assessment." Making the Case for Life IX: Mitigation and Jury Selection in Capital Cases. National Association of Criminal Defense Lawyers and the Southern Center for Human Rights. September 30, 2006. Las Vegas, NV.

2006    "Foundations of Neuropsychology." First Annual Felony Transition College. Solano County Public Defender's Office. June 23, 2006. Fairfield, CA.

2006    "Psychological and Neuropsychological Testing." Motions, Evidence & Expert Witnesses. The Center for American and International Law. May 21, 2006. Plano, TX.

2006    "Brain, Behavior, and Cognition." Co-Presented with James R. Merikangas, M.D. National Seminar on the Development and Integration of Mitigation Evidence. Administrative Offices of the U.S. Courts. April 28, 2006. Washington, DC.

## PRESENTATIONS (CONTINUED):

2005　　"Executive Functions." Second National Seminar on Development and Integration of Mitigation Evidence. Administrative Office of the U.S. Courts. April 22, 2005. Salt Lake City, UT.

2005　　"Law and the Brain – The Neurobiology of Violence." Washington State Appellate Courts Spring Judicial Conference. April 6, 2005. Walla Walla, WA.

2005　　"Mental Retardation." Texas Criminal Defense Lawyers Association. February 23 & 24, 2005. Dallas, TX.

2005　　"Neuropsychological Evaluation." 2005 CACJ/CPDA Capital Case Defense Seminar. February 21, 2005. Monterey, CA.

2005　　"Mental Retardation." CACJ/CPDA Capital Case Defense Seminar. February 21, 2005. Monterey, CA.

2004　　"Developmental Aspects of Executive Functions." 2004 CACJ/CPDA Capital Case Defense Seminar. February 15, 2004. Monterey, CA.

2004　　"Advanced Determination of Competency – A Case Study (Workshop)." Co-presented with John Philipsborn and Judge Michael Ryan. 2004 CACJ/CPDA Capital Case Defense Seminar. February 15, 2004. Monterey, CA.

2003　　"Update on IQ Testing: Neuropsychology for the 21st Century." Paper presented with George W. Woods, M.D. at the 2003 Annual Meeting of the American Academy of Psychiatry and the Law (AAPL), October 19, 2003, San Antonio, TX.

2003　　"The Subtlety of IQ Testing." 8th Annual National Federal Habeas Corpus Seminar. Administrative Office of the United States Courts and Habeas Assistance and Training Counsel. Chicago, IL.

2003　　"Mental Retardation." Investigating Capital Cases Seminar. Virginia Capital Representation Resource Center. Charlottesville, VA.

## DISSERTATION:

"Screening for Neurotoxicity: A Comparison of the Neurobehavioral Evaluation System and the California Neuropsychological Screening Battery"

## PROFESSIONAL AFFILIATIONS:

International:　　Member, International Neuropsychological Society (2004-present)
　　　　　　　　Member, International Society for Intelligence Research (2011-present)
National:　　　Member, American Psychological Association (1988-present).
　　　　　　　　Member, Division 12 (Society of Clinical Psychology), Section IX (Assessment)
　　　　　　　　Member, Division 33 (Intellectual and Developmental Disabilities)
　　　　　　　　Member, Division 40 (Clinical Neuropsychology)
　　　　　　　　Member, Division 41 (American Psychology - Law Society)
　　　　　　　　Member, National Academy of Neuropsychology (1995-present)
　　　　　　　　　　Associate Member (1983-1994)
　　　　　　　　Member, the Reitan Society (1998-2006)
　　　　　　　　Member, American Association on Intellectual and Developmental Disabilities (2007-present)
　　　　　　　　Member, Society for Personality Assessment (2009-present)

## HOSPITAL PRIVILEGES:

2000-2003　　Doctors Medical Center – San Pablo Campus
1991-2003　　Doctors Medical Center – Pinole Campus
1992-1997　　East Bay Hospital, Richmond, CA.
1993-1995　　First Hospital of Vallejo

## LICENSES, QUALIFICATIONS AND CERTIFICATES:

| | |
|---|---|
| 1990-Present | State of California Licensed Psychologist (PSY11899) |
| 2018-2020 | Association of State and Provincial Psychology Boards Interjurisdictional Practice Certificate (IPC) (Valid in Georgia, Idaho, Kentucky, Mississippi, Ohio, and South Carolina) #4462 |
| 2018-2019 | State of Oregon Visitor's Permit OAR 858-010-0055 |
| 2018-2019 | State of Texas Temporary License NTLP-18-0030 |
| 2017-2018 | State of Oregon Limited Visitor's Permit 348 |
| 2017-2018 | State of Washington Temporary Permit TE600672389 |
| 2016-2018 | Association of State and Provincial Psychology Boards Interjurisdictional Practice Certificate (IPC) (Valid in Georgia, Idaho, Kentucky, Mississippi, Ohio, and South Carolina) #4462 |
| 2016-2017 | State of Nevada Non-Resident Consultant Permit. |
| 2016 | State of Louisiana Temporary Registration |
| 2016 | State of Idaho Temporary License No PSYT - 202955 |
| 2016 | State of Oregon Limited Visitor's Permit 309 |
| 2015-2016 | State of Texas Temporary License NTLP-15-0002 |
| 2014-2016 | State of Indiana Limited Scope License No. 99065119A |
| 2014-2015 | State of Alaska Courtesy License No 33 |
| 2014-2015 | State of Mississippi Temporary Practice Certificate |
| 2012 | State of Texas Temporary License TLP-13-0008 |
| 2012 | State of Texas Temporary License TLP-13-0003 |
| 2012-2014 | State of Indiana Limited Scope License No. 99054133A |
| 2012-2013 | State of Oregon Psychology Visitor's Permit No. 218 |
| 2012 | State of Louisiana Temporary Registration |
| 2011-2012 | State of Indiana Limited Scope License No. 99048551A |
| 2011 | State of Texas Psychology Temporary License No. TLP-11-0023 |
| 2010 | State of Louisiana Temporary Registration |
| 2010-2011 | State of Washington Psychology Temporary Permit (Credential #: TE 60072389) |
| 2010 | State of Texas Psychology Temporary License No. TLP-10-0019 |
| 2009-2010 | State of Washington Psychology Permit (Credential #: TE 60072389) |
| 2007 | State of Texas Psychology Temporary License No. TLP-07-0014; TLP-07-0015 |
| 2007 | State of Texas Psychology Temporary License No. TLP-07-0009; TLP-07-0012 |
| 2003-2004 | State of Washington Psychology Permit (030503) |
| 2002-2004 | State of Oregon Psychology Permit (LP 077) |
| 2001-2002 | State of Washington Psychology Permit (010903) |
| 1992-1994 | Qualified Medical Examiner / Psychology (State of California Industrial Medical Council # 009321) |

*References on request*